Robert V. Prongay (SBN 270796)
  rprongay@glancylaw.com
Charles H. Linehan (SBN 307439)
  clinehan@glancylaw.com
Pavithra Rajesh (SBN 323055)
  prajesh@glancylaw.com
GLANCY PRONGAY WOLKE & ROTTER LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Plaintiff Apurva Bhuva*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| APURVA BHUVA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SUPER MICRO COMPUTER, INC., CHARLES LIANG, and DAVID WEIGAND,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT

Plaintiff Apurva Bhuva ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Super Micro Computer, Inc. ("Super Micro" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Super Micro; and (c) review of other publicly available information concerning Super Micro.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired Super Micro securities between April 30, 2024 and March 19, 2026, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Super Micro is technology company which designs, develops, and manufactures high-performance server and storage systems, primarily for artificial intelligence ("AI"), data center, and cloud solutions customers. The Company's offerings include complete servers, storage systems, modular blade servers, workstations, full rack-scale solutions, networking devices, server sub-systems, and server management software. Super Micro's manufacturing operations are principally conducted from its headquarters in San Jose, California, with additional facilities in Taiwan. The Company's flagship products are servers that integrate Nvidia Corporation's graphics processing units ("GPUs") and are subject to strict U.S. export controls barring their sale to China without a license.

3. On March 19, 2026, after the market closed, the U.S. Justice Department announced the unsealing of an indictment against three individuals associated with Super Micro for engaging in a "scheme to divert massive quantities of servers housing U.S. artificial intelligence technology to customers in China" in violation of U.S. export control laws. The announcement stated these activities were done "*all to drive sales and generate revenues in violation of U.S. law*" and enabled

the sale of *"approximately $2.5 billion worth of servers"* between 2024 and 2025.[1] According to the DOJ, Yih-Shyan Liaw (the Company's co-founder, director, and Senior Vice President of Business Development), Ruei-Tsang Chang ("a general manager in the [Super Micro's] Taiwan office," and Ting-Wei Sun ("a third-party broker and "fixer") *"conspired to systematically divert [Super Micro's] servers with certain GPUs to China without a license to do so from the U.S. Department of Commerce*." According to media reports, the GPUs are Nvidia's most advanced AI chips.

4.    On the same date, Super Micro released a statement seeking to distance itself from the indictment by noting that the Company has not directly been named a defendant in the Justice Department action. However, the Company confirmed that the charged individuals had been affiliated with Super Micro, stating that the two employees were placed on administrative leave and the contractor's relationship was terminated. The statement claimed the "Company has been cooperating fully with the government's investigation and will continue to do so."

5.    On this news, Super Micro's stock price fell $10.26, or 33.3%, to close at $20.53 per share on March 20, 2026, on unusually heavy trading volume.

6.    Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (1) a significant portion of the Company's sales of servers were to companies based in China; (2) these transactions violated U.S. export control laws; (3) there were material weaknesses in the Company's controls to ensure compliance with applicable export control laws and regulations; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

7.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

**JURISDICTION AND VENUE**

8.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

11.      In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

12.      Plaintiff Apurva Bhuva, as set forth in the accompanying certification, incorporated by reference herein, purchased Super Micro securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13.      Defendant Super Micro is incorporated under the laws of Delaware with its principal executive offices located in San Jose, California. Super Micro's common stock trades on the NASDAQ exchange under the symbol "SMCI."

14.      Defendant Charles Liang ("Liang") was the Company's Chief Executive Officer ("CEO") at all relevant times. He co-founded the Company in September, 1993.

15. Defendant David Weigand ("Weigand") was the Company's Chief Financial Officer ("CFO") at all relevant times.

16. Defendants Liang and Weigand (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

17. Super Micro is technology company which designs, develops, and manufactures high-performance server and storage systems, primarily for AI, data center, and cloud solutions customers. The Company's offerings include complete servers, storage systems, modular blade servers, workstations, full rack-scale solutions, networking devices, server sub-systems, and server management software. Super Micro's manufacturing operations are principally conducted from its headquarters in San Jose, California, with additional facilities in Taiwan.

### Materially False and Misleading
### Statements Issued During the Class Period

18. The Class Period begins on April 30, 2024. On that day, Super Micro issued a press release announcing financial results for the quarter ended March 31, 2024.[2] The press release touted

---

[2] The Company's fiscal year runs from July 1st to June 30th.

the Company's financial results, as well as the purported drivers of the Company's sales growth. Specifically, the press release stated as follows, in relevant part:

**Third Quarter Fiscal Year 2024 Highlights**

•Net sales of $3.85 billion versus $3.66 billion in the second quarter of fiscal year 2024 and $1.28 billion in the same quarter of last year.

•Gross margin of 15.5% versus 15.4% in the second quarter of fiscal year 2024 and 17.6% in the same quarter of last year.

•Net income of $402 million versus $296 million in the second quarter of fiscal year 2024 and $86 million in the same quarter of last year.

\*　　　　　　\*　　　　　　\*

"We had yet another record quarter with fiscal Q3 revenue of $3.85 billion with non-GAAP EPS of $6.65 per share. This year-over-year revenue growth of 200% and year-over-year non-GAAP EPS growth of 308% was well above our industry peers," said Charles Liang, President and CEO of Supermicro. "Strong demand for AI rack scale PnP solutions, along with our team's ability to develop innovative DLC designs, enabled us to expand our market leadership in AI infrastructure. As new solutions ramp, including fully production ready DLC, we expect to continue gaining market share. As such, we are raising our fiscal year 2024 revenue outlook from $14.3 to $14.7 billion to a new range of $14.7 to $15.1 billion."

