UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

APURVA BHUVA,

Plaintiff,

v.

SUPER MICRO COMPUTER, INC., et al.,

Defendants.

Case No.  26-cv-02606-JSC

**ORDER CONSOLIDATING CASES AND APPOINTING LEAD PLAINTIFF AND LEAD COUNSEL**

Re: Dkt. Nos. 22, 29, 35, 38, 43, 50, 61

Pending before the Court are various motions to consolidate, and to appoint lead plaintiffs and lead counsel in, three Private Securities Litigation Reform Act ("PSLRA") lawsuits against Defendants Super Micro Computer Inc. and the company's CEO and Chief Financial Officer. (Dkt. Nos. 22, 29, 35, 38, 43, 50, 61.)[1]  The motions to consolidate are unopposed and four motions to appoint lead plaintiff and counsel have effectively been withdrawn (Dkt. Nos. 22, 29, 35, 61), leaving only three competing motions.  (Dkt. Nos. 38, 43, 50.)  After carefully considering the parties' submissions, and having had the benefit of oral argument on July 2, 2026, the Court consolidates *Bhuva v. Super Micro Computer, Inc.*, Case No. 3:26-cv-02606-JSC; *City of Hialeah Employees' Retirement System v. Super Micro Computer, Inc.*, Case No. 3:26-cv-03018-JSC; and *Chung v. Super Micro Computer, Inc.*, Case No. 3:26-cv-04394-JSC. Additionally, the Court appoints Storebrand Asset Management, Public Employees' Retirement System of Mississippi, and Handelsbanken Fonder as lead plaintiffs, and appoints their counsel (Kessler Topaz Meltzer & Check LLP and Bernstein Litowitz Berger & Grossman LLP) as co-lead class counsel.

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

**BACKGROUND**

Defendant Super Micro Computer Inc. ("Super Micro") is a "technology company which designs, develops, and manufactures high-performance server and storage systems, primarily for artificial intelligence ('AI'), data center, and cloud solutions customers."  (Dkt. No. 1 ¶ 2.)[2] Across the three to-be-consolidated complaints, three of Super Micro's officers are individual defendants.  The competing lead plaintiffs are various individuals and entities who purchased or owned Super Micro's securities during the alleged class period of February 2, 2024 to March 19, 2026.[3]  During this period, Defendants allegedly made several false or misleading statements in various press releases and quarterly reports to the Securities and Exchange Commission ("SEC"). (*Id.* ¶¶ 18-38.)

> Specifically, Defendants failed to disclose to investors that: (1) a significant portion of the Company's sales of servers were to companies based in China; (2) these transactions violated U.S. export control laws; (3) there were material weaknesses in the Company's controls to ensure compliance with applicable export control laws and regulations; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

(*Id.* ¶ 6.)  "[A]fter the market closed" on the last day of the class period, March 19, 2026, "the U.S. Justice Department announced the unsealing of an indictment against three individuals associated with Super Micro for engaging in a 'scheme to divert massive quantities of servers housing U.S. artificial intelligence technology to customers in China' in violation of U.S. export control laws." (*Id.* ¶ 3.)  As further discussed below, the plaintiff in the *Chung* action alleges Defendant also made partial corrective disclosures in 2024, but the plaintiffs in the two other to-be-consolidated cases do not plead those disclosures.

### A.  The Competing Lead Plaintiffs

#### 1.  Jayantilal Patel

Jayantilal Patel, a proposed lead plaintiff, claims he "suffered losses of $39,248,880.55 on

---

[2] Citations to the complaint are to the complaint filed in *Bhuva v. Super Micro Computer, Inc., et al.*, Case No. 26-cv-02606, unless otherwise noted.

[3] For purposes of appointing lead plaintiffs, the three movants agree the Court should use the longest alleged class period from the three cases, which is February 2, 2024 to March 19, 2026.