19.　　On May 6, 2024, the Company submitted its quarterly report for the period ended March 31, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The quarterly report further purported to state the Company's net sales by product type and describe the alleged drivers of the Company's increase in net sales, including those sales attributed to major customers. Specifically, the quarterly report stated as follows, in relevant part:

| | Three Months Ended March 31, | | Change | | Nine Months Ended March 31, | | Change | |
|---|---|---|---|---|---|---|---|---|
| | 2024 | 2023 | $ | % | 2024 | 2023 | $ | % |
| Server and storage systems | $ 3,698.5 | $ 1,163.7 | $ 2,534.8 | 217.8 % | $ 9,100.7 | $ 4,537.7 | $ 4,563.0 | 100.6 % |
| Percentage of total net sales | 96.1 % | 90.7 % | | | 94.5 % | 91.9 % | | |
| Subsystems and accessories | $ 151.6 | $ 119.6 | $ 32.0 | 26.8 % | $ 534.0 | $ 400.9 | $ 133.1 | 33.2 % |
| Percentage of total net sales | 3.9 % | 9.3 % | | | 5.5 % | 8.1 % | | |
| Total net sales | $ 3,850.1 | $ 1,283.3 | $ 2,566.8 | 200.0 % | $ 9,634.7 | $ 4,938.6 | $ 4,696.1 | 95.1 % |

\*　　　　　　\*　　　　　　\*

*Comparison of Three Months Ended March 31, 2024 and 2023*

**The period-over-period increase in overall net sales is driven by an increase in demand from customers for GPU servers**, HPC, and rack-scale solutions which have higher ASPs, **especially for large enterprise and data center customers from the United States and Asia sales where they have experienced significant growth. The**

*period-over-period increase of net sales in Asia, Europe and other regions is mainly due to an increase in net sales in Singapore, Taiwan, Germany and South Africa.*

Customer A accounted for 21.2% and customer B accounted for 16.8% of the net sales for the three months ended March 31, 2024. Customer A accounted for 10.7% of the net sales for the three months ended March 31, 2023. We expect to continue to have customers exceeding 10% of net sales in future quarters.

*Comparison of Nine Months Ended March 31, 2024 and 2023*

The period-over-period increase in overall net sales is driven by an increase in demand from customers for GPU servers, HPC and rack-scale solutions which have higher ASPs, especially for large enterprise and data center customers from the United States. The period-over-period increase of net sales in Asia and other regions is mainly due to an increase in net sales in Taiwan, Singapore, Canada and South Africa.

Customer A accounted for 23.7% of the net sales for the nine months ended March 31, 2024. Customer C accounted for 11.8% of the net sales for the nine months ended March 31, 2023. We expect to continue to have customers exceeding 10% of net sales in future quarters.

20.    On August 6, 2024, Super Micro issued a press release announcing financial results for the quarter and fiscal year ended June 30, 2024. The press released touted the Company's financial results, as well as the purported drivers of the Company's sales growth. Specifically, the press release stated as follows, in relevant part:

**Fourth Quarter of Fiscal Year 2024 Highlights**

•Net sales of $5.31 billion versus $3.85 billion in the third quarter of fiscal year 2024 and $2.18 billion in the same quarter of last year.

•Gross margin of 11.2% versus 15.5% in the third quarter of fiscal year 2024 and 17.0% in the same quarter of last year.

•Net income of $353 million versus $402 million in the third quarter of fiscal year 2024 and $194 million in the same quarter of last year.

\*                    \*                    \*

"***Supermicro continues to experience record demand of new AI infrastructures propelling fiscal 2024 revenue up 110% year over year to $14.9 billion*** and non-GAAP earnings per share up 87% to $22.09," said Charles Liang, President and CEO of Supermicro,

\*                    \*                    \*

**Fiscal Year 2024 Summary**

Net sales for the fiscal year ended June 30, 2024, were $14.94 billion versus $7.12 billion for the fiscal year ended June 30, 2023. Net income for fiscal year 2024 was

$1.21 billion, or $20.09 per diluted share, versus $640 million, or $11.43 per diluted share, for fiscal year 2023. Non-GAAP net income for fiscal year 2024 was $1.34 billion, or $22.09 per diluted share, versus $673 million, or $11.81 per diluted share, for fiscal year 2023. Non-GAAP net income for fiscal year 2024 adds back stock-based compensation expense of $135 million, net of the related tax effects of $93 million.

21. On November 5, 2024, the Company issued a press release announcing partial financial results for the quarter ended September 30, 2024. The press released touted the Company's financial results as follows, in relevant part:

**Preliminary First Quarter Fiscal Year 2025 Highlights**

The Company expects to report the following financial information for the quarter ended September 30, 2024:

•Net sales in a range of $5.9 billion to $6.0 billion compared to its previous guidance range of $6.0 billion to $7.0 billion

•GAAP and non-GAAP gross margin of approximately 13.3%

•GAAP diluted net income per common share in the range of $0.68 to $0.70 compared to its previous guidance range of $0.60 to $0.77

•Non-GAAP diluted net income per common share of $0.75 to $0.76 compared to its previous guidance range of $0.67 to $0.83

22. On February 11, 2025, the Company issued a press release announcing partial financial information for the quarter ended December 31, 2024. The press released touted the Company's financial results as follows, in relevant part:

**Preliminary Second Quarter Fiscal Year 2025 Highlights**

The Company expects to report the following financial information for the quarter ended December 31, 2024:

•Net sales in the range of $5.6 billion to $5.7 billion, reflecting 54% year-over-year growth at the midpoint

•GAAP and non-GAAP gross margin in the range of 11.8% to 11.9%

•GAAP diluted net income per common share in the range of $0.50 to $0.52, flat year-over-year

•Non-GAAP diluted net income per common share in the range of $0.58 to $0.60, reflecting 5% year-over-year growth

23. On February 25, 2025, the Company submitted its annual report for the fiscal year ended June 30, 2024 on a Form 10-K filed with the SEC (the "FY24 10-K"). The FY 10-K touted

the Company's financial results, including its revenue and sales, and further purported to describe the drivers of the Company's sales results. Specifically, the FY24 10-K stated as follows, in relevant part:

> *Fiscal Year 2024 Compared with Fiscal Year 2023*
>
> ***During fiscal year 2024 we experienced increased net sales from server and storage systems, particularly from our large enterprise and datacenter customers. The year-over-year increase in net sales of server and storage systems was primarily due to the strong demand for GPU based rack-scale solutions, including liquid-cooled and air-cooled servers*** which are generally more complex and of higher value, resulting in an increase of average selling prices ("ASP"). The year-over-year increase in net sales for our subsystems and accessories is primarily due to increased demand of accessories sold to our larger enterprise and data center customers as more accessories and spares were purchased in conjunction with the increased volume of full systems and servers. Our services and software net sales, included in server and storage systems net sales, increased by $53.8 million year-over-year.