United States District Court
Northern District of California

United States District Court
Northern District of California

his purchases of" Super Micro's common stock during the class period. (Dkt. No. 38 at 8; *see* Dkt. No. 39-2 at 2.) As relevant here, Mr. Patel acquired his shares of Super Micro's stock by virtue of being an "assignee of" his daughter Meenal Patel, various dissolved entities, and the entities' former shareholders. (Dkt. No. 39-1 at 2.) The assignment from Sunburst Express Inc. requires Mr. Patel to remit half of the proceeds he receives as a result of the assignment. (Dkt. No. 39-2 at 2; Dkt. No. 39-3 at 18.) Another assignment is from Skyways Hotel Inc.; Mr. Patel agreed to remit 20% of the proceeds he receives as a result of this assignment. (*See* Dkt. No. 39-3 at 21, 23 (identifying Mr. Patel's 80% ownership interest in the company and his agreement to remit proceeds).) The remaining assignments require Mr. Patel to remit all of the proceeds he receives as a result of the assignment. (*See* Dkt. No. 39-3 at 13, 28, 33, 40.) Mr. Patel attests he "was responsible for making all investment decisions with respect to the securities held in Meenal's account, including the purchases and sales of Super Micro securities." (*Id.* ¶ 6.) Mr. Patel also attests he was responsible for each entity's investment decisions prior to their dissolution and held executive positions at most of the dissolved entities. (*See id.* ¶¶ 7-13.) Every purchase of Super Micro's stock by Mr. Patel or his assignors occurred between August 22, 2024 and August 26, 2024, and every one of those shares was sold no later than November 4, 2024. (*See* Dkt. No. 39-2 at 3-16.)

Of Mr. Patel's and his assignors' $39 million in losses, roughly $5.6 million resulted from shares he purchased in his name (*i.e.*, shares that were not assigned to him). (*Id.* at 2.) Approximately $3.3 million in losses resulted from shares purchased in his daughter's name, $5.8 million were from shares held by Sunburst Express, and $6.4 million were from Skyways Hotel. (*Id.*) The remaining losses were from shares held by dissolved entities which will receive 100% of any proceeds Mr. Patel receives from the assignments. (*Id.* at 2; *see* Dkt. No. 39-3 at 13, 18, 23, 28, 33, 40.)

### 2. The Institutional Investors

Another group of proposed lead plaintiffs are three institutional investors who assert roughly $20.8 million in losses. These investors are represented by two law firms: Kessler Topaz Meltzer & Check LLP and Bernstein Litowitz Berger & Grossman LLP. The first investor is

United States District Court
Northern District of California

Storebrand Asset Management AS, a Norwegian asset manager, who asserts losses of $4.4 million. (Dkt. No. 50-3 at 10.) Second, Public Employees' Retirement System of Mississippi ("Mississippi"), a U.S.-based pension fund, claims losses of $4.8 million. (*Id.* at 4.) Third, Handelsbanken Fonder AB, a Swedish firm, asserts $11.6 million in losses. Each institutional investor purchased Super Micro's stock numerous times throughout the class period, and each investor sold and retained stock through the end of the class period. (*See id.* at 2 (chart showing Handelsbanken's stock purchases between April 2024 and February 2026), 4 (chart showing Mississippi's purchases between March 2024 and June 2025), 5-10 (chart showing Storebrand's purchases between February 2024 and February 2026).)

### 3. Arkansas Teacher Retirement System

The remaining proposed lead plaintiff is Arkansas Teacher Retirement System ("ATRS"), which asserts losses of roughly $3.7 million. (Dkt. No. 43 at 7.) ATRS purchased and sold Super Micro's securities numerous times between February 2024 and December 2025. (Dkt. No. 44-1 at 4-5; Dkt. No. 44-2 at 2-3.) Unlike the other movants, ATRS's purchased Super Micro's bonds. (*See id.*)

### DISCUSSION

### I.    Motions to Consolidate

Plaintiffs move to consolidate three related cases: *Bhuva v. Super Micro Computer, Inc.*, Case No. 3:26-cv-02606-JSC; *City of Hialeah Employees' Retirement System v. Super Micro Computer Inc.*, Case No. 3:26-cv-03018-JSC; and *Chung v. Super Micro Computer Inc.*, Case No. 3:26-cv-04394-JSC. Federal Rule of Civil Procedure 42 governs consolidation of cases. Rule 42(a) provides the Court may consolidate actions before it that "involve a common question of law or fact," Fed. R. Civ. P. 42(a), and "[t]he district court has broad discretion [ ] to consolidate cases pending in the same district." *Inv'rs Res. Co. v. U.S. Dist. Court for Cent. Dist. of Cal.*, 877 F.2d 777, 777 (9th Cir. 1989). In determining whether consolidation is appropriate, the court "weighs the saving of time and effort consolidation would produce against any inconvenience, delay, or expense that it would cause." *Huene v. United States*, 743 F.2d 703, 704 (9th Cir. 1984).

The Court grants the parties' unopposed motions to consolidate. There are common

questions of law or fact; in each case, purchasers of Super Micro's securities allege the company and its officers violated the PSLRA by making false and/or misleading statements and assert the class period ended on March 19, 2026, when the U.S. Department of Justice unsealed an indictment against three of Super Micro's officers.  Unlike the other two cases, the *Bhuva* action does not name Yih-Shyan Liaw as a defendant.  And Plaintiff Apurva Bhuva alleges the class period begins on April 30, 2024, whereas the other two cases assert the class period begins on February 2, 2024.  Despite these differences, consolidation is appropriate because it would save significant time and effort litigating three separate cases, which dwarfs any inconvenience or delay.