24.    The FY24 10-K acknowledged that in October 2022, U.S. export restrictions and licensing requirements were imposed on "China's semiconductor and supercomputing industries," which "impacted certain of our products, including products that contain the NVIDIA A100 and H100 integrated circuits, among others. The FY24 10-K purported to warn of risks which "***could***" or "***may***" negatively impact the Company, as follows in relevant part:

> **Our operations are impacted by complex laws, rules and regulations related to export control to which our business is subject, and rapid changes in such laws, rules, and regulations as well as political and other actions related thereto may adversely impact our business.**
>
> We are subject to U.S. and other applicable trade control regulations that restrict with whom we may transact business, including the trade sanctions enforced by the U.S. Treasury, Office of Foreign Assets Control and the export controls enforced by the U.S. Commerce Department's Bureau of Industry and Security. ***If we fail to comply with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists, we may be subject to civil or criminal penalties.*** Any future violations could have an adverse impact on our ability to sell our products to United States federal, state and local government and related entities.
>
> \*                    \*                    \*
>
> **Failure to comply with the U.S. Foreign Corrupt Practices Act, other applicable anti-corruption and anti-bribery laws, and applicable trade control laws could subject us to penalties and other adverse consequences.**
>
> We manufacture and sell our products in several countries outside of the United States, both to direct and OEM customers as well as through our indirect sales channel. Our operations are subject to the U.S. Foreign Corrupt Practices Act (the

"FCPA") as well as the anti-corruption and anti-bribery laws in the countries where we do business. The FCPA prohibits covered parties from offering, promising, authorizing or giving anything of value, directly or indirectly, to a "foreign government official" with the intent of improperly influencing the official's act or decision, inducing the official to act or refrain from acting in violation of lawful duty or obtaining or retaining an improper business advantage. The FCPA also requires publicly traded companies to maintain records that accurately and fairly represent their transactions, and to have an adequate system of internal accounting controls. In addition, other applicable anti-corruption laws prohibit bribery of domestic government officials, and some laws that may apply to our operations prohibit commercial bribery, including giving or receiving improper payments to or from non-government parties, as well as so-called "facilitation" payments.

***In addition, while we have implemented policies, internal controls and other measures reasonably designed to promote compliance with applicable anti-corruption and anti-bribery laws and regulations, our employees or agents may engage in improper conduct for which we could be held responsible. If we, or our employees or agents acting on our behalf, are found to have engaged in practices that violate these laws and regulations, we could suffer severe fines and penalties, profit disgorgement, injunctions on future conduct, securities litigation, bans on transacting government business and other consequences that may have a material adverse effect on our business, results of operations and financial condition***. In addition, our brand and reputation, our sales activities or our stock price could be adversely affected if we become the subject of any negative publicity related to actual or potential violations of anti-corruption, anti-bribery or other similar applicable laws and regulations.

25.    On February 25, 2025, the Company submitted its quarterly report for the period ended September 30, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The quarterly report touted the Company's financial results, including its revenue and sales, and further purported to describe the drivers of the Company's sales results. Specifically, the quarterly report stated as follows, in relevant part:

| | Three Months Ended September 30, | | Change | |
| | 2024 | 2023 | $ | % |
|---|---|---|---|---|
| Server and storage systems | $ 5,747.8 | $ 1,966.6 | $ 3,781.2 | 192.3 % |
| *Percentage of total net sales* | 96.8 % | 92.8 % | | |
| Subsystems and accessories | $ 189.5 | $ 153.1 | $ 36.4 | 23.8 % |
| *Percentage of total net sales* | 3.2 % | 7.2 % | | |
| Total net sales | $ 5,937.3 | $ 2,119.7 | $ 3,817.6 | 180.1 % |

\*                    \*                    \*

***The period-over-period increase in net sales of our server and storage systems was primarily driven by an increase in the demand from customers for GPU servers,*** high performance computing ("HPC"), and rack-scale solutions which are generally more complex and of higher value, resulting in an increase of average selling price ("ASP").

The period-over-period increase in net sales for our subsystems and accessories is primarily due to increased demand of accessories sold to data center customers as more accessories and spares were purchased in conjunction with the strong sales of full systems and servers.

26.    On February 25, 2025, the Company submitted its quarterly report for the period ended December 31, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The quarterly report touted the Company's financial results, including its revenue and sales, and further purported to describe the drivers of the Company's sales results. Specifically, the quarterly report stated as follows, in relevant part:

| | Three Months Ended December 31, | | Change | | Six Months Ended December 31, | | Change | |
| | 2024 | 2023 | $ | % | 2024 | 2023 | $ | % |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Server and storage systems | $ 5,487.2 | $ 3,435.6 | $ 2,051.6 | 59.7 % | $ 11,234.9 | $ 5,402.2 | $ 5,832.7 | 108.0 % |
| *Percentage of total net sales* | 96.6 % | 93.7 % | | | 96.7 % | 93.4 % | | |
| Subsystems and accessories | $ 190.8 | $ 229.3 | $ (38.5) | (16.8)% | $ 380.3 | $ 382.4 | $ (2.1) | (0.5)% |
| *Percentage of total net sales* | 3.4 % | 6.3 % | | | 3.3 % | 6.6 % | | |
| Total net sales | $ 5,678.0 | $ 3,664.9 | $ 2,013.1 | 54.9 % | $ 11,615.2 | $ 5,784.6 | $ 5,830.6 | 100.8 % |

\*                    \*                    \*

 *Comparison of Three Months Ended December 31, 2024 and 2023*

**The period-over-period increase in net sales of our server and storage systems was primarily driven by an increase in the demand from customers for GPU servers,** high performance computing ("HPC"), and rack-scale solutions which are generally more complex and of higher value, resulting in an increase of average selling price ("ASP").