## II.    Competing Motions for Lead Plaintiff and Counsel

Upon consolidation of multiple PSLRA class actions "asserting substantially the same claim or claims," the PSLRA provides the Court "shall appoint as lead plaintiff the member or members of the purported plaintiff class" who is "most capable of adequately representing the interests of class members."  15 U.S.C. § 78u-4(a)(3)(B)(i)-(ii).  There is a rebuttable presumption "the most adequate plaintiff"

> is the person or group of persons that—
>
> (aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);
>
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

*Id.* § 78u-4(a)(3)(B)(iii)(I); *see also* Fed. R. Civ. P. 23(a)(1)-(2) (providing a plaintiff may represent a class if the plaintiff demonstrates numerosity, commonality, typicality, adequacy of representation).  That presumption "may be rebutted only upon proof […] that the presumptively most adequate plaintiff […] will not fairly and adequately represent the interests of the class[, or] is subject to unique defenses that render such plaintiff incapable of adequately representing the class."  *Id.* § 78u-4(a)(3)(B)(iii)(II).  Here, there is no dispute the competing lead plaintiffs satisfied the first requirement regarding notice publicization.  *Id.* § 78u-4(a)(3)(B)(iii)(I).

The parties dispute who "has the greatest financial interest in the relief sought by the class" and otherwise satisfies Rule 23's typicality and adequacy requirements. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb), (cc). To resolve this question

> the district court must compare the financial stakes of the various plaintiffs and determine which one has the most to gain from the lawsuit. It must then focus its attention on that plaintiff and determine, based on the information he has provided in his pleadings and declarations, whether he satisfies the requirements of Rule 23(a), in particular those of "typicality" and "adequacy." If the plaintiff with the largest financial stake in the controversy provides information that satisfies these requirements, he becomes the presumptively most adequate plaintiff. If the plaintiff with the greatest financial stake does not satisfy the Rule 23(a) criteria, the court must repeat the inquiry, this time considering the plaintiff with the next-largest financial stake, until it finds a plaintiff who is both willing to serve and satisfies the requirements of Rule 23.

*In re Cavanaugh*, 306 F.3d 726, 729–30 (9th Cir. 2002) (internal footnotes omitted). Under Rule 23, a class representative's "claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) (quoting Fed. R. Civ. P. 23(a)(3)). But typicality is not met when "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). And adequacy of representation requires a plaintiff be able to "prosecute the action vigorously on behalf of the class," *Hanlon*, 150 F.3d at 1020, which depends on "a sharing of interests between representatives and absentees." *Brown v. Ticor Title Ins.*, 982 F.2d 386, 390 (9th Cir. 1992).

Once the presumptive lead plaintiff is determined, the Court provides "other plaintiffs an opportunity to rebut the presumptive lead plaintiff's showing that it satisfies Rule 23's typicality and adequacy requirements." *Id.* at 730. The Court applies the preponderance of the evidence standard to determine whether the presumption has been rebutted. *In re Crain Walnut Shelling, LP*, 175 F.4th 1069, 1079 (9th Cir. 2026) ("We hold that the preponderance of the evidence standard applies to a rebuttal of the presumption of adequacy under the PSLRA.").

### A. The Institutional Investors are the Presumptive Most Adequate Plaintiff

The movant with the largest financial interest is the "movant [with] the largest alleged

United States District Court
Northern District of California

losses." *In re Mersho*, 6 F.4th 891, 899 (9th Cir. 2021). Upon identifying that movant, the district court must "determine whether [it] has made a prima facie showing of adequacy and typicality." *Id.* "If the movant with the largest losses does not satisfy the Rule 23 requirements, the district court must then look to the movant with the next largest losses and repeat the inquiry." *Id.*

### i. Mr. Patel's Losses, Typicality, and Adequacy

Here, Mr. Patel asserts he lost $39 million, a larger alleged loss than the institutional investors' $20.8 million and ATRS's $3.7 million. Mr. Patel's asserted losses, however, do not render him the presumptive lead plaintiff for two reasons. First, Mr. Patel does not have the largest losses because if Mr. Patel prevails, he himself will pocket, at most, roughly $14 million; any additional amount he receives pursuant to the assignments must be returned to the assignors.[4] As this Court recently explained in *Hsu v. Pubmatic, Inc.*, 2025 WL 3280896 (N.D. Cal. Nov. 25, 2025), an "assignment agreement does not provide [an assignee] any financial stake" in a PSLRA action when the assignee must "remit any proceeds received as a result of the [a]ssignment." *Id.* at *2. This Court relied on *May v. Barclays PLC*, 2023 WL 5950689 (S.D.N.Y. Sept. 13, 2023), which interpreted dictionary definitions of "financial interest," "interest," and "relief," as well as the PSLRA's "structure and purpose," to hold a party cannot "achieve lead plaintiff status […] by virtue of assignments of claims by other class members," as opposed to the party's purchase of securities. *Id.* at *12-14 (cleaned up). *Barclays* observed:

> [t]he statute does not define "financial interest" or "relief." Black's Law Dictionary, both today and in 1990, defined "financial interest" as "an interest equated with money or its equivalent." *Financial Interest*, Black's Law Dictionary (6th ed. 1990); *see also Financial Interest*, Black's Law Dictionary (11th ed. 2019) ("An interest involving money or its equivalent."). Interest is "[t]he most general term that can be employed to denote a right, claim, title, or legal share in something." *Interest*, Black's Law Dictionary (6th ed. 1990). Relief

---

[4] As noted above, Mr. Patel suffered $5.6 million in losses and must remit 50% of proceeds from Sunburst's assignment. Sunburst lost $5.8 million, 50% of which is $2.9 million. Mr. Patel also had an 80% ownership interest in the Skyway company and must remit proceeds he receives from Skyway's assignment. Skyway lost $6.4 million, 80% of which is $5.12 million. Adding these numbers together ($5.6 million + $2.9 million + $5.12 million) totals $13.62 million.

The parties also dispute whether the assignments from dissolved entities are valid. The Court need not resolve this dispute because regardless of whether the assignments are defective, the amount of money Mr. Patel would pocket is less than the institutional investors' asserted losses.

United States District Court
Northern District of California

> "is used as a general designation of the assistance, redress, or benefit which a complainant seeks at the hands of a court." *Relief*, Black's Law Dictionary (6th ed. 1990); *see also Relief*, Black's Law Dictionary (11th ed. 2019) ("[R]edress or benefit ... that a party asks of a court."). The plain meaning of the term "financial interest in the relief" indicates that the drafters of the PLSRA were focused on ensuring that the individual or group of individuals with the greatest *monetary* interest in the outcome of the litigation was presumptively appointed lead plaintiff. Assignments structured as the assignments were here—where all of the proceeds earned through the lawsuit on [the assignors'] shares were remitted back to [the assignors]—does not give [the assignee] a monetary interest in the proceeds.

*Id.* at *13 (internal footnote omitted).

Simply put, "[t]he presumption that Congress established through the [PSLRA] was that the person or persons who had the most to gain or lose from the litigation would be the most adequate to represent the class." *Id.* at *13. The Court finds *Barclays* persuasive; Mr. Patel does not have "the most to gain or lose" here. *Id.* If he recovers $39 million, he does not "gain" $39 million because he must remit most of it. Nor did *he* lose $39 million because most of those losses are not from shares purchased in his name. So, he is not the movant "with the largest losses." *See In re Mersho*, 6 F.4th at 899.

Mr. Patel's arguments to the contrary are unpersuasive. Mr. Patel first urges his "financial interest" and his "portion of any recovery" are "two distinct concepts" without explaining why that distinction is meaningful or reflected in the PSLRA's text and case law. (Dkt. No. 76 at 7.) Mr. Patel does not have "the largest alleged *losses*" because he did not lose $39 million. *In re Mersho*, 6 F.4th at 899 (emphasis added). Rather, it was other shareholders who suffered most of those losses. (*See generally* Dkt. No. 39-2 at 1-16.) Then, a year and a half after those shareholders suffered losses, and just ten days before Mr. Patel filed his motion, they assigned the rights to sue for *their* losses under the condition Mr. Patel remit the proceeds he receives. (*See generally id.* (loss charts showing shares were sold no later than November 4, 2024); Dkt. No. 39-3 at 12-43 (assignments dated May 16, 2026).) Mr. Patel then appears to suggest *Barclays*'s reasoning is unpersuasive because it is "derived from dictionary definitions and its reasoning of congressional purpose rather than anything in the statute's text," yet he offers no contrary analysis of the PSLRA's text, structure, or purpose. (Dkt. No. 76 at 7-8.) Instead, Mr. Patel emphasizes four cases. None undermine *Barclays*'s reasoning.