The period-over-period decrease in net sales for our subsystems and accessories of 16.8% was primarily due to the focus on allocating certain supply chain constrained components to build and ship server and storage systems rather than selling them as parts of subsystems and accessories.

27.    On April 29, 2025, Super Micro issued a press release announcing preliminary unaudited financial results for the quarter ended March 31, 2025. The press released touted the Company's financial results as follows, in relevant part:

• New generation product design wins are robust

• During Q3 some delayed customer platform decisions moved sales into Q4

• The GAAP and Non-GAAP gross margin for Q3 was 220 basis points lower than Q2 primarily due to higher inventory reserves resulting from older generation products and expedite costs to enable time-to-market for new products

|  | Expected Range | Prior Guidance |
|---|---|---|
| Net Sales | $4.5B to $4.6B | $5.0B to $6.0B |
| GAAP diluted net income per common share | $0.16 to $0.17 | $0.36 to $0.53 |
| Non-GAAP diluted net income per common share | $0.29 to $0.31 | $0.46 to $0.62 |

28.    On May 6, 2025, Super Micro issued a press release announcing financial results for the quarter ended March 31, 2025 stating, as follows, in relevant part:

**Third Quarter Fiscal Year 2025 Highlights**

•Net sales of $4.60 billion versus $5.68 billion in Q2'25 and $3.85 billion in Q3'24.
•Gross margin of 9.6% versus 11.8% in Q2'25 and 15.5% in Q3'24.
•Net income of $109 million versus $321 million in Q2'25 and $402 million in Q3'24.

29.    On May 12, 2025, the Company submitted its quarterly report for the period ended March 31, 2025 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The quarterly report further purported to state the Company's net sales by product type and describe the alleged drivers of the Company's increase in net sales. Specifically, the quarterly report stated as follows, in relevant part:

| | Three Months Ended March 31, | | Change | | Nine Months Ended March 31, | | Change | |
|---|---|---|---|---|---|---|---|---|
| | 2025 | 2024 | $ | % | 2025 | 2024 | $ | % |
| Server and storage systems | $ 4,458.9 | $ 3,698.5 | $ 760.4 | 20.6 % | $ 15,693.8 | $ 9,100.7 | $ 6,593.1 | 72.4 % |
| Percentage of total net sales | 96.9 % | 96.1 % | | | 96.8 % | 94.5 % | | |
| Subsystems and accessories | $ 141.0 | $ 151.6 | $ (10.6) | (7.0)% | $ 521.3 | $ 534.0 | $ (12.7) | (2.4)% |
| Percentage of total net sales | 3.1 % | 3.9 % | | | 3.2 % | 5.5 % | | |
| Total net sales | $ 4,599.9 | $ 3,850.1 | $ 749.8 | 19.5 % | $ 16,215.1 | $ 9,634.7 | $ 6,580.4 | 68.3 % |

*                      *                      *

*Comparison of Three Months Ended March 31, 2025 and 2024*

***The $760.4 million increase in net sales of our server and storage systems was primarily driven by an increase in the demand from customers for GPU servers,*** high performance computing ("HPC"), and rack-scale solutions which are generally more complex and of higher value, resulting in an increase of average selling price ("ASP").

The $10.6 million decrease in net sales for our subsystems and accessories of 7.0% was primarily due to the focus on allocating certain supply chain constrained components to build and ship server and storage systems rather than selling them as parts of subsystems and accessories.

*Comparison of Nine Months Ended March 31, 2025 and 2024*

***The $6,593.1 million increase in net sales of our server and storage systems was primarily driven by an increase in the demand from customers for GPU servers,***

HPC, and rack-scale solutions which are generally more complex and of higher value, resulting in an increase of ASP.

The $12.7 million decrease in net sales for our subsystems and accessories of 2.4% was primarily due to the focus on allocating certain supply chain constrained components to build and ship server and storage systems rather than selling them as parts of subsystems and accessories.

30.     On August 5, 2025, Super Micro issued a press release announcing financial results for the quarter and fiscal year ended June 30, 2025. The press released touted the Company's financial results, as well as the purported drivers of the Company's sales growth. Specifically, the press release stated as follows, in relevant part:

**Fourth Quarter Fiscal Year 2025 Highlights**

•Net sales of $5.8 billion versus $4.6 billion in Q3'25 and $5.4 billion in Q4'24.

•Gross margin of 9.5% versus 9.6% in Q3'25 and 10.2% in Q4'24.

•Net income of $195 million versus $109 million in Q3'25 and $297 million in Q4'24.

•Diluted net income per common share of $0.31 versus $0.17 in Q3'25 and $0.46 in Q4'24.

•Non-GAAP diluted net income per common share of $0.41 versus $0.31 in Q3'25 and $0.54 in Q4'24.

•Cash flow provided by operations for Q4'25 of $864 million and capital expenditures and investments of $79 million.

"We made solid progress in FY25 by growing our AI solution leadership in Neoclouds, CSPs, Enterprises, and Sovereign entities, which fueled our 47% annual growth," said Charles Liang, Founder, President and CEO of Supermicro.

*                    *                    *

**Fiscal Year 2025 Summary**

Net sales for the fiscal year ended June 30, 2025, were $22.0 billion versus $15.0 billion for the fiscal year ended June 30, 2024. Net income for fiscal year 2025 was $1.0 billion, or $1.68 per diluted share, versus $1.2 billion, or $1.92 per diluted share, for fiscal year 2024.