8

First, *Sprint v. Commc'ns Co., L.P. v. APCC Servs. Inc.*, 554 U.S. 269 (2008) held assignees for collections have Article III standing to bring suit. *Id.* at 271. *Sprint* rejected the argument such an assignee "lacks a 'personal stake' in the litigation's outcome" sufficient to confer Article III standing in the sense the assignee does "not actually benefit from a victory." *Id.* at 288 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). The Court noted the "the general 'personal stake requirement' and the more specific standing requirements […] are flip sides of the same coin" because both requirements "ensure […] concrete adverseness which sharpens the presentations of issues," and historically, "[c]ourts […] appear to have found that concrete adverseness where an assignee for collection brings a lawsuit." *Sprint*, 554 U.S. at 288–89; *see also id.* at 275–85 (discussing Supreme Court decisions dating back to the 1700s regarding whether assignees had standing to sue). True, Mr. Patel's assignments alone would give him a "personal stake" in the litigation sufficient to confer Article III standing to the extent the assignment gives him a stake in the proceeds; this Court and *Barclays* do not suggest otherwise. *See Barclays*, 2023 WL 5950689 at *12 (noting "it is undisputed that [the plaintiff] has Article III standing" under *Sprint*). But that simply means Mr. Patel's injury meets the Constitution's minimum requirements to file suit; it does not mean he has the greatest "financial interest in the relief." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). As *Barclays* explained, that phrase means the "greatest *monetary* interest […] in the proceeds" or "the most to gain or lose in the outcome." 2023 WL 5950689, at *13 (interpreting Black's Law Dictionary's definitions of "financial interest," "interest," and "relief") (emphasis in original). Because Mr. Patel will not keep most of the proceeds he receives, he has a smaller financial interest in the relief than the institutional investors.

Mr. Patel's remaining cases–*Xu v. FibroGen, Inc.*, 2021 WL 3861454 (N.D. Cal. Aug. 30, 2021), *Sokolow v. LJM Funds Mgmt., Ltd.*, 2018 WL 3141814 (N.D. Ill. June 26, 2018), and *In re Paysafe Ltd.*, 2022 WL 1471122 (S.D.N.Y. May 10, 2022)–do not persuade. All of the cases preceded *Barclays* and none addressed its reasoning. *Xu* did not address whether the assignment there required the assignee to remit funds received as a result of the assignment. *See* 2021 WL 3861454, at *6-7. Instead, Xu briefly held its assignment was "facially valid" and noted, without explanation, the assignment "does not raise concerns significant enough to warrant subtracting"

9

the assignors' losses from the movant's losses. *See id.* In other words, *Xu* did not interpret the PSLRA's phrase "financial interest in the relief" to include proceeds an assignee is required to remit pursuant to an assignment. Similarly, *Sokolow* held its lead plaintiffs had standing to bring claims by virtue of assignments, but did not mention whether the assignments required proceeds to be remitted. 2018 WL 3141814, at *5-6. So, *Sokolow* also did not hold a movant's "financial interest in the relief" includes funds the movant must remit pursuant to an assignment. And the same is true of *Paysafe*, which did not even mention whether its chosen lead plaintiff had an assignment, let alone opine as to how whether funds which must be remitted should be considered "financial interest in the relief." 2022 WL 1471122, at *6 & n.7. Ultimately, Mr. Patel's arguments and cited cases are non-responsive to *Barclay*'s and this Court's reasoning: he does not have the greatest financial interest in the relief because he is contractually obligated to remit most of the $39 million if he prevails. Therefore, he is not "the person or persons who had the most to gain or lose from the litigation." *See Barclays*, 2023 WL 5950689, at *13.

Relatedly, Mr. Patel asserts this Court's reasoning "would disqualify every movant in this case," *i.e.*, institutional investors and fund managers. (*Id.* at 10-11.) Not so. At bottom, Mr. Patel's barebones assignments do not cause him to gain more money if he wins the case or to lose more money if he loses the case. Not so with institutional investor plaintiffs, and Mr. Patel's argument ignores the dynamics inherent in investment funds. If, say, a pension fund prevails in a PSLRA action, it receives money equal to its financial interest in the case and may reinvest those funds without immediately returning those funds to pension holders. In other words, an institutional investor's financial interests may be similar in character to Mr. Patel's assigned interest, but the institution's fund has "more to gain or lose" because, unlike Mr. Patel, it actually experiences the gains and losses. *See Barclays*, 2023 WL 5950689, at *13.

Second, even if Mr. Patel's financial interest was valued at $39 million, he does not satisfy Rule 23 because all of his personal and assigned shares were sold no later than November 4, 2024–nearly 1.5 years before the Department of Justice unsealed its indictment against Super Micro's officers. One element of a PSLRA claim is "loss causation, *i.e.*, a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S.