For the full fiscal year ended 2025, the Non-GAAP gross margin was 11.2% with adjustments for stock-based compensation expenses of $25 million. Non-GAAP net income for fiscal year 2025 was $1.3 billion, or $2.06 per diluted share, versus $1.3 billion, or $2.12 per diluted share, for fiscal year 2024. This non-GAAP net income includes adjustments for stock-based compensation expenses and the loss on extinguishment of convertible notes of $239 million and $23 million, which are net of the related tax effect of $75 million and $8 million for fiscal year 2025.

31.    On August 28, 2025, the Company submitted its annual report for the fiscal year ended June 30, 2025 on a Form 10-K filed with the SEC (the "FY25 10-K"). The FY25 10-K affirmed the previously reported financial results and further purported to state the Company's net sales by product type and describe the alleged drivers of the Company's increase in net sales. Specifically, the FY25 10-K stated as follows, in relevant part:

| | Years Ended June 30, | | | 2025 over 2024 Change | | 2024 over 2023 Change | |
| | 2025 | 2024 | 2023 | $ | % | $ | % |
|---|---|---|---|---|---|---|---|
| Server and storage systems | $ 21,311.6 | $ 14,185.2 | $ 6,569.8 | $ 7,126.4 | 50.2 % | $ 7,615.4 | 115.9 % |
| *Percentage of total net sales* | 97.0 % | 94.6 % | 92.2 % | | | | |
| Subsystems and accessories | $ 660.4 | 804.0 | 553.7 | (143.6) | (17.9)% | 250.3 | 45.2 % |
| *Percentage of total net sales* | 3.0 % | 5.4 % | 7.8 % | | | | |
| Total net sales | $ 21,972.0 | $ 14,989.2 | $ 7,123.5 | $ 6,982.8 | 46.6 % | $ 7,865.7 | 110.4 % |

*            *            *

*Fiscal Year 2025 Compared with Fiscal Year 2024*

***During fiscal year 2025, we experienced increased net sales from server and storage systems, particularly from our large enterprise and datacenter customers.*** The year-over-year increase in net sales of server and storage systems was primarily due to the strong demand and increased billings for GPU & Super Racks of $5,804.0 million or 52% compared to prior year, including liquid-cooled and air-cooled servers which are generally more complex and of higher value, primarily related to our H200, H100, and B200 systems, resulting in an increase of average selling price of 34%. Our services and software net sales, included in server and storage systems net sales, increased by $102.2 million year-over-year.

The year-over-year decrease in net sales for our subsystems and accessories is primarily due to our strategic shift to focus on prioritizing sales of our server and storage systems.

*Fiscal Year 2024 Compared with Fiscal Year 2023*

During fiscal year 2024, we experienced increased net sales from server and storage systems, particularly from our large enterprise and datacenter customers. ***The year-over-year increase in net sales of server and storage systems was primarily due to the strong demand for GPU based rack-scale solutions***, including liquid-cooled and air-cooled servers which are generally more complex and of higher value, resulting in an increase of average selling prices.

The year-over-year increase in net sales for our subsystems and accessories is primarily due to increased demand of accessories sold to our larger enterprise and data center customers as more accessories and spares were purchased in conjunction with the increased volume of full systems and servers. Our services and software net sales, included in server and storage systems net sales, increased by $53.8 million year-over-year.

32.    The FY25 10-K acknowledged that the Company was being restricted by certain export control regulations, included as it related to its certain products which contain Nvidia

integrated circuits, among others. The FY24 10-K further purported to warn of risks which "***could***" or "***may***" negatively impact the Company, as follows in relevant part:

**Our operations are impacted by complex laws, rules and regulations related to import and export controls to which our business is subject, and rapid changes in such laws, rules, and regulations as well as political and other actions related thereto may adversely impact our business.**

We are subject to U.S. and other applicable trade control regulations that restrict with whom we may transact business, including the trade sanctions enforced by the U.S. Treasury, Office of Foreign Assets Control and the import and export controls enforced by the U.S. Commerce Department's Bureau of Industry and Security. I***f we fail to comply with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists, we may be subject to civil or criminal penalties.*** Any future violations could have an adverse impact on our ability to sell our products to United States federal, state and local government and related entities.

*                    *                    *

**Failure to comply with the U.S. Foreign Corrupt Practices Act, other applicable anti-corruption and anti-bribery laws, and applicable trade control laws could subject us to penalties and other adverse consequences.**

We manufacture and sell our products in several countries outside of the United States, both to direct and OEM customers as well as through our indirect sales channel. Our operations are subject to the U.S. Foreign Corrupt Practices Act (the "FCPA") as well as the anti-corruption and anti-bribery laws in the countries where we do business. The FCPA prohibits covered parties from offering, promising, authorizing or giving anything of value, directly or indirectly, to a "foreign government official" with the intent of improperly influencing the official's act or decision, inducing the official to act or refrain from acting in violation of lawful duty or obtaining or retaining an improper business advantage. The FCPA also requires publicly traded companies to maintain records that accurately and fairly represent their transactions, and to have an adequate system of internal accounting controls. In addition, other applicable anti-corruption laws prohibit bribery of domestic government officials, and some laws that may apply to our operations prohibit commercial bribery, including giving or receiving improper payments to or from non-government parties, as well as so-called "facilitation" payments.

*In addition, while we have implemented policies, internal controls and other measures reasonably designed to promote compliance with applicable anti-corruption and anti-bribery laws and regulations, our employees or agents may engage in improper conduct for which we could be held responsible. If we, or our employees or agents acting on our behalf, are found to have engaged in practices that violate these laws and regulations, we could suffer severe fines and penalties, profit disgorgement, injunctions on future conduct, securities litigation, bans on transacting government business and other consequences that may have a material adverse effect on our business, results of operations and financial condition.* In addition, our brand and reputation, our sales activities or our stock price could be adversely affected if we become the subject of any negative publicity related to actual or potential violations of anti-corruption, anti-bribery or other similar applicable laws and regulations.