10

336, 342 (2005).  To prove loss causation, the *Bhuva* and *City of Hialeah* complaints allege the stock price declined due to the indictment and Defendants' statements about the indictment. (*Bhuva v. Super Micro, et al.*, Dkt. No. 1 ¶ 42 (alleging Super Micro's stock price fell "[o]n this news" and alleging no other stock price declines); *City of Hialeah Employees Retirement System v. Super Micro, et al.*, Dkt. No. 1 ¶¶ 37-38 (alleging the indictment "caused" stock price declines and attributes "loss causation" only to the indictment)).  In other words, in two of the three now-consolidated cases, the plaintiff's theory for loss causation rests entirely on disclosures made long after Mr. Patel and his assignees suffered their asserted losses.  By contrast, the *Chung* action, filed by Mr. Patel's counsel, is the only now-consolidated case which alleges there were four corrective disclosures in 2024, two of which occurred while Mr. Patel held Super Micro's shares. (*See Chung v. Super Micro, et al.*, Dkt. No. 1 ¶¶ 31-38.)

Because Mr. Patel and his assignors held shares for just three months in 2024, nearly a year and a half before the 2026 corrective disclosure, he does not satisfy typicality or adequacy. That all of Mr. Patel's losses long pre-date the 2026 indictment means he may be unable to prove loss causation through the 2026 indictment, a defense "not typical of the defenses which may be raised against" other class members.  *Hanon*, 976 F.2d at 508; *see also Westchester Putnam Ctys. Heavy & Highway Laborers Loc. 60 Benefit Funds v. Kyndryl Holdings, Inc.*, 2026 WL 1295840, at *4 (S.D.N.Y. May 12, 2026) (collecting cases and holding a movant who sold all of its stock before a later disclosure "renders [it] vulnerable to unique defenses compared to other putative lead plaintiffs because, if the [later] disclosure is deemed to be the only operative disclosure, [the movant] would have no recoverable losses to recoup in the lawsuit.")  Although Mr. Patel may ultimately be able to prove loss causation through the 2024 and the 2026 disclosures, his "unique factual situation," at a minimum, creates a "danger" he will be "preoccupied" with loss causation as to the 2026 disclosures, causing "absent class members [to] suffer."  *Hanon*, 976 F.2d at 508. Similarly, Mr. Patel is not an adequate representative because the timing of his losses incentivizes him to emphasize the importance of the 2024 corrective disclosures over the 2026 disclosures. Mr. Patel's competing incentives are illustrated by the fact the *Chung* complaint, filed by Mr. Patel's counsel, is the only to-be-consolidated complaint which alleges Defendants' 2024

United States District Court
Northern District of California

statements constitute corrective disclosures.  So, Mr. Patel has not "made a prima facie showing of adequacy and typicality."  *In re Mersho*, 6 F.4th at 899.

Mr. Patel's arguments to the contrary are unavailing.  Mr. Patel incorrectly argues it is "premature" to evaluate loss causation, and a showing of his inadequacy must rest on "proof" and "evidence," as opposed to "a hypothetical defense that may succeed."  (Dkt. No. 76 at 11 (cleaned up).)  It would be premature to hold, for example, Mr. Patel is unable to prove loss causation as a matter of law.  But it is not premature to consider loss causation for purposes of appointing a lead plaintiff, nor is the issue purely "hypothetical," because it is Mr. Patel's burden to make a prima facie showing of his typicality and adequacy.  As the PSLRA and Rule 23 caselaw makes clear, defenses are relevant to that showing; *Hanon*, for instance, held a plaintiff was not typical when there was a "danger" he would be "preoccupied" with a defense in a way that is "not typical" of other class members.  *See* 976 F.2d at 508.  Put another way, the PSLRA and Rule 23 permit courts to evaluate how a defense may play out, so long as courts do not adjudicate that defense.

Further, even assuming he has satisfied his prima facie adequacy and typicality showing, it has been rebutted by a preponderance of the evidence because Mr. Patel "is subject to unique defenses that render such plaintiff incapable of adequately representing the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II); *see Hanon*, 976 F.2d at 508.  As explained above, Mr. Patel's and the competing movants' loss charts, certified under penalty of perjury, raise sufficient proof demonstrating Mr. Patel is not an adequate plaintiff and "there is a danger" Mr. Patel will be "preoccupied" with loss-causation issues in a way that is "not typical" of the class.  *See id.*

Mr. Patel relies on three cases which rejected the argument a proposed plaintiff is atypical when they sell stock after some, but not all corrective disclosures.  As the argument rejected in those cases went, such a plaintiff lacks standing to pursue claims on behalf of class members who retained shares throughout the entire class period.  In *Kusen v. Herbert*, 2023 WL 8171736 (N.D. Cal. Nov. 24, 2023), the court appointed a lead plaintiff who sold shares before a corrective disclosure and "held no stock during the final six weeks" of a class period of over two years.  *Id.* at *6-10.  And in *Retail Wholesale Dep't Store Union Local 338 Ret. Fund v. Stitch Fix, Inc.*, 2023 WL 3613313 (N.D. Cal. May 22, 2023), the court appointed a lead plaintiff over the objection the