33.    On October 23, 2025, Super Micro issued a press release providing a business update for the quarter ended September 30, 2025. The press released touted the Company's financial results, as well as the purported drivers of the Company's sales growth. Specifically, the press release stated as follows, in relevant part:

•Recent design wins in excess of $12B, requesting delivery in the second quarter of fiscal year 2026 (Q2'26). Company will provide further updates on our upcoming earnings call on expected Q2'26 deliveries and revenues

•Design win upgrades pushed some expected Q1'26 revenue to Q2'26, resulting in estimated revenue in Q1'26 of $5B versus $6B-$7B guidance

•Seeing robust demand for Supermicro Nvidia GB300, B300, RTX Pro, AMD 355X LC, now starting to ship

"Supermicro is seeing outstanding levels of customer engagements for newly released AI liquid cooled solutions along with numerous key customers ramping large, multi-quarter, volume deployments." said Charles Liang, President and CEO of Supermicro. "We see customer demand accelerating, and we are gaining AI share, reiterating revenue of at least $33B for FY 2026 with the expectation of delivering more."

34.    On November 4, 2025, Super Micro issued a press release announcing financial results for the quarter ended September 30, 2025. The press released touted the Company's financial results, as well as the purported drivers of the Company's sales growth. Specifically, the press release stated as follows, in relevant part:

**First Quarter Fiscal Year 2026 Highlights**

•Net sales of $5.0 billion versus $5.8 billion in Q4'25 and $5.9 billion in Q1'25

•Gross margin of 9.3% versus 9.5% in Q4'25 and 13.1% in Q1'25

•Net income of $168 million versus $195 million in Q4'25 and $424 million in Q1'25

•Diluted net income per common share of $0.26 versus $0.31 in Q4'25 and $0.67 in Q1'25

•Non-GAAP diluted net income per common share of $0.35 versus $0.73 in Q1'25

•Cash flow used by operations for Q1'26 of $918 million and capital expenditures of $32 million

"Powered by DCBBS, Supermicro is expanding/transforming into a leading AI and datacenter infrastructure company, delivering total solutions that simplify deployment, accelerate time-to-market, and reduce TCO," said Charles Liang, Founder, President and CEO of Supermicro. "With a rapidly expanding order book,

including more than $13B in Blackwell Ultra orders, we expect at least $36 billion in revenue for fiscal year 2026."

35.     On November 7, 2025, the Company submitted its quarterly report for the period ended September 30, 2025 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The quarterly report further purported to state the Company's net sales and describe the alleged drivers of the Company's increase in net sales. Specifically, the quarterly report stated as follows, in relevant part:

| | Three Months Ended September 30, | | Change | |
| | 2025 | 2024 | $ | % |
|---|---|---|---|---|
| Net sales | $        5,017.8 | $        5,937.3 | $        (919.5) | (15.5)% |

\*                    \*                    \*

*Comparison of the Three Months Ended September 30, 2025 and 2024*

The $919.5 million or 15.5% decrease in net sales was primarily due to the timing of several substantial orders, which were only received in late September, such that the products covered by those orders could not be shipped during the quarter ended September 30, 2025. This was caused principally by customer configuration upgrades and delays in data center readiness. A decrease in our average selling price compared to the prior quarter ended September 30, 2024 also contributed modestly to the decline in net sales of server and storage systems, as we maintained our strategy of pricing our products competitively to retain and or gain market shares. This was most pronounced in declining billings for GPU & Super Racks of $527.8 million or 11.7% year over year, including liquid-cooled and air-cooled servers that are generally more complex and of higher average selling price. Additionally, sales across other product categories decreased by $349.9 million, or 28.5%, including Traditional Storage, SuperBlade, Ultra Server, and other product lines.

36.     On February 3, 2026, Super Micro issued a press release announcing financial results for the quarter ended December 31, 2025. The press released touted the Company's financial results, as well as the purported drivers of the Company's sales growth. Specifically, the press release stated as follows, in relevant part:

**Second Quarter Fiscal Year 2026 Highlights**

•Net sales of $12.7 billion versus $5.0 billion in Q1'26 and $5.7 billion in Q2'25

•Gross margin of 6.3% versus 9.3% in Q1'26 and 11.8% in Q2'25

•Net income of $401 million versus $168 million in Q1'26 and $321 million in Q2'25

\*                    \*                    \*

"With our leading AI server and storage technology foundation, strong customer engagements, and expanding global manufacturing footprint, we are scaling rapidly to support large AI and enterprise deployments while continuing to strengthen our

operational and financial execution," said Charles Liang, Founder, President and CEO of Supermicro. "Our DCBBS, Data Center Building Block Solutions, enable customers to scale faster, greener, and at lower cost, Supermicro is well positioned to capture the next wave of AI and IT infrastructure demand."

37.     On February 6, 2026, the Company submitted its quarterly report for the period ended December 31, 2025 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The quarterly report further purported to state the Company's net sales and describe the alleged drivers of the Company's increase in net sales. Specifically, the quarterly report stated as follows, in relevant part:

| | Three Months Ended December 31, | | Change | | Six Months Ended December 31, | | Change | |
|---|---|---|---|---|---|---|---|---|
| | 2025 | 2024 | $ | % | 2025 | 2024 | $ | % |
| Net sales | $ 12,682.5 | $ 5,678.0 | $ 7,004.5 | 123.4 % | $ 17,700.3 | $ 11,615.2 | $ 6,085.1 | 52.4 % |

\*                      \*                      \*

*Comparison of the Three Months Ended December 31, 2025 and 2024*

The $7,004.5 million or 123.4% increase in net sales was primarily due to fulfillment and shipment of orders to support our customers' datacenters deployment, including a large design win from a customer, during the three months ended December 31, 2025, some of which were originally delayed due to customer configuration upgrades and data center readiness matters. An increase in our average selling price compared to the prior quarter ended December 31, 2024 also contributed modestly by product mix. This was most pronounced in increased billings for AI GPU related products of $7,398.2 million or 169.7% year over year, including liquid-cooled and air-cooled servers that are generally more complex and of higher average selling price. This was partially offset by decreased sales across other product categories by $475.9 million, or 42.5% as we continue to focus on gaining market share from our AI GPU platforms.