United States District Court
Northern District of California

plaintiff "may be atypical representatives because they may be subject to the unique defenses that they cannot prove loss causation because they lack standing to assert losses caused by [a later] disclosure." *Id.* at \*5.  Similarly, in *Sigman v. NuScale Power Corp.*, 2024 WL 727253 (D. Ore. Feb. 22, 2024), the court appointed a lead PSLRA plaintiff who sold "all" shares after one corrective disclosure, but "weeks" before the next corrective disclosure, noting a lead plaintiff need not have "'standing to sue on every available cause of action.'"  *Id.* at \*5 (quoting *Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 112 (2d. Cir. 2013)).

Mr. Patel's reliance on these cases is misplaced because neither case addresses the Court's particular Rule 23 concerns.  The Court is not concerned Mr. Patel is subject to a standing defense; the Court has concerns regarding Mr. Patel's adequacy and the danger he will be preoccupied with loss causation in a way that is atypical of the class.  And despite using the phrase "unique defenses," Mr. Patel's cited cases did not address *Hanon* or whether defenses would preoccupy their lead plaintiff in an atypical way.  *See generally Kusen*, 2023 WL 8171736 at \*6-10; *Stitch Fix*, 2023 WL 3613313 at \*4-5.  Accordingly, Mr. Patel's cited cases are unpersuasive.

Given Mr. Patel does not have the largest losses and has not made a prima facie showing of adequacy and typicality, the Court must "repeats th[is] inquiry" for the institutional investor plaintiffs.  *In re Mersho*, 6 F.4th at 899.

### ii.    The Institutional Investor Plaintiffs' Losses, Typicality, and Adequacy

Collectively, the institutional investors assert $20.8 million in losses, making their financial interest in the relief larger than Mr. Patel's and ATRS's.  Additionally, as noted above, the institutional investors bought and sold shares of Super Micro's stock continuously throughout the class period and continued to retain shares after the March 19, 2026 unsealing of the indictment.  Accordingly, the institutional investors' claims are typical of class members who presumably run the gamut in terms of when they purchased and sold stock in reliance on Super Micro's alleged misrepresentations.

Additionally, in light of the institutional investors' individual and joint certifications, the Court finds the institutional investors will adequately represent the class's interests.  Mississippi's certification attests, among other things, in the last three years it has sought or is currently seeking

13

appointment as lead plaintiff in 12 PSLRA class actions.  (Dkt. No. 50-2 at 6-7.)  In a joint certification, the institutional investors attest, among other things, Handelsbanken and Mississippi recently served together as lead plaintiffs in a PSLRA case where they recovered $1 billion, and where Bernstein Litowitz served as co-lead counsel; Storebrand currently serves as a lead PSLRA plaintiff in a case where Kessler Topaz is co-lead counsel; each institutional investor "independently determined to seek appointment as Lead Plaintiff in this case, and informed their respective counsel, […] of their decision" after "discussions with their respective counsel;" and representatives of each institution participated in a conference call to discuss the case prior to seeking appointment.  (Dkt. No. 50-4 at 3-8.)

Mr. Patel challenges the institutional investors' adequacy, asserting "serious questions about cohesion, counsel control, monitoring capacity, and counsel conflict." (Dkt. No. 73 at 5.) Mr. Patel asserts the institutions lack the "cohesion required for appointment as a group" because the group lacks a pre-litigation relationship and instead "appears to have been assembled through counsel," and that there are two law firms "supports the inference of counsel-driven assembly." (Dkt. No. 73 at 5-9.)  Not so.  Broadly speaking, Mr. Patel's cited district-court cases do not impose a bright-line rule or categorical bar to institutional investors being appointed as a group. The joint declaration attests to each firm's relationship with their counsel prior to this lawsuit, to each firm's independent determinations to seek appointment as lead plaintiff, and even to Handelsbanken and Mississippi having previously being appointed together as lead plaintiffs with Bernstein Litowitz representing them.  That evidence sufficiently establishes the institutional investors' adequacy and Mr. Patel does not offer evidence to rebut the institutional investors' showing.

Separately, Mr. Patel asserts Bernstein Litowitz has a conflict of interest with the class because the firm is lead counsel in a related PSLRA case against Defendant, *In re Super Micro Computer, Inc. Securities Litigation*, No. 5:24-cv-06147.  As relevant here, the plaintiffs there allege Defendants made partial corrective disclosures on August 28, 2024, October 30, 2024, November 13, 2024, and December 2, 2024 concerning "whether Super Micro complied with relevant U.S. export laws and regulations" and "audits" of the company's data center facilities.