*Comparison of the Six Months Ended December 31, 2025 and 2024*

The $6,085.1 million or 52.4% increase in net sales was primarily due to fulfillment and shipment of orders to support our customers' datacenters deployment, including a large design win from a customer, during the six months ended December 31, 2025. An increase in our average selling price compared to the six months ended December 31, 2024 also contributed modestly by product mix. This was most pronounced in increased billings for AI GPU related products of $6,870.4 million or 77.4% year over year, including liquid-cooled and air-cooled servers that are generally more complex and of higher average selling price. This was partially offset by decreased sales across other product categories by $784.5 million, or 34.3% as we continue to focus on gaining market share from our AI GPU platforms.

38.     The above statements identified in ¶¶18-37 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and

prospects. Specifically, Defendants failed to disclose to investors that: (1) a significant portion of the Company's sales of servers were to companies based in China; (2) these transactions violated U.S. export control laws; (3) there were material weaknesses in the Company's controls to ensure compliance with applicable export control laws and regulations; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**Disclosures at the End of the Class Period**

39. On March 19, 2026, after the market closed, the U.S. Justice Department announced the unsealing of an indictment against three individuals associated with Super Micro, including the Company's co-founder, for engaging in a "scheme to divert massive quantities of servers housing U.S. artificial intelligence technology to customers in China" in violation of U.S. export control laws. The announcement stated these activities were done "***all to drive sales and generate revenues in violation of U.S. law.***" As a result of these activities, ***between 2024 and 2025, "approximately $2.5 billion worth of servers"*** were sold. The announcement named the three indicted defendants, Yih-Shyan Liaw, Ruei-Tsang Chang, and Ting-Wei Sun. Specifically, the press release stated as follows, in relevant part:

> "Yih-Shyan Liaw, Ruei-Tsang Chang, and Ting-Wei Sun allegedly defrauded the United States by diverting hundreds of servers with advanced artificial intelligence capabilities to Chinese customers," said FBI Assistant Director in Charge James C. Barnacle, Jr of the New York Field Office. "These defendants allegedly fabricated documents, staged bogus equipment to pass audit inventories, and used a pass-through company to conceal their misconduct and true clientele list. The FBI will hold accountable individuals who use American companies to provide export-controlled technology to our adversaries."

> The entirety of the text of the indictment and the descriptions of the indictment constitute only allegations, and every fact described should be treated as an allegation. According to the allegations contained in the indictment unsealed today in Manhattan federal court:

> To protect U.S. national security and foreign policy interests, the U.S. Department of Commerce has implemented license requirements for the export and reexport of artificial intelligence technologies to China and Hong Kong. In particular, the U.S. Department of Commerce has placed restrictions on the export and reexport of items that could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States. For these reasons, among others, advanced artificial intelligence accelerator chips, and servers incorporating such chips, are subject to export license requirements for transfers to China and Hong Kong. ***Those***

*regulations reflect a formal determination that the computing capabilities in advanced artificial intelligence accelerator hardware are of sufficient strategic significance that their transfer to China poses an unacceptable risk to national security.*

Liaw is a co-founder, board member, and Senior Vice President of Business Development of a publicly traded U.S.-based manufacturer that designs and builds high-performance computer servers for artificial intelligence and cloud computing applications (the U.S. Manufacturer), including servers that integrate artificial intelligence graphics processing units (GPUs). Chang is a general manager in the U.S. Manufacturer's Taiwan office. Sun is a third-party broker and "fixer" who has worked with Liaw, Chang, and others to divert U.S.-export controlled technology to China. Together, the defendants and others conspired to systematically divert the U.S. Manufacturer's servers with certain GPUs to China without a license to do so from the U.S. Department of Commerce.

The scheme operated as follows. Liaw and Chang, who worked closely with third-party brokers with customers based in China, directed certain executives of a company based in Southeast Asia ("Company-1") to place purchase orders with the U.S. Manufacturer for servers with certain GPUs, purportedly for Company-1. Those servers were often assembled in the United States and shipped to the U.S. Manufacturer's facilities in Taiwan, then delivered to Company-1 elsewhere in Southeast Asia. Company-1, in consultation with the defendants, then used a shipping and logistics company to repackage the U.S. Manufacturer's servers and place them in unmarked boxes to conceal their content prior to shipping them to their final destinations in China. To ensure that these server allocations were approved internally at the U.S. Manufacturer, the defendants and executives at Company-1 prepared false documents and records, and transmitted false communications, purporting to show that Company-1 was the end user of the servers.

At the defendants' direction, between 2024 and 2025, Company-1 purchased approximately $2.5 billion worth of servers from the U.S. Manufacturer, many of which were assembled in the United States. The defendants' scheme became more brazen over time and resulted in massive quantities of servers with controlled U.S. artificial intelligence technology being sent to China. Between late April 2025 and mid-May 2025 alone, at least approximately $510 million worth of the U.S. Manufacturer's servers, assembled in the United States, were diverted to China in violation of U.S. export control laws as part of the defendants' scheme.