14

(*Id.* Dkt. No. 1 ¶ 33-38.)  The plaintiffs in *Chung* plead these corrective disclosures, essentially repeating the same allegations.  (*Compare id.*, with *Chung*, No. 26-cv-4394 Dkt. No. 1. ¶¶ 33-38.)  The *Bhuva* and *City of Hialeah* plaintiffs do not plead those 2024 disclosures; these plaintiffs' allege the 2026 indictment caused Defendant's stock price to decline.

Counsel's involvement in *in re Super Micro* does not create a conflict of interest with the class.  Mr. Patel does not explain why *in re Super Micro*'s pleading of additional corrective disclosures would be "inconsistent" with plaintiffs' loss-causation theories here; to the extent the 2024 disclosures in *in re Super Micro* revealed aspects of Defendant's fraud, such an argument or finding is not antagonistic to the theory the 2026 disclosure did so as well.  Additionally, a partner at Bernstein Litowitz, Ms. Ross, attests the "same day" the *Chung* action was filed, the firm "established an ethical wall" which "prohibits any attorney working on the" *In re Super Micro* case from having "any involvement" in the now-consolidated actions or discussing the case with other firm personnel.  (Dkt. No. 77-3 ¶ 3.)[5]  And prior to filing the motion, the firm also disclosed to the institutional investors the firm's role as lead counsel in the 2024 case, that Kessler Topaz is not involved in the case, and that the firm has an ethical wall.  (*Id.* ¶ 5.)  Given the institutional investors' continued willingness to retain Bernstein Litowitz in light of this disclosure, and the presence of co-counsel who is not involved in the *in re Super Micro* case, the Court finds Bernstein Litowitz and Kessler Topaz do not have conflicts of interests with the class and will adequately represent the class's interests.

Accordingly, the Court grants the institutional investors' motion; appoints Storebrand Asset Management, Mississippi, and Handelsbanken Fonder as lead plaintiffs, and appoints their counsel (Kessler Topaz Meltzer & Check LLP and Bernstein Litowitz Berger & Grossman LLP) as co-lead class counsel.

//

---

[5] The Court overrules Mr. Patel's objection to Ms. Ross's declaration (Dkt. Nos. 79, 79-1) because the declaration directly addresses an argument made in Mr. Patel's opposition.  Additionally, the Court grants the parties' motion for leave to file a sur-reply and has considered the sur-replies. (Dkt. Nos. 79, 80.)  The Court, however, declines Mr. Patel's request to permit discovery into the firm's communications with its clients.

### iii.    Arkansas Teachers Retirement System

ATRS requests the Court appoint it as co-lead plaintiff to represent the interests of Super Micro's bondholders, asserting it "is the only movant that purchased Super Micro bonds." (Dkt. No. 75 at 2-3; Dkt. No. 78 at 1.)  The Ninth Circuit has expressed doubts as to whether the PSLRA permits courts to appoint co-lead plaintiffs.  *See Cohen v. U.S. Dist. Ct. for N. Dist. of Cal.*, 586 F.3d 703, 711 n.4 (9th Cir. 2009) (noting "[a]lthough none of the parties raise the issue, the district court may have erred in appointing 'co-lead plaintiffs,'" because the PSLRA "consistently refers to the lead plaintiff and most adequate plaintiff in the singular" and "[t]he appointment of multiple lead plaintiffs also tend to run counter to the sequential inquiry" outlined in *Cavanaugh*).  ATRS notes the to-be-consolidated complaints do not bring claims specific to bondholders and "only ATRS is capable of bringing" such claims.  (Dkt. No. 75 at 2.)  But ATRS need not be appointed co-lead plaintiff for bonds claims to be brought in this consolidated suit because ATRS (or another bondholder) could represent bondholders' interests as a named plaintiff.  Accordingly, the Court denies ATRS's request to be appointed co-lead plaintiff and encourages the parties to meet and confer regarding how the class intends to pursue claims on behalf of bondholders.

### CONCLUSION

As explained above, the Court consolidates the *Bhuva*, *City of Hialeah*, and *Chung* actions; appoints the institutional investor plaintiffs as lead plaintiffs; and appoints their counsel as co-lead class counsel.  The institutional investor plaintiffs are the movants with the greatest financial interest who satisfy Rule 23's typicality and adequacy requirements.

This Order disposes of Docket Nos. 22, 29, 35, 38, 43, 50, 61.

**IT IS SO ORDERED.**

Dated: July 13, 2026

_____
JACQUELINE SCOTT CORLEY
United States District Judge