40.     The unsealed indictment alleges that the indicted defendants coordinated with executives at a Southeast Asia company (nicknamed "Company-1" in the indictment) to act as a "pass-through entity to give [Super Micro] transactions that they arranged the appearance of legitimate commercial activity and to obscure their China-based end customers." Those defendants also "pressured" Super Micro's compliance team "to authorize the shipment of servers to Company-1, knowing that the servers would then be secretly diverted to China." The scheme skyrocketed Company-1 as one of Super Micro's largest customers and, according to an internal spreadsheet for fourth quarter fiscal 2024, "Company-1 ranked as [Super Micro's] eleventh most profitable

customer worldwide—accounting for approximately $99.7 million in revenue for the quarter—alongside major U.S. technology and social media companies developing artificial intelligence infrastructure." However, Company-1's purchases of Super Micro's servers was not for its own use, and the servers were "diverted to China through a network of third-party brokers who worked closely with the defendants."

41.    On the same date, Super Micro released a statement, noting the Company had not yet been directly named a defendant in the Justice Department action, but confirming the individuals charged were associated with the Company. The statement also reported the "Company has been cooperating fully with the government's investigation and will continue to do so." Specifically, the Company's statement contained the following, in relevant part:

> Supermicro was informed today that the United States Attorney's Office for the Southern District of New York has unsealed an indictment of three individuals associated with the Company in connection with an alleged conspiracy to commit export-control violations.
>
> Supermicro is not named as a defendant in the indictment. The individuals charged are Yih-Shyan "Wally" Liaw, Senior Vice President of Business Development and a member of the Company's Board of Directors; Ruei-Tsang "Steven" Chang, a sales manager in Taiwan; and Ting-Wei "Willy" Sun, a contractor. Supermicro has placed the two employees on administrative leave and terminated its relationship with the contractor, effective immediately.
>
> The conduct by these individuals alleged in the indictment is a contravention of the Company's policies and compliance controls, including efforts to circumvent applicable export control laws and regulations. Supermicro maintains a robust compliance program and is committed to full adherence to all applicable U.S. export and re-export control laws and regulations.
>
> The Company has been cooperating fully with the government's investigation and will continue to do so. Supermicro has not been named as a defendant in the indictment.

42.    On this news, Super Micro's stock price fell $10.26, or 33.3%, to close at $20.53 per share on March 20, 2026, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

43.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Super Micro securities between April 30, 2024 and March 19, 2026, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers

and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

44. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Super Micro's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Super Micro shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Super Micro or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

45. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

46. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

47. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Super Micro; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

48.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

49.     The market for Super Micro's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Super Micro's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Super Micro's securities relying upon the integrity of the market price of the Company's securities and market information relating to Super Micro, and have been damaged thereby.

50.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Super Micro's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Super Micro's business, operations, and prospects as alleged herein.

51.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Super Micro's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the

Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

52. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

53. During the Class Period, Plaintiff and the Class purchased Super Micro's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

54. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Super Micro, their control over, and/or receipt and/or modification of Super Micro's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Super Micro, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

55. The market for Super Micro's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Super Micro's securities traded at artificially inflated prices during the Class Period. On May 15, 2024, the Company's share price closed at a Class Period high of $95.24 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying

upon the integrity of the market price of Super Micro's securities and market information relating to Super Micro, and have been damaged thereby.

56.    During the Class Period, the artificial inflation of Super Micro's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Super Micro's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Super Micro and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

57.    At all relevant times, the market for Super Micro's securities was an efficient market for the following reasons, among others:

(a)    Super Micro shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Super Micro filed periodic public reports with the SEC and/or the NASDAQ;

(c)    Super Micro regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Super Micro was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

58.    As a result of the foregoing, the market for Super Micro's securities promptly digested current information regarding Super Micro from all publicly available sources and reflected such information in Super Micro's share price. Under these circumstances, all purchasers of Super Micro's securities during the Class Period suffered similar injury through their purchase of Super Micro's securities at artificially inflated prices and a presumption of reliance applies.

59.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.    Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

60.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement

CLASS ACTION COMPLAINT

25

was authorized or approved by an executive officer of Super Micro who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and

### Rule 10b-5 Promulgated Thereunder

### Against All Defendants

61.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

62.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Super Micro's securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

63.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Super Micro's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

64.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Super Micro's financial well-being and prospects, as specified herein.

65.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Super Micro's value and performance and

continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Super Micro and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

66.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

67.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Super Micro's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by

deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

68.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Super Micro's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Super Micro's securities during the Class Period at artificially high prices and were damaged thereby.

69.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Super Micro was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Super Micro securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

70.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

71.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act

### Against the Individual Defendants

72.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

73.    Individual Defendants acted as controlling persons of Super Micro within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

74.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

75.    As set forth above, Super Micro and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  March 25, 2026

**GLANCY PRONGAY WOLKE & ROTTER LLP**

By:     */s/ Pavithra Rajesh*

Robert V. Prongay
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email:  CLinehan@glancylaw.com
          PRajesh@glancylaw.com

Rebecca Dawson
230 Park Ave, Suite 358
New York, New York 10169
Telephone: (213) 521-8007
Facsimile: (212) 884-0988
Email:  RDawson@glancylaw.com

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
2121 Avenue of the Stars, Suite 800
Century City, CA 90067
Telephone: (310) 914-5007

*Attorneys for Plaintiff Apurva Bhuva*

**SWORN CERTIFICATION OF PLAINTIFF**

**SUPER MICRO COMPUTER, INC. SECURITIES LITIGATION**

I, Apurva Bhuva, certify that:

1. I have reviewed the Complaint, adopt its allegations, and authorize the filing of the Complaint on my behalf.

2. I did not purchase the Super Micro Computer, Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this federal securities laws.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in Super Micro Computer, Inc. securities during the Class Period set forth in the Complaint are as follows:

   (See attached transactions)

5. I have not sought to serve, nor served, as a representative party on behalf of a class in any action under the federal securities laws (15 U.S. Code, Chapter 2B; and 15 U.S. Code, Chapter 2A, Subchapter I) during the last three years.

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

3/23/2026
_____
Date

*Apurva Bhuva*
_____
Apurva Bhuva

**Apurva Bhuva's Transactions in Super Micro Computer, Inc. (SMCI)**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 12/4/2024 | Bought | 23 | $40.16 |