**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Salvatore J. Graziano (*pro hac vice*)
Hannah G. Ross (*pro hac vice*)
James A. Harrod (*pro hac vice*)
Scott R. Foglietta (*pro hac vice*)
Jorge G. Tenreiro (*pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
hannah@blbglaw.com
jim.harrod@blbglaw.com
scott.foglietta@blbglaw.com
jorge.tenreiro@blbglaw.com

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Jennifer L. Joost (Bar No. 296164)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel: (415) 400-3000
Fax: (415) 400-3001
jjoost@ktmc.com

Sharan Nirmul (*pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
snirmul@ktmc.com

*Counsel for Lead Plaintiffs and Proposed Lead Counsel for the Class*

[*Additional Counsel Listed on Signature Page.*]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE SUPER MICRO COMPUTER, INC. SECURITIES LITIGATION | Case No. 3:26-cv-02606-JSC<br><br>Consolidated Case Nos. 3:26-cv-3018-JSC; 3:26-cv-4394-JSC<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL<br><br>CLASS ACTION<br><br>The Honorable Jacqueline S. Corley |

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION .......... 2
II. JURISDICTION AND VENUE .......... 9
III. PARTIES .......... 10
A. Lead Plaintiffs .......... 10
B. Defendants .......... 11
C. Relevant Non-Parties .......... 12
IV. SUMMARY OF THE FRAUD .......... 13
A. Super Micro's Business .......... 13
1. Liang And Liaw Co-Founded Super Micro And Have Maintained Close Control Over The Company's Sales Operations .......... 13
2. Super Micro's Dependence On NVIDIA's Highly Regulated Chips .......... 15
3. Super Micro's Sales Of Servers Incorporating NVIDIA GPUs Were Subject To Critical Export Control Regulations .......... 16
B. Super Micro's History Of Repeated Compliance And Internal Controls Failures .......... 19
1. 2006 Export Control Violation Scheme .......... 19
2. 2017 Revenue Recognition Scandal And Nasdaq Delisting .......... 20
3. Super Micro's Accounting Misconduct Resumes In 2020 .......... 23
4. Super Micro's 2024 Accounting Scandal .......... 25
C. Throughout The Class Period, Defendants Assured Investors That Super Micro Complied With U.S. Export Control Requirements And Attributed Growth In Asia Sales To Legitimate Business Factors .......... 25
1. Super Micro's Compliance With Export Requirements Was A Key Subject Of Investor And Analyst Concern .......... 25
2. Defendants Repeatedly Reassured Investors That Super Micro Fully Complied With All U.S. Export Control Requirements .......... 27

3. Super Micro Denied Reports Of Accounting And Export Misconduct In August 2024 And Throughout The Rest Of The Class Period ....30

4. Defendants Repeatedly Attributed The Company's Growing Sales And Revenue In Asia To Legitimate Business Factors....42

D. Super Micro Illegally Diverted Billions Of Dollars' Worth Of Servers Containing Restricted Technology To Customers in China, And These Sales Became A Significant Portion Of The Company's Revenues ....45

1. Leading Up To The Diversion Schemes, Liang's Compensation Was Made Fully Contingent On Hitting Increasing Super Micro Revenue And Stock Price Targets....46

2. Liang Orchestrates The Re-Hirings Of Ousted Sales Leaders And Super Micro's Sham Export Compliance System....48

3. Super Micro Illegally Diverted Restricted Products Into China Through Thailand ....55

4. Parallel Super Micro Scheme To Illegally Divert Restricted Products Into China Through Taiwan....63

5. Former Super Micro Employees Report That The Illicit Sales Diverted To Customers In China Were Internally Known Throughout The Company, Including To Defendants Liang And Weigand....68

6. Defendants Profited From The Fraud Through Lucrative Executive Compensation Awards And Insider Trading ....73

a. Defendants Liang's And Weigand's Executive Compensation ....73

b. Defendants Liang's And Weigand's Class Period Insider Sales ....77

7. Summary Of The Illicit Scheme Revenue ....82

E. Super Micro's Stock Price Declines As Investors Learn About The Illegal Diversion Scheme And Its Implications And Scope ....83

F. Post-Class Period Developments ....90

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ....91

A. False And Misleading Statements From February 2, 2024 Through March 31, 2024 ....91

B. False And Misleading Statements From April 1, 2024 Through June 30, 2024 ..... 93

C. False And Misleading Statements From July 1, 2024 Through September 30, 2024 ..... 95

D. False And Misleading Statements From October 1, 2024 Through December 31, 2024 ..... 98

E. False And Misleading Statements From January 1, 2025 Through March 31, 2025 ..... 100

F. False And Misleading Statements From April 1, 2025 Through June 30, 2025 ..... 105

G. False And Misleading Statements From July 1, 2025 Through September 30, 2025 ..... 108

H. False And Misleading Statements From October 1, 2025 Through December 31, 2025 ..... 112

I. False And Misleading Statements From January 1, 2026 Through March 31, 2026 ..... 112

VI. DEFENDANTS' OTHER FRAUDULENT ACTS ..... 113

VII. ADDITIONAL INDICIA OF SCIENTER ..... 118

VIII. LOSS CAUSATION ..... 132

A. Price Declines In Super Micro Common Stock ..... 134

1. March 19, 2026 ..... 134

2. June 9, 2026 ..... 137

3. June 29, 2026 ..... 138

B. Price Declines In Super Micro Convertible Notes and Options ..... 139

IX. DEFENDANTS' INSIDER TRADES IN VIOLATION OF SECTION 20A OF THE EXCHANGE ACT ..... 140

X. CLASS ACTION ALLEGATIONS ..... 141

XI. A PRESUMPTION OF RELIANCE APPLIES ..... 143

XII. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE ..... 144

XIII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ..... 145

COUNT I: For Violations Of Section 10(b) Of The Exchange Act And SEC Rule 10b-5(b) (Against All Defendants) ..... 145

COUNT II: For Violations of Section 10(b) Of The Exchange Act And SEC Rule 10b-5(a) & (c) (Against All Defendants) .......... 146

COUNT III: For Violations Of Section 20(a) Of The Exchange Act (Against The Individual Defendants) .......... 147

COUNT IV: For Violations Of Section 20A Of The Exchange Act (Against Defendants Liang and Weigand) .......... 149

XIV. PRAYER FOR RELIEF .......... 150

XV. JURY DEMAND .......... 151

Lead Plaintiffs Public Employees' Retirement System of Mississippi ("MissPERS"), Handelsbanken Fonder AB ("Handelsbanken"), and Storebrand Asset Management AS ("Storebrand") (collectively, "Lead Plaintiffs"), by and through their undersigned counsel ("Lead Counsel"), along with named plaintiff Arkansas Teacher Retirement System ("ATRS") (collectively, "Plaintiffs"), bring this action under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, against Defendants Super Micro Computer, Inc. ("Super Micro" or the "Company"), Charles Liang ("Liang"), David Weigand ("Weigand"), and Yih Shyan "Wally" Liaw ("Liaw") (collectively, the "Defendants"), on behalf of themselves and all other similarly situated persons who purchased or otherwise acquired Super Micro securities, including common stock, call options, put options, and convertible senior notes (collectively, "Super Micro Securities") after market close on February 2, 2024, through June 29, 2026, both dates inclusive (the "Class Period"), and were damaged thereby (collectively, the "Class").

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief are based upon Lead Counsel's investigation, which included review and analysis of, among other things: (1) Super Micro's public filings with the SEC; (2) Defendants' additional public statements and presentations, including those made in press releases, at investor conferences, and on earnings calls; (3) pleadings and other filings offered in connection with Defendant Liaw's criminal violations of export control laws in *United States v. Liaw*, No. 1:26-CR-00100 (S.D.N.Y., filed Mar. 17, 2026), and other litigation against Super Micro and Defendant Liang, including *Luong v. Super Micro*, No. 5:24-CV-02440 (N.D. Cal., filed Apr. 24, 2024); (4) research reports by securities and financial analysts concerning Defendants; (5) news and media reports concerning Super Micro and other facts related to this action; (6) price and volume data for Super Micro Securities; (7) information provided by former Super Micro employees and other knowledgeable individuals; (8) information from consultations with relevant experts; and (9) other publicly available information. Lead Counsel's investigation into the factual allegations contained in this Complaint is continuing, and many of the relevant facts are known only by Defendants or

are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support for the allegations set forth in this Complaint exists and would be uncovered through a reasonable opportunity for further investigation or discovery.

## I. INTRODUCTION

1. Super Micro and three of its senior executives deceived investors by concealing Super Micro's illegal sales of at least $2.5 billion of advanced artificial intelligence ("AI") technology diverted to companies in China, in violation of U.S. export control laws and in flagrant disregard of U.S. national security interests, leading to criminal and other charges and massive investor losses when the schemes came to light.

2. Super Micro is a technology company that designs, builds, and sells high-performance servers and data storage systems used for cloud computing, AI, and managing large-scale data centers. Super Micro derives most of its revenue from selling servers that incorporate microchips manufactured by NVIDIA. Since Defendant Liang co-founded Super Micro in 1993 with Defendant Liaw and with Sara Liu, Liang's wife, Liang has closely controlled Super Micro's operations, earning himself the reputation of a "one-man" show.

3. Super Micro has a documented history of compliance and internal controls failures spanning more than two decades. In 2006, Super Micro pleaded guilty to a felony charge of knowingly exporting products to Iran in violation of a national security ban. Liang assured investors this was merely the result of Super Micro being "a new company" but that Super Micro was now "well-trained" and he would personally "watch over this 24 hours a day."

4. Notwithstanding Liang's assurances, Super Micro found itself embroiled in other scandals in the years that followed. For example, in 2018, Nasdaq delisted Super Micro from its exchange because of the Company's poor internal controls. In 2020, Super Micro paid $17.5 million to settle SEC claims of widespread accounting violations. In 2024, Super Micro's auditor resigned after concluding it could no longer rely on Super Micro's management's representations.

5. In October 2022, the U.S. Department of Commerce's Bureau of Industry and Security ("BIS") published sweeping new restrictions on the export of advanced computing chips (including NVIDIA chips in Super Micro's servers) to address the national security threat posed

by China's efforts to develop advanced AI capabilities for military and surveillance operations. Because these restrictions concerned the export of Super Micro's key product, and in light of the Company's history of compliance problems, investors were understandably concerned about the impact of BIS's restrictions on Super Micro.

6. Defendants assured them that Super Micro had effective systems to monitor and ensure compliance with export restrictions to prevent diverted sales to China and that such risks were minimal because Super Micro did not have any material sales to customers in China. For example, on November 1, 2022, during the Company's 1Q23 earnings call, an analyst asked if Defendants were "seeing any [] impact from the sanctions on China by the U.S.," and whether any of Super Micro's customers were added to the list of restricted companies. In response, Defendant Liang reassured investors the Company was "keeping a watch" to ensure compliance with these new rules. Further, Defendant Weigand reassuringly stated, "we didn't have any customers that were added [to the entity list]," and because Super Micro's "China sales last quarter were less than 3% . . . we don't consider this to be a significant issue for us going forward."

7. Throughout the Class Period, Defendants repeatedly gave investors similar, false assurances that Super Micro was in full compliance with these critical requirements, including by vehemently denying various reports suggesting Super Micro was ***not*** in compliance.

8. For example, when *Reuters* reported in April 2024 that Chinese universities and research institutes had obtained Super Micro servers powered by high-end NVIDIA AI chips, Defendants publicly stated that Super Micro "complied with U.S. requirements on the sale and export of GPU [Graphics Processing Unit] systems" and "goes above and beyond what U.S. export restrictions require." When *The Information* reported in August 2024 that smuggling AI chips to companies in China had "become an industry" and that a chip broker detailed how he had rerouted thousands of Super Micro's servers to China, Defendants stated that Super Micro "follow[s] all US export control requirements on the sale, service, support, and export of GPU systems." In December 2024, when reports circulated that NVIDIA, prompted by the U.S. Department of Commerce, had asked Super Micro to conduct spot checks of its customers in Southeast Asia to ensure servers with its chips were not being exported to countries subject to U.S. export

restrictions, Defendants again publicly assured investors that Super Micro "follows all U.S. export control requirements" and that "[i]f we become aware that a third party has exported or reexported without the required licenses, we investigate [the matter] and take appropriate action." In an Export Compliance Policy dated that same month, Super Micro stated it would "fully comply with all export and re-export control laws of the United States."

9. Defendants also assured investors throughout the Class Period that Super Micro's increasing sales to customers in Asia were driven by seemingly legitimate business factors and that, in any event, less than 1% of its total sales were to customers in China.

10. For example, in August 2024, when Super Micro reported its fiscal year 2024 results, it reported unprecedented 110% year-over-year revenue growth. Defendants falsely attributed the sales and their growth to supposedly legitimate business factors, such as Super Micro's supposed technology and product leadership in AI and ability to leverage its system building blocks to secure larger AI opportunities. Similarly, in May 2025, when analysts asked about the Company's exposure to China, Defendant Weigand stated that "China continued to represent less than 1% of sales." In August 2025, when reporting its fiscal year 2025 results and after Super Micro reported 47% year-over-year growth, Defendants attributed these results to Super Micro's supposedly legitimate business strengths, including "strong demand for AI and green computing solutions," "gaining a lot of new customers," and "a lot of development" in Asia.

11. These statements were materially false and misleading and omitted material facts, in violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) & (c), and (b) thereunder. Unbeknownst to investors, Defendants did ***not*** go "above and beyond" what U.S. export controls required or "fully comply with all export and re-export control laws of the United States." Instead, Defendants engaged in a massive scheme to illegally divert billions of dollars' worth of Super Micro's AI servers to companies in China, in violation of the relevant U.S. export controls.

12. Defendant Liaw, one of Super Micro's co-founders, board members, and Senior Vice President of Business Development, directly orchestrated a significant part of Defendants' fraudulent conduct. Beginning by 2024, Liaw coordinated directly with a Thailand-based pass-through company called "Obon" on order volumes, timing, and GPU allocations for China-based

customers. The scheme was breathtaking in scale, involving "the sale of at least approximately $2.5 billion worth" of Super Micro servers containing the restricted chips to Obon, the majority of which were ultimately diverted to companies in China. By June 2024, Liaw recognized Obon's importance to Super Micro's financial performance, thanking Obon's executives for the "help for June" and promising "[i]n return" to "help [Obon] the whole year." Each of the restricted server models Super Micro sold through Obon to customers in China generated significant revenue. The B200 models—of which Super Micro sold thousands to Obon during the Class Period—generated approximately $300,000 in sales ***per unit***. Super Micro's $2.5 billion in sales to Obon thus involved illegally shipping an estimated ***8,333*** servers in violation of export restrictions.

13. Obon was a company with no apparent data center operations, no history of purchasing at this level, a suspiciously sparse online presence, and no business justification for acquiring billions of dollars in AI servers. Nevertheless, it rapidly ascended to become one of Super Micro's largest customers as an internal Super Micro spreadsheet explicitly documented—all unequivocal signs that Obon was nothing but a pass-through entity that Defendants knew or recklessly disregarded while assuring investors of their compliance with the law.

14. Obon was not Super Micro's only illicit sales channel to unlawfully divert its products to customers in China. Defendants also violated U.S. export controls by diverting sales to China through another pass-through entity called "Flying Tiger" based in Taiwan. Through an illicit sales scheme that ran parallel to Defendants' diversion scheme through Obon and as mounting scrutiny of the Obon scheme made those sales increasingly difficult to complete, sales managers from Super Micro's Taiwan office used Flying Tiger as a pass-through to sell 130 restricted servers for diversion to customers in China. These servers—Super Micro's advanced models that incorporated NVIDIA's B300 chips—each carried a particularly high unit price of approximately $500,000. As a result, Super Micro's illicit sales to Flying Tiger generated approximately $65 million in revenue for Super Micro during its fiscal year ("FY") 2026. For their sales, the Company rewarded the two sales managers who participated in this scheme with performance bonuses of nearly $150,000.

15. Moreover, far from "investigating" or "tak[ing] appropriate action" against parties

re-exporting in violation of these requirements, as Defendants repeatedly claimed, Super Micro executives actively obstructed the Company's compliance efforts and Defendants knew or acted with deliberate recklessness in disregarding that Super Micro was selling its GPUs indirectly to Chinese customers in violation of U.S. export control requirements.

16. For example, when Super Micro's compliance team paused shipments to Obon and initiated audits in August 2025, Defendant Liaw effectively blocked those efforts by: (i) preventing independent auditors from physically entering Obon's purported data center facilities; (ii) arranging for an auditor described as "friendly" to conduct reviews; (iii) fabricating lease agreements to create the false appearance that Obon had sufficient data center capacity to justify its server purchases; and (iv) staging "dummy" non-working servers to deceive inspectors. Defendant Liang facilitated this fraudulent conduct including by personally re-hiring Defendant Liaw after he had left the Company due to his involvement in prior illicit sales and accounting fraud schemes and giving him free rein over sales in the region.

17. Defendants' public reassurances that "China continued to represent less than 1% of sales" also were false and misleading, as Super Micro's illicit sales represented many times that figure, reaching nearly 18% of all sales and over 60% of its critical Asia revenue by March 2025. Similarly, Defendants' repeated claims that Super Micro's Asia growth was driven by seemingly legitimate factors such as "gaining a lot of new customers" and "product innovation" fraudulently concealed that this growth was driven by illegal diversions to pass-through customers in Thailand and Taiwan that were, in turn, diverting the servers to China.

18. Indeed, purported revenues from Thailand surged from just 1.5% to 14.2% of the Company's entire revenue between FY24 and 3Q25—a nearly ***tenfold*** increase in sales that Defendants presented to investors as being due to legitimate and seemingly innocuous business reasons. Unbeknownst to investors, this "Thailand" revenue Super Micro reported was driven by Super Micro's illicit sales through Obon. For example, between January and April 2025, Super Micro sold 2,749 of the servers to Obon, generating approximately $825 million in illicit sales. Between late April and mid-May 2025, Super Micro shipped over approximately $510 million of additional servers to Obon—all destined for companies in China. In June 2025, Super Micro

shipped at least 854 more servers to Obon for diversion to China, generating over $250 million in additional illicit sales revenue. Together, these sales in the first half of calendar year 2025 generated over $1.5 billion, booked and reported to Super Micro's investors as legitimate revenue.

19. Even direct warnings from federal authorities failed to deter Defendants' fraudulent conduct. In August 2025, BIS privately contacted Super Micro with alarming news: the agency had reason to believe Obon was illegally diverting Super Micro servers to companies in China and ordered an immediate compliance hold on all Obon shipments. Yet Defendants continued their scheme, with the participation of multiple other Super Micro employees and agents in addition to Defendant Liaw, including Steven Chang, a general manager in Super Micro's Taiwan office, and Ting-Wei "Willy" Sun, a broker they hired as a "fixer" to arrange and carry out the illicit sales.

20. In December 2025, a BIS export control officer conducted a non-public post-shipment examination of Obon's warehouse to ensure Obon was the ultimate recipient of the servers. Defendant Liaw's fixer, Willy Sun, impersonated a law firm assistant and showed the officer dummy servers that had been staged the previous day to deceive the officer into thinking the servers were operating there when, in fact, they had been diverted to customers in China. As detailed in the DOJ's indictment of Liaw and Chang, surveillance cameras captured Sun and others unboxing fake servers, using a hair dryer to transfer labels and serial numbers from genuine packaging and repackaging the dummies in authentic Super Micro boxes. Sun lied to BIS inspectors about where the servers were stored, knowing the real servers were already in China.

21. When this increased scrutiny effectively prevented Liaw from generating additional illicit sales through Obon, Super Micro's "Thailand" revenue abruptly plummeted. For example, after Super Micro's reported Thailand revenue jumped to 14.2% in 3Q25 and remained over 10% in 4Q25 (quarters when the scheme was operating), Thailand revenue dropped below 10% during Super Micro's FY26—coinciding with the Company's inability to continue illicit sales.

22. Defendant Liang knew of or recklessly disregarded the existence of the Obon diversion scheme at the same time he was assuring investors Super Micro complied fully with export control laws. Among other things, Defendant Liang personally orchestrated Defendant Liaw's return to Super Micro after Liaw was ousted in the Company's earlier accounting scandal.

Liang re-hired Liaw and gave him free rein over sales in the Asia region, knowing Liaw's history of compliance violations. According to public reports and the independent accounts of multiple former employees from across the Company, Liang was highly involved in all aspects of Super Micro's sales operations, requiring personal approval of even minuscule business deals. Defendant Liang, moreover, spoke frequently to investors about the Company's compliance with export control laws at a time when sales to Obon alone became so large—netting billions in revenue and involving over ***8,300*** GPU-equipped servers—that it defies common sense to believe that Defendant Liang was not aware of these transactions. It was readily apparent to Liang that Obon, a previously unknown startup company in Thailand, could not have any need for even a fraction of this amount of computing capacity. Given the magnitude of Super Micro's business with Obon and Liang's personal, active involvement in Super Micro's sales practices, it is not remotely plausible that he lacked knowledge of these sales.

23. The relevant truth about the Obon scheme began to emerge on March 19, 2026, when the FBI arrested Defendant Liaw and the DOJ unsealed an indictment charging him, Chang, and the third-party broker with conspiring to divert at least $2.5 billion worth of Super Micro servers with restricted NVIDIA chips through Obon to companies in China in violation of U.S. export controls. In response to this news, Super Micro's stock declined by over 33%.

24. Yet Defendants continued to mislead investors, and the relevant truth concerning the extent of Defendants' misrepresentations, of Super Micro's diversion schemes, and of the associated business and legal exposure had not yet been revealed to the market. For example, one week after the Obon-related indictment was unsealed, Defendant Liang downplayed Super Micro's exposure, reassuring investors there was "no impact on our business operations."

25. Then, on June 9, 2026, Super Micro disclosed that the diversion scheme under investigation by U.S. authorities was wider than previously known to the market. That day, in an SEC filing in connection with Super Micro's $7 billion equity raise, Super Micro disclosed that it had received subpoenas from the SEC, grand jury subpoenas from U.S. Attorneys' Offices in the Southern and Eastern Districts of New York and the Central District of California, and multiple subpoenas from BIS, all relating to the Company's customers, compliance program, internal

controls, and the individuals and facts referenced in the DOJ indictment. Super Micro's stock price declined approximately 28% on June 10, 2026, following these disclosures.

26. Then, on June 29, 2026, Taiwanese authorities raided Super Micro's Taiwan offices and detained four Super Micro employees for questioning, revealing a large Taiwan diversion scheme that was deeply embedded within the Company's operations. The June raid followed Taiwanese law enforcement's May raid of warehouses in Keelung, where they had initially seized Super Micro servers equipped with NVIDIA GPUs, and detained three suspects who had used shell companies and forged export declarations to ship Super Micro servers, including to buyers in mainland China. Together, the parallel schemes involving both Thailand (Obon) and Taiwan (Flying Tiger) exposed concerted efforts to illegally divert Super Micro's restricted products to China, involving multiple Super Micro employees across different geographies. Super Micro's stock price declined an additional 8.1% after these disclosures.

27. Defendants' misstatements and fraudulent conduct concealing Super Micro's diversion schemes and reliance on the illicit sales they generated caused massive losses to investors. Super Micro's stock price reached a Class Period high of over $118 per share in March 2024 but plummeted to just $28.15 at the end of the Class Period, wiping out billions of dollars in Super Micro's market capitalization.

## II. JURISDICTION AND VENUE

28. The claims asserted arise under Sections 10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), 78t-1, and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

29. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

30. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b), including because at all relevant times Super Micro had its principal executive offices located in this District and conducted substantial business here. In addition, many of the acts alleged herein occurred in this District.

31. In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but

not limited to, the U.S. mails, interstate telephone and internet communications, and the facilities of the national securities exchanges and markets.

## III. PARTIES

### A. Lead Plaintiffs

32. Lead Plaintiff MissPERS is a pension fund established for the benefit of the current and retired public employees of the State of Mississippi. MissPERS is responsible for the retirement income of employees of the State, including current and retired employees of the State's public-school districts, municipalities, counties, community colleges, state universities, libraries, and water districts. MissPERS provides benefits to over 75,000 retirees, manages over $28 billion in assets for its beneficiaries, and is responsible for providing retirement benefits to more than 250,000 current public employees. As set forth in the attached certification, MissPERS purchased Super Micro common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint.

33. Lead Plaintiff Handelsbanken is a mutual fund management company based in Stockholm, Sweden that manages approximately $67.5 billion in assets. As set forth in the attached certification, Handelsbanken, through its investment funds Handelsbanken Global Index Criteria and Handelsbanken USA Index Criteria, purchased Super Micro common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint.

34. Lead Plaintiff Storebrand is an asset management company based in Lysaker, Norway that manages more than NOK 1,500 billion (EUR 125 billion) in assets. As set forth in the attached certification, Storebrand, through its investment funds SPP Generation 40-tal, SPP Generation 50-tal, SPP Generation 60-tal, SPP Generation 70-tal, SPP Generation 80-tal, and Storebrand Global All Countries, purchased shares of Super Micro common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint.

35. Additional plaintiff Arkansas Teacher Retirement System ("ATRS") has been providing retirement benefits to Arkansas's public school and education employees since 1937.

ATRS is a defined benefit retirement plan established by state law with approximately $26 billion in total assets, as of June 30, 2026. ATRS is headquartered in Little Rock, Arkansas, and is administered as a "qualified" government sponsored retirement plan under the provisions of Internal Revenue Code Section 401(a). The state statute, Arkansas Code Sections 24-7-201, *et seq.*, containing the benefit provisions for the plan, is supplemented by ATRS Rules and Regulations. As set forth in the certification previously filed with the Court (ECF No. 44-1), ATRS purchased Super Micro Securities at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint.

**B. Defendants**

36. Defendant Super Micro designs, manufactures, and sells, among other things, high-performance servers and data storage systems. Super Micro maintains its headquarters at 980 Rock Avenue, San Jose, California and its common stock trades on Nasdaq under the symbol "SMCI." Effective October 1, 2024, Super Micro executed a 10-for-1 forward stock split for its common stock. As of January 31, 2026, Super Micro had nearly 599 million shares of common stock outstanding, owned by thousands of investors. Super Micro's fiscal year runs from the beginning of July to the end of June. For example, Super Micro's FY24 ran from July 1, 2023 through June 30, 2024.

37. Defendant Liang is, and was at all relevant times, Super Micro's Chief Executive Officer ("CEO"), Chairman of its Board of Directors, and the President of the Company.

38. Defendant Liaw was at all relevant times Super Micro's co-founder, a member of its Board of Directors, and its Senior Vice President of Business Development.

39. Defendant Weigand is, and was at all relevant times, Super Micro's Chief Financial Officer ("CFO"). Before his time as CFO, Defendant Weigand served as Senior Vice President and Chief Compliance Officer ("CCO") from 2018-2021. Until November 2024, Defendant Weigand, as CFO, was also the Company's principal accounting officer.

40. Defendants Liang, Liaw, and Weigand are collectively referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with Super Micro, possessed the power and authority to control the contents of Super Micro's reports to the SEC,

press releases, and presentations to securities analysts, money and portfolio managers, and institutional and other investors. Each of the Individual Defendants was provided with copies of Super Micro's statements, reports, and press releases alleged herein to be false and/or misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

### C. Relevant Non-Parties

41. Sara Liu is, and was at all relevant times, Defendant Liang's spouse, and Super Micro Co-Founder, Senior Vice President, and Director.

42. Ruei-Tsang "Steven" Chang was at all relevant times a general manager at Super Micro's Taiwan office.

43. Ting-Wei "Willy" Sun was at all relevant times a third-party broker hired by Defendant Liaw in connection with Super Micro's sales.

44. Former Employee ("FE")-1 was a Sales Director at Super Micro from July 2023 to July 2025.[1] As a Sales Director, FE-1 was primarily responsible for bringing in new business to the Company as part of Super Micro's sales Team #1, which generated approximately 80% of the Company's total sales. FE-1 reported to Ally Nassar and Shadow Liu, who reported to Marcus Sylva, a Senior Vice President of Sales, who in turn reported to Senior Vice President and Chief Growth Officer Cenly Chen, who reported directly to Defendant Liang.

45. FE-2 was a Sales Manager for Original Equipment Manufacturer (or "OEM") and Business Development at Super Micro from March 2023 to July 2024. As a Sales Manager, FE-2 was primarily responsible for finding new accounts for the Company and managing the Company's OEM business—producing parts or products that would be used in other companies' finished goods. FE-2 reported to Senior Sales Manager, Jessie Chou, who reported to then-Senior Sales

[1] The former employees and confidential witness herein are referenced using feminine pronouns regardless of actual gender in order to maintain the person's confidentiality.

Director, Dave Dunkle, who in turn reported to Chief Growth Officer Cenly Chen, who ultimately reported to Defendant Liang.

46. FE-3 was a Technical Accounting and SEC Reporting employee at Super Micro from January 2025 to September 2025, reporting to Kenneth Cheung, who in turn reported to Defendant Weigand. As a member of the accounting and reporting team, FE-3 was primarily responsible for reviewing accounting matters, preparing financial statements, and reviewing the Company's periodic reports before they were filed with the SEC.

47. FE-4 was a Director in sales at Super Micro for several years until 2024. During her tenure, FE-4 reported to a Super Micro executive who reported directly to Liang.

48. Confidential Witness ("CW")-1 was an employee of Taiwan-based telecommunications company Chief Telecom. CW-1 served as an Operations Team Member at Chief Telecom from January 2024 through September 2025. She was responsible for preparing and monitoring a server space rented by Super Micro from May or June 2024 to March or April 2025.

## IV. SUMMARY OF THE FRAUD

### A. Super Micro's Business

#### 1. Liang And Liaw Co-Founded Super Micro And Have Maintained Close Control Over The Company's Sales Operations

49. Defendants Liang and Liaw founded Super Micro in 1993 together with Liang's wife, Sara Liu. Since then, Liang has maintained tight control over Super Micro, and particularly its sales operations, operating the Company as a family-run business, as both public sources and former Company employees confirm.

50. For example, in a 2008 profile of Liang, *The New York Times* described Super Micro as a "one-man, or at least one-family, powerhouse" and noted that Liang "obsesses over every detail of the business, from approving the custom orders that are the company's specialty to dictating the environmentally themed, green neckties that executives wear to customer meetings." In the same profile, Scott Barlow, a former manager of sales at Super Micro, described Liang as "the person who approves and looks at everything the company is doing" and a "one-man show."

51. Former employees echoed the descriptions of Defendant Liang's management style from *The New York Times* profile, confirmed that it remained the same during the Class Period, and reported that Liang was intimately involved in reviewing and approving deals with customers, especially deals of significant size.

52. FE-1, a Sales Director at Super Micro during the Class Period, stated that Liang required Super Micro sales employees to obtain his signed approval for all sales transactions, even deals as low as $3,000, and that any proof of concept or customer evaluation worth $25,000 also required Liang's written approval. FE-1 personally experienced this process: she was required to wait outside Liang's office for his sign-off, and nothing left the Company without his signature. According to FE-1, Liang had his fingers in everything. For example, when FE-1's team handled projects for major customers, Liang was involved in the design, attended the meetings, and pushed the team to finish faster.

53. Other former employees corroborated the accounts described above. For example, FE-4 stated that under Super Micro's sales practices, Liang had to personally sign off on everything, whether it was a promotion approval, product kick-off, event budget, or signage and slogan messaging for marketing. Additionally, the AlphaSense Expert Insights platform published a transcribed interview on May 22, 2026 between an analyst and a former sales director at Super Micro ("Former Director 1"). Former Director 1 oversaw enterprise sales in the Midwest region for data center infrastructure and storage solutions, including channel/partner motions and complex deal executions. According to Former Director 1, "the executive board of directors will do whatever Charles [Liang] wants them to do, regardless of rules, regulations, and common sense. It's crazy." Former Director 1 further noted that he had to personally appear before Liang to request $40,000 worth of demo gear to show a customer, and that during that meeting, Defendant Liang "asked about the deal, he asked about the long-term, he asked about the scope."

54. The AlphaSense Expert Insights platform published another transcribed interview on March 24, 2026, between an analyst and a different former director of sales and AI solutions at Super Micro, who was responsible for enterprise sales in the Midwest and worked at the Company between 2019 and 2022 ("Former Director 2"). Former Director 2 similarly reported that

Defendant Liang "very much [has] his hands on almost every deal. He likes to approve everything. Anything over a certain dollar amount he has to approve." Former Director 2 further noted that "Charles, the CEO[,] controls everything. It's just really a strange environment there when everybody on the board of directors is not independent and they're all family members."

55. In the Company's regulatory filings during the Class Period, Super Micro described Liang as integral to its operations and warned he was the only such "key employee" specifically identified.

56. In addition, members of Defendant Liang's family have served in a variety of senior management or Board positions at Super Micro. Liang's wife, Sara Liu, is a director at Super Micro, has been a member of its Board since March 2007, and has held a number of positions within the Company, including Treasurer from 1993 to 2019, Senior Vice President of Operations from 2014 to 2018, and Chief Administrative Officer from 1993 to 2019. Bill Liang, one of Defendant Liang's younger brothers, also serves on Super Micro's Board.

### 2. Super Micro's Dependence On NVIDIA's Highly Regulated Chips

57. Super Micro specializes its data-storage systems with "rack-scale" solutions, which use collections or "racks" of servers designed for particularly demanding workloads, including running AI systems and other high-performance computing tasks.

58. Super Micro incorporates into many of its products graphics processing units ("GPUs")—computer chips that perform rapid mathematical calculations. GPUs, originally designed to render sophisticated computer imaging, have become critical components of AI platforms due to their ability to analyze massive amounts of data and quickly perform billions of mathematical calculations.

59. In recent years, Super Micro's business has become heavily dependent on sales of servers that incorporate GPUs. For example, Super Micro's sales of GPU servers increased from less than 20% in 2022 to over 50% of sales by the end of June 2024, when the Company's fiscal year 2024 ended. Throughout the Class Period, Super Micro's revenues continued to grow increasingly reliant on GPU-server sales, reaching over 70% of Super Micro's revenues.

60. Before and during the Class Period, Super Micro relied on NVIDIA—a public

technology company headquartered in Santa Clara, California—as its primary supplier of GPUs. NVIDIA does not sell its most advanced chips directly to many of its global customers. Instead, it sells these chips to companies like Super Micro which then assemble and sell servers powered by these chips to its customers. As the demand for AI chips boomed, Super Micro's purchases of GPUs from NVIDIA grew from ***17.6%***—measured as a share of the total dollar value of components and materials Super Micro purchased from all of its suppliers—at the end of its fiscal year 2023 (*i.e.*, June 2023) to ***55.1%*** by September 2023, ***68.1%*** by December 2023, and ***69.8%*** by March 2024. During the Class Period, Super Micro maintained a strategic "first-to-market" partnership with NVIDIA, which allowed Super Micro to ship products incorporating NVIDIA GPUs ahead of Super Micro's competitors. Moreover, NVIDIA commanded a share of more than 75% of the global market for GPUs throughout the Class Period.

### 3. Super Micro's Sales Of Servers Incorporating NVIDIA GPUs Were Subject To Critical Export Control Regulations

61. As a U.S. manufacturer that sells and ships its products internationally, Super Micro is subject to rigorous export controls. In this regard, the U.S. Department of Commerce's BIS is responsible for safeguarding national security by ensuring the effective control of sensitive exports. According to BIS, "[t]he Bureau's paramount concern is the security of the United States. The [BIS's] mission is to protect the security of the United States, which includes its national security, economic security, cyber security, and homeland security." To further that mission, BIS implements and enforces the Export Administration Regulations ("EAR"), which regulate the export, re-export, and transfer of items that could be used or exploited in ways that compromise national security. Anyone seeking to export such items must obtain a license from BIS.

62. In the years leading up to the Class Period, BIS concluded that the Chinese government used advanced computing integrated circuits "to improve the speed and accuracy of its military decision making, planning, and logistics, as well as of its autonomous military systems, such as those used for cognitive electronic warfare, radar, signals intelligence, and jamming" and "to improve calculations in weapons design and testing including for WMD, such as nuclear weapons, hypersonics and other advanced missile systems, and to analyze battlefield effects."

Recognizing this national security threat, on October 7, 2022, BIS released an interim final rule ("IFR") called "Implementation of Additional Export Controls: Certain Advanced Computing and Semiconductor Manufacturing Items; Supercomputer and Semiconductor End Use; Entity List Modification" (the "2022 IFR"). *See* 87 Fed. Reg. 62186. The 2022 IFR, which became effective the same day it was released, imposed licensing requirements on the export of advanced AI accelerator chips, including NVIDIA's B200, H100, and H200 GPUs—which were some of NVIDIA's most critical products—and servers incorporating them. This meant that, absent an export license from BIS, as of October 7, 2022, it was illegal for Super Micro to export servers it produced that contained NVIDIA's B200, H100, or H200 GPUs to companies in China.

63. On November 1, 2022, during the Company's 1Q23 earnings call, analysts asked Super Micro how the new re-export restrictions on China impacted the Company. For example, an analyst from CJS Securities engaged in the following colloquy with Defendants Liang and Weigand:

> Q: I was wondering if you're seeing any kind of impact from the sanctions on China by the US, if there are any. I know earlier in the quarter there was NVIDIA news. I know a lot of companies got added to the [entity] list. Were any of those your customers? How should we think about the consequences of those actions?
>
> A (Liang): [W]e see some impact for sure. And exactly how long the impact will be lasting, we're are (*sic*) keeping a watch.
>
> A (Weigand): [W]e didn't have any customers that were added. However, as everyone knows, the GPU sales became limited. China sales last quarter were less than 3%. So we don't consider this to be a significant issue for us going forward.

64. These statements represented to investors that Super Micro vigilantly monitored its compliance with restrictions prohibiting diversion of its products into China. They also reassured investors that Super Micro did not face any material impact from these restrictions in any event because "China sales" were insignificant to the Company's financial results.

65. Nevertheless, a June 2023 investigation by *Reuters* confirmed that it was still possible to purchase top-end NVIDIA AI chips in China via a "de facto underground market" created following the 2022 restrictions. In an article dated June 20, 2023 titled, "Focus: Inside China's underground market for high-end Nvidia AI chips," *Reuters* described how Chinese vendors procured the chips: "snatching up excess stock that finds its way to the market after Nvidia

ships large quantities to big U.S. firms, or importing through companies locally incorporated in places such as India, Taiwan and Singapore."

66. On October 25, 2023, in response to public reports that companies in China had continued to acquire restricted NVIDIA GPUs, BIS issued a new IFR, which strengthened the restrictions set forth in the 2022 IFR, and which was called "Implementation of Additional Export Controls: Certain Advanced Computing Items; Supercomputer and Semiconductor End Use; Updates and Corrections" (the "2023 IFR"). *See* 88 Fed. Reg. 71478. To ensure that companies could not circumvent the 2022 IFR, the 2023 IFR added a licensing requirement for any transaction involving a company headquartered or with an ultimate parent company headquartered in China, whether that company was the "purchaser," "intermediate consignee," "ultimate consignee," or "end-user."

67. BIS provided additional guidance for complying with the 2022 and 2023 IFRs, including a list of "Red Flags" that trigger an "affirmative duty upon exporters to inquire, verify, or otherwise 'go behind' the customer's representations" and "check out the suspicious circumstances and inquire about the end-use, end-user, or ultimate country of destination." BIS also explicitly warned companies that they should "not self-blind," including by "cut[ting] off the flow of information that comes to your firm in the normal course of business." At the time BIS issued the 2023 IFR, BIS's list of "Red Flags" about orders of products that should prompt suspicion and trigger the duty to exercise additional due diligence included: (i) the "product's capabilities do not fit the buyer's line of business"; (ii) the "customer has little or no business background"; and (iii) the "customer is unfamiliar with the product's performance characteristics but still wants the product."

68. BIS provided additional guidance "to help increase industry's awareness of illegal diversion schemes," on May 13, 2025. Among other things, BIS added as Red Flags that: (i) the customer saw a significant increase in exports after the 2022 IFR; (ii) the customer had not received exports of advanced computing (including GPUs) prior to the 2022 IFR; (iii) the customer "has little to no presence online"; (iv) the customer does not "typically engage in business consistent with requiring a large quantity of advanced computing" chips; and (v) the customer cannot affirm

it has the infrastructure to operate the advanced computing exports. BIS also provided a list of due diligence actions companies could take if any of the Red Flags were present, including checking if the customer's date of incorporation was after the 2022 IFR and evaluating the customer's data center to determine if it has the capacity to support the advanced computing chips that it had ordered.

69. The EAR also requires that exporters (like Super Micro) or their authorized agents file certain forms and declarations containing information about their exports or Electronic Export Information ("EEI") with U.S. Customs and Border Protection. Exporters or their agents must file truthful and accurate EEI for every export valued at $2,500 or more or if a license is required (regardless of value). 15 C.F.R. §§ 30.2, 758.1. Among other things, EEI must include the identity of the end user and the country of ultimate destination and false statements in these forms are criminally penalized by various federal statutes and regulations.

## B. Super Micro's History Of Repeated Compliance And Internal Controls Failures

70. Since its founding, Super Micro has repeatedly failed to implement compliance systems and internal controls in accordance with applicable legal requirements. These pervasive deficiencies have surfaced through multiple crises and scandals, including criminal export control violations and accounting scandals involving revenue recognition improprieties. Through the periods reflected below, Defendants Liang and Liaw have been control persons and leaders of Super Micro's business, if not direct participants in the conduct underlying these deficiencies.

### 1. 2006 Export Control Violation Scheme

71. One of Super Micro's major compliance crises involved its admission that it criminally violated U.S. export control laws. In September 2006, the year before Super Micro went public, a criminal investigation by U.S. officials revealed that between 2001 and 2002 Super Micro knowingly shipped hundreds of computer motherboards to a Dubai-based entity to divert these products to Iran in violation of BIS export rules. To resolve the charges, Super Micro pleaded guilty to felony offenses, admitting that it shipped motherboards to a company in Dubai "knowing that the motherboards would be trans-shipped to Iran" even though "***at the time of the export it***

***knew that the United States had imposed an embargo*** against the Islamic Republic of Iran."[2] As part of its plea agreement, the DOJ required Super Micro to pay hundreds of thousands of dollars in criminal fines.

72. In its guilty plea, Super Micro admitted that, since its founding in 1993, the Company lacked any "in-house export control program," and that it only created such a program in February 2004, ***after*** it "became aware of the [government's] investigation." Super Micro's representation that it had "voluntarily created and implemented an in-house export control program before being charged" was a key factor in the U.S. government agreeing to the terms of the plea.

73. Following the Iranian diversion scandal, Defendant Liang publicly ascribed Super Micro's criminal violations to its purported inexperience as an emerging company. For example, Liang told *The New York Times* in 2008, "We were a new company and didn't know every regulation . . . . ***Now, we are well trained and watch over this 24 hours a day***." As *The New York Times* further reported, Liang reassuringly stated that "Super Micro was improving its order-tracking system and might consider purchasing process management software."

74. As part of its supposed remedial efforts, Super Micro also purported to remove the employee behind the Iranian sales from "an international sales function," but in fact "continue[d] to [] employ[]" this individual, even after the scandal, according to a Form S-1 Registration Statement filed by the Company on December 14, 2006. Super Micro would later repeat this move leading up to the China diversion scandal, immediately before which it re-elected to its Board Defendant Liaw, whom Super Micro had recently terminated due to other controls related misconduct. *See infra* §IV.D.2.

### 2. 2017 Revenue Recognition Scandal And Nasdaq Delisting

75. Starting in 2017, Super Micro became engulfed in another major crisis, this time involving a pervasive accounting fraud that resulted in Nasdaq delisting Super Micro's stock, Super Micro paying a $17.5 million fine to the SEC, and Defendant Liang disgorging millions of dollars in ill-gotten gains from insider trading.

[2] Unless otherwise noted, all emphasis is added and all citations are omitted.

76. In August 2017, Super Micro announced that it could not timely file its annual report on Form 10-K for its FY17. Failing to file this SEC-mandated annual report posed serious risks to the Company. These included being "delisted" from Nasdaq, meaning Super Micro's shares could no longer be bought or sold there. Nasdaq granted Super Micro an extension, but Super Micro was unable to file the relevant 10-K within the extra time allotted. At the time, the Company disclosed nothing about the nature or scope of the underlying problems.

77. Super Micro at first offered only vague explanations for the delays in filing its periodic reports with the SEC, including blaming them on a purported administrative delay, while seeking successive extensions from Nasdaq. In August 2018, after the Company repeatedly failed to file its reports with the SEC, Nasdaq suspended trading in Super Micro stock and delisted it in March 2019.

78. As it turned out, Super Micro's inability to timely file its mandatory reporting with the SEC was the product of years of pervasive accounting manipulation. As subsequent internal and external investigations revealed, and as the SEC later found, Super Micro had been "engaged in improper accounting—prematurely recognizing revenue and understating expenses from at least fiscal year ("FY") 2015 through FY 2017." As the SEC later determined, from FY15 to FY17, Super Micro "improperly accelerated revenue recognition and reporting" through an extensive, multi-pronged scheme that included: (i) recognizing revenue before delivering goods to customers; (ii) sending goods to customers prior to the specified delivery date; (iii) improperly changing shipment terms to large customers to recognize revenue upon shipment rather than when the goods were delivered; (iv) recognizing revenue on sales to large distributors upon shipment, even though the revenue should have been recognized when Super Micro received payment; and (v) holding back documentation from certain overseas customers to prevent them from taking possession of the goods but nevertheless improperly recognizing the revenue upon shipment.

79. As the SEC later concluded, Super Micro had prematurely recognized hundreds of millions of dollars in revenue through this scheme. As a result, Super Micro "materially misstated financial statements in its annual, quarterly and current reports [filed with the SEC]." Moreover, as Super Micro was later forced to admit in restated SEC filings, Super Micro suffered from "a

culture of aggressively focusing on quarterly revenue ***without sufficient focus on compliance***" and from "***an inappropriate tone at the top***." The investigations determined that Super Micro's internal controls contained "deficiencies related to segregation of duties" and "lacked controls" necessary to "mitigate the risk of ***management overriding internal controls***."

80. As the details behind the delays came to light, Super Micro announced an internal investigation as a supposed effort to "remediate" its problematic sales and revenue recognition practices. Following the completion of this investigation in January 2018, the Company announced the resignation of multiple members of its senior and executive management, including (but not limited to) Defendant Liaw, then Senior Vice President of International Sales and member of Super Micro's Board of Directors; Howard Hideshima, then CFO; and Phidias Chou, then Senior Vice President of Worldwide Sales. In addition to these high-level departures, multiple other senior sales leaders stepped down, including three vice presidents of sales. In explaining this wave of departures by Defendant Liaw and others, Super Micro did not expressly reveal their connection to the accounting misconduct behind the scandal. Instead, it noted that these individuals departed the Company "following completion of an Audit Committee investigation, in connection with a restructuring of the Company's sales organization as part of ***the Company's remediation of material weaknesses in its internal control over financial reporting***."

81. In connection with these supposed "remediation" efforts, Super Micro replaced former CFO Hideshima with Kevin Bauer, who served as the company's Senior Vice President and CFO from January 2018 until his resignation on January 29, 2021. During his tenure as CFO, Super Micro filed its delayed SEC reports and regained its listing on Nasdaq. In May 2019, nearly two years after the initial filing failure, Super Micro finally filed its annual report for fiscal year 2017, which revealed restatements including a reduction in FY15 revenues by $37 million, with about one-third of the restatements attributable to revenues from related parties.

82. After finally filing its required SEC reports, Nasdaq approved Super Micro to relist its common stock in January 2020. Just as he had done after the Iran conviction, Defendant Liang assured investors that Super Micro had remediated the problems behind the scandal. For example, in the press release announcing its relisting on Nasdaq, Liang assured investors that the Company

had begun "a new chapter . . . that is ***based on improved internal controls***." Further, addressing investors in August 2020, Defendant Liang assured them that although Super Micro had fallen "short of [its] standards," the Company had "***implemented numerous remedial actions and internal control enhancements to prevent such errors from recurring***."

83. In August 2020, based upon the foregoing misconduct, the SEC charged Super Micro and its now former CFO Hideshima with "widespread accounting violations," failures in Super Micro's internal accounting controls, and filing SEC public reports with materially misstated financial statements. Super Micro and Hideshima settled the charges with the SEC and agreed to pay a $17.8 million combined fine. The SEC also ordered Defendant Liang to reimburse Super Micro for the more than $2.1 million in profits from stock sales he made after the Company issued its false financial statements.

### 3. Super Micro's Accounting Misconduct Resumes In 2020

84. On April 24, 2024, Bob Luong, former Head of Global Services at Super Micro, filed a whistleblower retaliation suit against Super Micro and Defendant Liang. The veracity of the detailed factual allegations in Luong's complaint was confirmed by Lead Plaintiffs' counsel with Luong's counsel of record in that action.

85. According to Luong, Super Micro and Liang did not actually remediate the improper systems or practices that caused its 2017-2020 revenue recognition accounting scandal. Instead, the Company suspended these practices just long enough to regain its listing on the Nasdaq in January 2020 but resumed its accounting schemes "just weeks after the SEC cease and desist orders were issued" on August 25, 2020, according to Luong. Moreover, these accounting schemes involved "improper revenue recognition, circumvention of internal accounting controls, shipping product with known issues, and providing service support to customers without service—to unlawfully overstate revenue and/or shift revenue between business units."

86. Luong was well positioned to observe this misconduct. Super Micro hired Luong in 2012 and promoted him in 2015 to Senior Director and then to General Manager, Service and Strategic Solutions, where he was responsible for providing strategic guidance for Super Micro's Global Service team. That team provided post-sale maintenance and support services to purchasers

of Super Micro's equipment. Luong managed a team of over eighty people and effectively reported directly to Defendant Liang from 2015 until approximately mid-2022.

87. Luong described several methods Super Micro used to recognize revenue early beginning in late 2020. First, Super Micro improperly recognized revenue for equipment sales to multiple large customers in the fiscal quarter ending December 2020. Second, Super Micro recognized revenue from sales the Company knew would not be completed in that quarter. For example, although the Company knew certain equipment would not be delivered, installed, or functioning by quarter-end as its contracts required, it booked the revenue anyway rather than waiting until a later quarter when its contractual obligations had been satisfied. Third, Super Micro shipped and billed customers for incomplete equipment that was not ready for sale, such as equipment lacking components necessary to its operation, which could not be shipped or installed until later quarters, and equipment containing components, such as pre-release processors, that Super Micro was not authorized to resell.

88. As Luong further witnessed, Super Micro also deviated from proper methods of allocating revenue between services and hardware. According to Luong, the method that the Company adopted in accordance with GAAP—validated by then-CFO Bauer and the Company's external auditors during the SEC enforcement action—was abandoned in favor of allocating more revenue to the hardware business for the purpose of making that business line appear more profitable. Beginning January 1, 2022, Super Micro also changed its accounting for revenue from its top four customers. It cut the share of revenue attributed to services for those four customers alone from approximately 7% to approximately 1.4%. Super Micro justified the change with what Luong described as "the dubious explanation that the four customers did not need as much service as other customers." According to Luong, Liang decided on the 1.4% allocation by directive, with Defendant Weigand present for the discussions, and without any data to support the decision.

89. According to Luong, he reported multiple instances of accounting manipulation and misconduct to Super Micro's executive leadership, including Defendant Liang. For example, in late 2020, Luong reported to Super Micro's controller Kenneth Cheung that his direct report, Jenny Lau, had miscategorized over $10 million in revenue to the wrong accounting category, overstating

reported profit margins. In December 2020 and January 2021, Luong escalated these concerns to then-CFO Kevin Bauer, who in turn communicated them to Defendant Liang.

90. Luong reported that he was pressured to approve accounting changes in violation of revenue recognition rules. For example, in January 2022, Luong was asked to approve a change in the treatment of revenue received from Super Micro's top four customers, but Luong refused due to concerns it violated applicable accounting rules.

91. As discussed below, Luong was allegedly retaliated against and terminated following his reporting of these concerns about Super Micro's accounting misconduct.

#### 4. Super Micro's 2024 Accounting Scandal

92. In late 2024, the Company was engulfed in a new accounting scandal, its second in less than a decade. This time it ended with the resignation of the Company's newly hired outside auditor, Ernst & Young ("E&Y"), and Super Micro's admission that its internal controls over financial reporting were not effective. The misconduct at the center of the E&Y scandal occurred during, at a minimum, Super Micro's fiscal year 2024, which ran from July 1, 2023 through June 30, 2024. As Super Micro's subsequent admissions made clear, during this period, Super Micro's internal controls and compliance systems suffered from serious material weaknesses, including misconduct that E&Y flagged concerning the Company's export control compliance. *See infra* §IV.C.3.

### C. Throughout The Class Period, Defendants Assured Investors That Super Micro Complied With U.S. Export Control Requirements And Attributed Growth In Asia Sales To Legitimate Business Factors

#### 1. Super Micro's Compliance With Export Requirements Was A Key Subject Of Investor And Analyst Concern

93. Super Micro depended on NVIDIA GPUs as a critical driver of demand for the Company's products and, in turn, of its financial performance. This was particularly true in light of the ongoing shortage of NVIDIA GPUs. Accordingly, Super Micro's ability to obtain NVIDIA GPUs to generate revenue from sales of servers with NVIDIA GPUs was a key investor concern analysts recognized during the Class Period.

94. After BIS announced the 2023 IFR, analysts questioned the impact of the new

restrictions on Super Micro's bottom line. For example, on an earnings call held November 1, 2023, an analyst asked if Super Micro would "benefit from the increased NVIDIA supply" that would result from the restrictions on exports to China. Liang responded that the new restriction was "one reason why" the Company was seeing increased NVIDIA supply. This conveyed to investors that the 2023 IFR ***benefited*** Super Micro because it would have access to an increased supply of coveted NVIDIA chips and because its business did not materially involve the sale of its products incorporating NVIDIA chips to China, which was now restricted. This is precisely how analysts understood Defendants' statements. For example, in a November 1, 2023 report, Barclays analysts commented that Super Micro was a "beneficiary of China AI export restriction[s]," because the Chinese AI footprint would be limited as a result, "leading to [a] greater share" of certain NVIDIA GPUs that Super Micro could use to build its servers. Similarly, Loop Capital analysts on November 2, 2023 noted that they believed Super Micro would be on "accelerated footing," "aided in no small part" by the NVIDIA GPUs being "freed up from the U.S. to China ban." This sentiment was also expressed by analysts from Rosenblatt, who reported on November 16, 2023 that "U.S. restrictions" on China have "clearly positioned Supermicro with a competitive advantage in AI."

95. Analyst reliance on Defendants' statements that the 2023 IFR benefited Super Micro in legitimate ways persisted into and throughout the Class Period. In March 2024, shortly after the Class Period started, analysts from J.P. Morgan wrote that "supply of GPUs could be a key driver of revenue" for Super Micro, commenting that "the largest constraint in relation to revenue is likely most in relation to [acquiring GPUs from] Nvidia." In May 2025, analysts from CGS International wrote that because Super Micro was "subject to NVIDIA's GPU allocations," Super Micro's financial results depended on its ability to "manage the appropriate levels of inventory for the specific families of chips" from NVIDIA.

96. Meanwhile, NVIDIA required Super Micro to certify that it complied with export controls as a condition of receiving GPU allocations. NVIDIA also required buyers like Super Micro to have a "whitelist" of companies approved for sales and to provide documentation on the end-users of the servers that would incorporate NVIDIA's regulated GPU components, with

further resale prohibited. NVIDIA imposed these requirements on buyers of its GPUs because it too had an obligation under the 2022 and 2023 IFRs to ensure its products were not sold in violation of the export control regulations.

97. Analysts and investors were especially focused on potential compliance problems given Super Micro's long history of compliance failures leading up to the Class Period, which remained top of mind for analysts. For example, analysts from Loop Capital wrote in an October 2023 report that a key risk to the Company was that "[c]ustomers [were] still concerned about viability," as the Company was still working "to regain customer strength" after negative reporting. Similarly, CFRA analysts noted in December 2023 the Company's previous scandals, including that Super Micro was "delisted from the Nasdaq Exchange given its inability to properly file SEC required documents."

### 2. Defendants Repeatedly Reassured Investors That Super Micro Fully Complied With All U.S. Export Control Requirements

98. Recognizing that Super Micro's compliance with export control regulations was a critical subject for investors, Defendants repeatedly assured investors, including in response to repeated and specific questions about compliance with export controls, that the Company complied with U.S. export laws, including all restrictions banning the re-export of Super Micro's servers containing restricted GPUs to companies in China.

99. For example, on February 16, 2024, Defendant Liang appeared in a television interview with reporters from *Bloomberg Technology*. During the interview, the host noted "You had to pull out your manufacturing from China previously . . . How do you see that restriction on supply and the ongoing relationship between the U.S. and China now and [sic] it affecting your business?" In response, Defendant Liang assured investors, "We are USA company . . . ***for sure we follow the national law. The company complies very well***."

100. Defendants reassured investors that Super Micro complied with U.S. export control laws as questions about Super Micro's adherence to these requirements re-emerged. For example, in and around April 2024, *Reuters* investigated reports that Super Micro's servers containing restricted GPUs were appearing in China, suggesting they were illegally re-exported in violation

of U.S. regulations. On April 23, 2024, *Reuters* detailed these reports in an article titled, "China acquired recently banned Nvidia chips in Super Micro, Dell servers, tenders show." *Reuters* "review[ed] hundreds of tender documents show[ing] 10 Chinese entities acquired advanced Nvidia chips embedded in server products made by Super Micro," among others, "after the U.S. on Nov. 17 expanded the embargo to subject more chips and countries to licensing rules." Moreover, as *Reuters* noted, even though "[t]he transactions [] disclosed in a dozen of the tenders . . . cover only a fraction of purchases by China's state entities," "the small snapshot shows China still has access to advanced chips."

101. In response to *Reuters*' inquiries about whether Super Micro's products were illegally moved to companies in China, Super Micro emphatically stated that it "***complied with U.S. requirements on the sale and export of GPU systems***," and ***went "above and beyond what U.S. export restrictions require***."

102. Defendants doubled down on these public claims as additional investigations raised more questions about Super Micro's products illegally moving into the Chinese market. For example, in response to a July 2, 2024 article in the *Wall Street Journal* titled, "The Underground Network Sneaking Nvidia Chips Into China," Super Micro said it "***compl*[*ies*]** ***with U.S. export controls and act*[*s*]** ***if illicit behavior is discovered***." The *Wall Street Journal*'s investigation, which included "verifying purchases with Chinese buyers . . . as well as access to transaction records, customs filings and photos of Nvidia chips up for sale," revealed "a ***barely concealed*** network of buyers, sellers and couriers bypassing the Biden administration's restrictions aimed at denying China access to Nvidia's advanced AI chips," including "[m]ore than 70 distributors [] openly advertising online what they purport to be Nvidia's restricted chips."

103. In August 2024, *The New York Times* published an article titled, "With Smugglers and Front Companies, China Is Skirting American A.I. Bans," reporting that "***American companies have found workarounds to keep selling some products***" in China. According to *The New York Times*, "[w]hile the scale of the trade [in China] is unclear, the sales described to Times reporters, including [a] $103 million transaction" described earlier in the article "would be far larger than any previously reported in China." According to "U.S. officials," "American

companies generally try to comply with the rules. ***But some have found loopholes, like rerouting business through new partnerships or overseas subsidiaries***."

104. Later that month, journalists from *The Information* investigated reports from NVIDIA employees, chip smugglers, suppliers, and distributors stating that Super Micro servers were being purchased by smugglers. The article, entitled "Nvidia AI Chip Smuggling to China Becomes an Industry," reported that for at least two years, distributors and other companies had been allowing Chinese "chip brokers" to purchase chips subject to U.S. export bans through shell companies to conceal the buyer's true identity. For example, one broker in Hong Kong who went by "Mike" told *The Information* that he got his hands on thousands of NVIDIA chips from Super Micro and Dell thanks to his "strong personal relationships" with sales representatives at both companies. The broker explained that he set up shell companies in countries that were not subject to U.S. export restrictions. Then, the shell companies purchased servers from companies like Super Micro and shipped them close to the border of Hong Kong and China. To avoid any trace of illegal exports, the broker explained that he removed the servers from their Super Micro boxes and placed them in boxes with other companies' logos and labeled the servers as something else on customs forms. The broker also told *The Information* that, while the illegal chips were valued at $180 million, he had been able to charge a premium to Chinese customers and had sold the chips for around $230 million. When *The Information* visited Mike's warehouse in Hong Kong in May 2024, Mike had 600 servers from Dell and Super Micro, each of which contained NVIDIA's H100 GPUs, which were prohibited from export to China under the 2022 and 2023 IFRs.

105. *The Information* article included the following graphic illustrating how Super Micro sold its servers with restricted GPU chips to brokers who then routed them to China.




**Source: *The Information*, "Nvidia AI Chip Smuggling to China Becomes an Industry," August 12, 2024**

106. Super Micro was aware of the facts reported in *The Information* article detailing the improper re-export of its products because it commented on the article. In response to a press inquiry from *The Information* for the article, Super Micro unequivocally stated, "***We follow all US export control requirements on the sale, service, support, and export of GPU systems*** to regions and parties that require licenses under the Export Administration Regulations." It further stated, "***If Supermicro becomes aware that a third party has exported or reexported without the required licenses, it investigates the matter and takes appropriate action***."

### 3. Super Micro Denied Reports Of Accounting And Export Misconduct In August 2024 And Throughout The Rest Of The Class Period

107. As noted in Section IV.C.3, in August 2024 reports began to emerge that Super

Micro was again engaged in accounting misconduct and improper sales practices, including export control violations. These reports raised serious concerns for investors, which Defendants quelled through repeated public statements by highlighting the Company's compliance systems and internal controls.

108. On August 27, 2024, the market analysis firm Hindenburg Research published a report (the "Hindenburg Report") detailing the results of a three-month investigation into Super Micro's accounting practices and compliance issues. The report included interviews with former senior Super Micro employees and industry experts, as well as a review of international corporate records, and customs export records. The Hindenburg Report raised questions about Super Micro's compliance systems and internal controls, including as to its compliance with export controls. The Hindenburg Report noted, for example, that although Super Micro had an export control policy on its website, the Company had not updated the document since 2020, even after U.S. authorities carried out the sweeping changes set forth in the 2022 and 2023 IFRs.

109. The Hindenburg Report also detailed specific instances in which Super Micro appeared to be engaging in sales that violated U.S. export restrictions. For example, following Russia's invasion of Ukraine in February 2022, the U.S. government imposed stringent restrictions on exports of high-performance computers and components to Russia. Super Micro subsequently disclosed that its products were subject to the new bans on exports to Russia and represented that, while it had historically sold to Russian entities, it was halting all sales and had "not recorded revenue" from Russia since the day before the war started. Yet, according to the Hindenburg Report's analysis of customs records, approximately $210 million in Super Micro products had been shipped to Russia between February 2022 and June 2024. Trade data cited in the Hindenburg Report indicated that, during calendar year 2023, "exports of Super Micro products to Russia rose to $126.6 million – 9.6x higher than in 2021," which was "equivalent to 4.9% of Super Micro's total worldwide sales, excluding the U.S., in calendar 2023, per [Super Micro's SEC] filings."

110. Additionally, the Hindenburg Report noted that Super Micro continued to have extensive business dealings in China. The Report claimed that since 2016 Super Micro had maintained a joint venture with Fiberhome, a Chinese state-run company that the U.S. government

had identified as being involved in human rights violations and high-tech surveillance. Despite Fiberhome being placed on the "Entity List" (a list of foreign persons and entities subject to export restrictions and license requirements independent of, and in addition to, those imposed elsewhere in the EAR) by BIS in 2020, Super Micro allegedly sold approximately $196 million of sophisticated computer components to the joint venture.

111. Defendants swiftly denied the allegations in the Hindenburg Report. On the same day the report was published, Super Micro dismissed the Hindenburg Report as mere "rumors and speculation" in response to multiple press inquiries, including from *Fortune*, *The Associated Press*, and *Barron's*.

112. Nevertheless, on August 28, 2024, which was one day after Hindenburg published its report, Super Micro publicly stated that it would not timely file its Form 10-K for the 2024 fiscal year.[3] The Company's explanation was vague and limited. In a press release and Form 8-K filed that day, Super Micro stated that it was "unable to file its Annual Report within the prescribed time period without unreasonable effort or expense" and that "[a]dditional time [was] needed for SMCI's management to complete its assessment of the design and operating effectiveness of its internal controls over financial reporting as of June 30, 2024."

113. On August 30, 2024, Super Micro filed a Notification of Late Filing with the SEC on Form 12b-25. In that filing, Super Micro stated, "In response to information that was brought to the attention of the Audit Committee of the Company's Board of Directors, the Board of Directors has formed a committee to review certain of the Company's internal controls and other matters." Further attempting to downplay the seriousness of the issues, Super Micro also stated "the Company does not anticipate the 2024 Form 10-K will contain any material changes to its results for the fiscal year and quarter ended June 30, 2024 that were announced in the Company's

[3] On May 12, 2026, an investor unaffiliated with Lead Plaintiffs filed the action *Chung v. Super Micro Computer, Inc.*, No. 3:26-cv-04394 (N.D. Cal.), later consolidated with this action on July 13, 2026, when the Court appointed Lead Plaintiffs to represent the Class in this consolidated action. In *Chung*, the plaintiff alleged that information disclosed on August 28, 2024 and October 30, 2024 (discussed below) revealed previously undisclosed information that proximately caused investors' losses. Lead Plaintiffs reserve the right to allege the August 28, 2024, October 30, 2024, and other events, proximately caused investor losses pending further investigation and discovery.

press release dated August 6, 2024." Super Micro did not specify the nature of the information "brought to the attention" of its Audit Committee, nor the focus of the new investigation. However, as the Company would later admit, and as described further below, the Company's auditor, E&Y, had raised serious concerns privately with Super Micro, including about the inadequacy of Super Micro's internal controls, improper accounting practices, inaccuracy of financial reporting, and illicit sales practices in violation of export controls.

114. At the same time, Defendants continued to vehemently deny the allegations in the Hindenburg Report. For example, on September 3, 2024, Defendant Liang signed a letter, filed with the SEC on a Form 8-K, claiming the Hindenburg Report contained "false or inaccurate statements about our company" and consisted of "misleading presentations of information."

115. Super Micro offered even more specific denials of the Hindenburg Report's allegations in direct meetings with securities analysts, who published Super Micro's statements to the market. For example, as J.P. Morgan reported on September 6, 2024, Super Micro represented to J.P. Morgan analysts that "the company does not have any sales to Russia since the sanctions were put in place." Notably, while Super Micro unequivocally denied selling products directly to Russia once the February 2022 sanctions were established, Defendants' denials were carefully worded to avoid addressing the question of diversion. In other words, the Company denied that it sold products directly ***to customers in Russia*** but could not deny that its products were systematically diverted into Russia through third-party intermediaries and shell companies that purchased from Super Micro. That potential diversion activity remained a key concern for investors, especially given trade data cited in the Hindenburg Report that "exports of Super Micro products to Russia rose to $126.6 million" during "calendar year 2023"—4.9% of the Company's total non-U.S. sales—after Super Micro supposedly stopped selling to Russia.

116. According to that same September 6, 2024 report by J.P. Morgan, Super Micro had reassured J.P. Morgan about Super Micro's export compliance by "indicat[ing] . . . there is a detailed process in place both from Super Micro (and Nvidia) to check customer background before approving orders." Further, the J.P. Morgan report addressed concerns about the impact of export restrictions on its sales to China. The J.P. Morgan report said that Super Micro indicated

that "***sales to China have declined in recent years in terms of revenue mix and is only a low-single digit percentage of total company revenue***." In other words, Super Micro quelled investor concerns over the Company's compliance with export restrictions on sales to China and minimized the impact of those restrictions on the Company's revenue.

117. These assurances were effective, as analysts credited and relied on Defendants' denials and dismissed the compliance concerns. For example, on September 18, 2024, analysts from Needham & Company reported that "***Supermicro has little exposure to China and is largely immune from export control restrictions . . . We see the lower exposure as an advantage vs. ODM peers . . . given continued export control and trade tensions between the U.S. and China***."

118. Despite relying on Super Micro's assurances of its compliance with export controls, ongoing compliance with these rules remained critical to Super Micro's investors, particularly after the *Wall Street Journal* reported on September 26, 2024 that DOJ was investigating Super Micro following the publication of the Hindenburg Report. For example, in an October 3, 2024 Argus Research report, analysts noted that the allegations of export control violations from the Hindenburg Report were "very serious" and that they would "continue to monitor this situation closely." The Argus report further noted that they would be "most concerned if the allegations lead to the DoJ establishing a pattern of deliberate sales to sanctioned Russia firms."

119. Moreover, Super Micro was unable to keep hidden why it was unable to timely file SEC periodic reports, which risked the Company's shares being delisted from Nasdaq. On September 20, 2024, Super Micro announced in a Form 8-K filed with the SEC that it had received a letter from Nasdaq stating that the Company was not in compliance with Nasdaq's rules due to its failure to timely file its Form 10-K. The letter further stated that Super Micro had 60 days to regain compliance or submit a plan to do so, or else it risked being delisted (yet again). Then, Super Micro disclosed in an October 30, 2024 Form 8-K, signed by Liang, that E&Y had sent the members of Super Micro's Audit Committee a letter of resignation on October 24, 2024, effective immediately. E&Y had been engaged on March 15, 2023 to perform an audit for the Company's fiscal year 2024 (its first audit performed for Super Micro) and resigned before issuing any public report for the Company.

120. The resignation of a Big Four accounting firm mid-audit raised significant concerns for the market. As Needham & Company analysts observed: "It is not often that a Big 4 audit firm fires a client. It is even more rare that a Big 4 firm resigns stating that it ***can no longer rely on the representations of management and the Audit Committee of the Board of Directors***." Bloomberg Radio's hosts called E&Y's resignation "a big deal," noting, "this isn't Joe's CPAs resigning, this is Ernst & Young resigning, and this does not happen often at all."

121. The October 30, 2024 Form 8-K revealed that E&Y's concerns had been building for months and directly called the credibility of Defendants' public representations into question. In late July 2024, during E&Y's audit work, E&Y communicated to Super Micro's Audit Committee "concerns about several matters relating to governance, transparency and completeness of communications to EY, and other matters pertaining to the Company's internal control over financial reporting." After the Board appointed a Special Committee, consisting entirely of the one purportedly independent Super Micro board member Susie Giordano, and E&Y received information from the Special Committee's investigation, that information only raised more serious questions "about whether the Company demonstrates a commitment to integrity and ethical values" and "whether EY could rely on representations from certain members of management and from the Audit Committee." E&Y also questioned "the ability and willingness of the Audit Committee and overall Board to . . . act as an oversight body that is ***independent of the CEO and other members of management***," concerns that had been raised in the course of the various scandals in Super Micro's history.

122. E&Y had also refused to sign on to Super Micro's statements that the Company did not expect any changes to previously issued financial statements. Instead, in its resignation letter E&Y stated: "we are resigning due to information that has recently come to our attention which has led us to no longer be able to rely on management's and the Audit Committee's representations and to be unwilling to be associated with the financial statements prepared by management, and after concluding we can no longer provide the Audit Services in accordance with applicable law or professional obligations."

123. E&Y's public statements raised serious questions for investors about Defendants'

credibility. For example, as Needham & Company stated in an analyst report dated October 30, 2024, "if Ernst & Young is not willing to rely on management's representations, why should investors?" Similarly, *Bloomberg*, in an October 30, 2024 article titled "Super Micro Auditor EY Resigns, Citing 'Integrity' Concerns," noted increased scrutiny on Super Micro following Bob Luong's allegations that the Company was improperly recording revenue, the disclosure of the DOJ's investigation into its accounting practices, and the Company's inability to file timely SEC periodic statements. As to E&Y's resignation, *Bloomberg* quoted accounting analyst Olga Usvyatsky as stating that this type of "public criticism by an auditor" seen in E&Y's resignation letter was "extremely rare and a huge red flag." Usvyatsky also noted that her research showed only two instances between January 1, 2024, and October 24, 2024, where audit firms resigned because auditors could not trust the management of a public company, and noted that the two companies at issue were ultimately delisted.

124. Nevertheless, following E&Y's resignation, Defendants once again took a series of highly publicized steps to quell investor concerns, specifically as to concerns E&Y raised about possible export control violations. On November 5, 2024, Super Micro announced in a Form 8-K filed with the SEC that the Special Committee had "completed its investigation based on a set of initial concerns raised by EY" and found "that there is no evidence of fraud or misconduct on the part of management or the Board of Directors."

125. On November 18, 2024, the Audit Committee approved BDO USA, P.C. ("BDO") as the Company's new independent registered public accounting firm. This was publicly presented by Defendants as a decisive step toward resolving the crisis prompted by E&Y's departure. The same day, on November 18, 2024, Super Micro submitted a compliance plan to Nasdaq, and on November 20, 2024, publicly announced the submission, stating "it believes it will be able to file both its Annual Report on Form 10-K for the fiscal year ended June 30, 2024 and its Quarterly Report on Form 10-Q for the period ended September 30, 2024, and become current with its periodic filings within the discretionary period available to the Nasdaq staff to grant."

126. On December 2, 2024, Super Micro disclosed the Special Committee's findings and recommendations in a Form 8-K filed with the SEC, signed by Defendant Liang. According

to Super Micro, the Special Committee's investigation "focused on the rehiring of nine individuals . . . who had previously resigned from the Company following" the 2017 revenue recognition scandal. While the Special Committee purportedly found no evidence of wrongdoing, it noted "lapses, including in ensuring guardrails were always in place and observed," and that Defendant Weigand, who was Super Micro's Chief Compliance Officer at the time of the accounting scandal and was by then CFO and principal accounting officer, "had primary responsibility for the process of rehiring these employees" and thus "primary responsibility for process lapses." The lapses identified by the Special Committee included "instances of not promptly informing the Company's Audit Committee and/or independent auditor of certain rehires or plans to rehire some of these former employees, including not informing EY prior to entering in June 2024 into a now terminated consulting arrangement with the Company's former CFO, who had resigned following the 2017 Audit Committee Investigation" and "instances where the documentation, tracking, training, and instructions around appropriate guardrails were inconsistent or vague."

127. As a result of these findings, the Special Committee recommended that the Company remove Weigand from his position as CFO and "appoint at the soonest practicable time a new CFO with extensive experience working as a senior finance professional at a large public company," and "appoint a Chief Accounting Officer, which will create an additional layer of accounting standards and oversight." In addition, because the Special Committee "found that the Company's ability to properly oversee and monitor guardrails related to the rehired employees was impacted because the CFO/CCO functions were combined longer than anticipated," it "recommended that the Company promptly appoint a separate Chief Compliance Officer." The Special Committee also recommended that Super Micro "appoint a General Counsel and expand the number of in-house attorneys to a level commensurate for a company of Supermicro's size and complexity, particularly in light of its recent rapid growth and future growth ambitions."

128. In the December 2, 2024 Form 8-K, Super Micro stated that "[e]ffective November 27, 2024, the Board has adopted all the Special Committee's recommendations, including that it would commence a search for a new Chief Financial Officer immediately" but that Weigand would stay on "until his successor has been appointed." Defendant Weigand remains Super Micro's CFO

to this day.

129. Super Micro further stated that the Special Committee had "reviewed 11 specific export transactions noted by EY" and had "also reviewed certain allegations of export control violations contained in [the Hindenburg Report]." Super Micro reported that the Special Committee "did not see any evidence suggesting that anyone at the Company tried to circumvent export control regulations or restrictions, or that anyone at the Company was aware that any of its products might be diverted to a prohibited end user or location." The Special Committee supposedly "also did not identify products that were sold to Russian customers or shipped to Russia in violation of export controls or sanctions laws that were in place when products were shipped." The Special Committee thus concluded that "the Company has implemented a reasonable program for compliance with applicable export control regulations."

130. Analysts credited these representations as confirmation that Super Micro's problems were not serious, were limited to financial reporting controls, and did not involve any dimension of export compliance failures. On December 2, 2024, analysts from Needham & Company described the Special Committee's findings as "key steps in the right direction," noting that the Committee had found "no evidence of misconduct" and that Defendants Liang and Weigand, and the rest of Super Micro's senior leadership, such as Defendant Liaw, had set an "appropriate tone at the top." Similarly, Wedbush Securities called the announcement "a net positive" and concluded that "the risk of delisting appears to have been minimized."

131. Defendants otherwise continued to reassure investors that Super Micro maintained full compliance with U.S. export restrictions. For example, on December 19, 2024, *The Information* published another article regarding the diversion of Nvidia chips to China titled, "U.S. Prompts Nvidia, Supermicro Probe Into How Chips Ended Up in China." According to *The Information*, NVIDIA had turned to Super Micro "for answers" regarding chips diverted to China in violation of U.S. export regulations, including asking Super Micro "to conduct spot checks of its customers in Southeast Asia—a hot spot for chip smuggling to China—to verify that those customers still possess the servers equipped with Nvidia chips they bought." Super Micro conducted these inspections "after the Commerce Department [] asked Nvidia to look into how the

company's products ended up being smuggled into China over the past year," according to a person close to the Department of Commerce.

132. *The Information* reported that Super Micro purportedly "began performing random, on-site inspections in September of Southeast Asia-based customers who had purchased Supermicro servers over the past year." These inspections nominally consisted of warehouse and data center visits "in the region[s] where Supermicro sales invoices show it has previously shipped its servers" during which "Supermicro's inspectors [] seek to verify whether the serial numbers on the servers and their locations match those listed on the invoices." According to *The Information*'s article, Super Micro also purported to step up its review of new clients—for instance, ensuring that prospective customers do not have Chinese ownership and that customers' top management teams and boards of directors do not include any Chinese nationals.

133. The article identified certain "decidedly simple" techniques and "tricks" that Super Micro customers used to "make it hard to figure out if they've illegally resold Nvidia's chips to customers in China," including "duplicat[ing] serial numbers of the servers with Nvidia chips they've purchased from Supermicro and attach[ing] them to other servers they had access to," according to "a person close to Supermicro." They accomplish this "by printing out labels containing the serial numbers of the machines Supermicro is auditing and attaching them to other servers with Nvidia chips they have on hand." Thus, while Super Micro's supposed inspections were "ongoing" at the time of the article, *The Information* detailed how these inspections were meaningless, including because "five different people involved in smuggling Nvidia chips said they have managed so far to evade detection during recent inspections by Supermicro."

134. Super Micro was aware of *The Information*'s reporting because it commented on its findings. In addition to reiterating that its recently concluded investigation "found no evidence of misconduct by the company's management or board," *The Information* article quoted a Super Micro spokesperson as stating, "the company '***follows all U.S. export control requirements on the sale and export***' of Nvidia chips. '***If we become aware that a third party has exported or reexported without the required licenses, we investigate and take appropriate action***.'"

135. Defendants' assurances to investors of Super Micro's full compliance with export

control restrictions continued after U.S. authorities proposed new rules to further restrict exports of products that integrated GPU components.

136. On January 15, 2025, BIS announced the "Framework for Artificial Intelligence Diffusion," or "AI Diffusion Rules," which expanded the EAR controls to impose additional licensing requirements on the export of advanced computing products, including GPUs and servers containing them, to certain additional countries and to impose caps on exports of these products to Southeast Asian countries that were frequently used for diversion. The AI Diffusion Rules, set to go into effect in May 2025, were enacted in direct response to failures of the existing export controls to fully prevent diversion of GPUs to companies in China. The rules targeted countries, including Malaysia, Singapore, and Thailand, that U.S. authorities believed had become trans-shipment points to divert restricted products into China. These new requirements obligated Super Micro and other manufacturers to obtain a special license to ship to these Southeast Asian countries and potentially cap their shipments to these countries.

137. On January 28, 2025, shortly after BIS announced the new AI Diffusion Rules, Super Micro published on its website an "Export Compliance Policy (External)," purportedly dated as of December 2024, stating, "***It is the policy of Super Micro to fully comply with all export and re-export control laws of the United States***." The policy emphatically stated, and purportedly required senior management to annually remind employees, that "***[u]nder no circumstances will a Supermicro transaction be undertaken in a manner contrary to U.S. export regulations***." The policy further described detailed processes that Super Micro's management and employees supposedly followed to comply with applicable export laws. Among other things, the policy stated that all orders for restricted GPUs were "blocked at time of order creation" and could only be "released by the [Global Trade Compliance] team prior to release to manufacturing." Further, new customers purchasing restricted GPUs were subject to a "Due Diligence Qualification Process," involving review by a "Restricted GPU Qualification Committee," which Super Micro claimed was empowered to "approve with conditions . . . or reject." The policy also stated that Super Micro conducted "Red Flag Screening" of customer accounts and sales orders for indicators of diversion, such as abnormal shipping routes, packaging inconsistent with the stated destination, and

transactions involving entities with "little to no web presence."

138. Having failed to meet Nasdaq's 60-day deadline to regain compliance, Super Micro requested an extension to file its FY24 Form 10-K and its Forms 10-Q for the first two quarters of FY25, which Nasdaq granted. On February 25, 2025, Super Micro filed its delayed FY24 Form 10-K and its belated Forms 10-Q for the first two quarters of FY25. In these filings, the Company explicitly adopted and continued to rely on the Special Committee's conclusion, communicated to investors in the Company's December 2, 2024 press release and Form 8-K, that the Special Committee "did not see any evidence suggesting that anyone at the Company tried to circumvent export control regulations or restrictions."

139. However, the next week, on March 3, 2025, *Bloomberg* reported that "Singapore [wa]s probing whether Dell Technologies Inc. and Super Micro servers shipped to Malaysia housed Nvidia Corp. chips barred from China," "after local media reported police arrested several people for their alleged roles in procuring and shipping Nvidia chips in violation of US sanctions." Although Super Micro did not immediately respond to a request for comment on *Bloomberg*'s March 3 story, on March 10, 2025, Defendant Liang stated in an interview with *Fox Business* that Super Micro's new auditor had "found everything is good" and that Super Micro "***[had] the matter all fixed and indeed nothing [was] really wrong***."

140. A few months later, a July 2025 *Financial Times* article titled "Nvidia AI chips worth $1bn smuggled to China after Trump export controls," reported that "[a]t least $1bn worth of Nvidia's advanced artificial intelligence processors were shipped to China in the three months after Donald Trump tightened chip export controls" based on the media outlet's "analysis of dozens of sales contracts, company filings and multiple people with direct knowledge." *Financial Times* further reported about Nvidia's B200 chip, "the most sought-after . . . chip in a rampant Chinese black market for American semiconductors" given its use in training "the[] latest AI systems" by companies such as Google and Meta. As the article explained, the B200s are typically sold in ready-built racks each containing eight B200 chips at prices up to $489,000 per rack or a 50% premium from the average selling price for similar products in the U.S. Moreover, according to the *Financial Times*, "[s]ince mid-May," the Chinese-owned company "Gate of the Era obtained

at least two shipments of a few hundred B200 racks each" and alongside its affiliates was estimated to have sold nearly $400 million of these products to data centers in China. Critically, "[a]ccording to industry insiders, product specifications and pictures of packaging seen by the FT, ***many of the B200 racks sold by Gate of the Era, as well as other Chinese distributors, over the past months were originally from Supermicro***." In response to the *Financial Times* investigation, Super Micro "said it '***complies with all US export control requirements on the sale and export of GPU systems***.'"

141. On August 5, 2025, *Reuters* published an article entitled "Two Chinese nationals in California accused of illegally shipping Nvidia AI chips to China." The article reported that two individuals from the company ALX Solutions "exported . . . advanced Nvidia chips and other technology to China from October 2022 through July 2025 without the required licenses from the U.S. Commerce Department." The article reported that these two ALX employees were indicted by DOJ for violating export control laws. It further reported that these individuals had purchased the restricted materials "***from . . . Super Micro Computer***, declaring that the customers were in Singapore and Japan." The article cited invoices for multiple orders ALX purchased from Super Micro, with one order valued at $28.5 million. Super Micro provided a statement to *Reuters* that the Company was "'***firmly committed to compliance with all U.S. export control regulations***.'"

142. Through their repeated public representations, Defendants effectively assured the market that Super Micro not only was "committed" to compliance but had successfully implemented effective systems to ensure its own compliance with applicable export controls. Investors relied on these representations, which quelled their concerns based on Super Micro's long history of compliance failures, questions about why Super Micro's products appeared to be illegally entering Chinese markets during the Class Period, the importance of sales of NVIDIA-based servers to Super Micro, and the serious consequences of failing to comply with the EAR.

#### 4. Defendants Repeatedly Attributed The Company's Growing Sales And Revenue In Asia To Legitimate Business Factors

143. During the Class Period, Super Micro's sales to customers in Asia increased both in absolute terms and as a proportion of the Company's overall sales. From the time of Super

Micro's third quarter of fiscal 2024 (running from January 1, 2024 to March 31, 2024), when the Class Period begins, to the start of fiscal year 2026 in July of 2025, Super Micro's Asia sales more than tripled in absolute terms (from approximately $765 million to approximately $2.3 billion) and more than doubled as a percentage of Super Micro's total sales (from approximately 20% to nearly 50%), as the following table demonstrates:[4]

| Q/FY | Calendar Dates | Total Sales | Sales to Customers in Asia | Asia as a % of Super Micro Total Sales |
|---|---|---|---|---|
| 3Q24 | Jan–Mar 2024 | $3.9B | $764.6M | 20.0% |
| 4Q24 | Apr–Jun 2024 | $5.3B | $1.3B | 24.0% |
| 1Q25 | Jul–Sep 2024 | $5.9B | $954.6M | 16.0% |
| 2Q25 | Oct–Dec 2024 | $5.7B | $768.2M | 13.5% |
| 3Q25 | Jan–Mar 2025 | $4.6B | $1.4B | 29.4% |
| 4Q25 | Apr–Jun 2025 | $5.8B | $2.4B | 42.0% |
| 1Q26 | Jul–Sep 2025 | $5.0B | $2.3B | 46.2% |

144. Defendants consistently told investors that this increase in sales growth in Asia was the result of legitimate business factors, such as increasing demand from new customers, and, as such, left investors with the impression that this sales growth was durable and sustainable.

145. For instance, on May 20, 2024, Defendant Weigand spoke at the J.P. Morgan Global Technology Conference as a representative of Super Micro. During the conference, analysts questioned Weigand about Super Micro's financial performance, including its share of the AI-based server market. When asked, "[h]ow should we think about the likelihood of share loss," Defendant Weigand stated that Super Micro was "***gaining a lot of new customers right now*** . . . we're seeing a lot of development over in Europe, in the Middle East, ***as well as Asia . . . our Asia sales grew most recently***.***"***

146. Similarly, on August 6, 2024, during Super Micro's earnings call for the end of

[4] Starting in 2Q26—the quarter immediately after illicit sales to Obon ended—Super Micro for the first time in the Class Period stopped reporting the specific amount of its sales to customers in Asia and instead split its revenue into only two categories: the "United States" and "Other"—effectively obscuring the impact of the Company losing its illicit Obon sales and further concealing that the contributions these sales made in prior periods were significant.

FY24, Defendant Weigand reported that yearly ***"Asia [sales] increased 437%"*** from the prior year, which Weigand attributed to legitimate factors: "***Growth was driven by strong demand for next generation air-cooled and direct liquid cooled rack scale AI GPU platforms***." During the call, Defendants Liang and Weigand presented a slide deck, which represented that Super Micro's revenue from China constituted "***Less than 1% of Total Revenue***."

147. On November 5, 2024, during Super Micro's next earnings call, when Weigand was asked about risks that Super Micro was too reliant on sales concentrated in large-scale "10% customers"—*i.e.*, customers comprising 10% or more of Super Micro's revenue—Defendant Liang stated, "we will have 10% customers," but reassured investors, "***we continue to gain more new customers, especially . . . in Asia*** . . . ***we will be able to keep a healthy ratio"*** between large and smaller customers.

148. Analysts repeatedly echoed and relied on Defendants' statements attributing the Company's revenue performance to a host of legitimate business factors. For instance, on October 14, 2024, analysts from Baptista Research credited Super Micro's growth to "***close alignment with chip manufacturers also enables Super Micro to customize its servers to meet the specific needs of its customers***."

149. Critically, analysts relied on Defendants' representations that Super Micro was not engaging in any meaningful sales to companies in China and viewed its small exposure to China as giving it an edge over its competitors. For example, on September 6, 2024, analysts from J.P. Morgan wrote that, "***sales to China have declined in recent years in terms of revenue mix and is only a low-single digit percentage of total company revenue***," which J.P. Morgan said was a positive for Super Micro's investors. Similarly, on September 16, 2024, analysts from Mizuho Securities reported that Super Micro's "***revenue is primarily from US customers (hyperscalers)***" and "***We believe <1% of [Super Micro's] total sales are to China with restrictions***." Similarly, on September 18, 2024, analysts from Needham & Company reported that "***While Supermicro derived 24% of F4Q24 sales from Asia, <1% of revenue was derived from China***," which put Super Micro at "***an advantage vs. [Super Micro's] peers***."

150. In 2025, Defendants continued to assure investors that Super Micro did not receive

anything more than *de minimis* revenue from sales in China. For example, on May 6, 2025, during Super Micro's earnings call, while reporting 76% growth in Asia sales from the prior year, Defendant Weigand flatly represented that "***China continued to represent less than 1% of sales***."

151. On the same earnings call, analysts questioned Defendants about the new AI Diffusion Rules, which as discussed above, imposed new licensing requirements on Super Micro's sales and shipments to Southeast Asia. For example, one analyst, noting "investor angst" about the "AI diffusion rules," asked how the "AI diffusion [rules] could impact or possibly could impact your revenues?" In response, Defendant Liang stated, "***At this moment, we see our demand continue to grow. And that's why we continue to expand our facility in U.S.A., in Taiwan, in Malaysia. So overall, our technology [is] leading edge, especially, I mean we do continue to see the demand will continue to grow stronger. I mean tariff[s] may impact the demand a little bit, but overall, we will continue to gain market share.***"

152. On August 28, 2025, in Super Micro's Form 10-K for fiscal year 2025 (the "FY25 Form 10-K"), which was reviewed and approved by Defendants Liang and Weigand, who signed the 10-K, Defendants reported significant sales increases during the Company's FY25 of approximately 47% and that sales to customers in Asia had increased nearly 89% from FY24 to FY25. Along the same lines, in their quarterly and annual filings with the SEC, Defendants represented that from FY24 to 3Q25, the Company's ***"revenues [] from Thailand" had increased from 1.5% to 14.2% of the Company's entire revenue***.

153. Analysts continued to rely on these statements. For example, on May 12, 2025, analysts from Raymond James reported that "Supermicro experienced a sharp acceleration in growth, ***catalyzed by the surge in demand for specialized AI accelerated servers by large hyperscale/cloud operators***" and attributed this growth to legitimate competitive advantages, reporting that "***Supermicro's growth above the market therefore reflects share gains, which has nearly doubled from ~2.9% in FY2022 to ~5.8% in FY2024.***"

### D. Super Micro Illegally Diverted Billions Of Dollars' Worth Of Servers Containing Restricted Technology To Customers in China, And These Sales Became A Significant Portion Of The Company's Revenues

154. The truth was far different from what Defendants told investors. As subsequently

revealed by cross-border, sprawling criminal investigations, and charges in the United States, Taiwan, and Singapore, Super Micro—through the active participation of senior executives, including Defendant Liaw, and the awareness of or reckless disregard by Defendants Liang and Weigand—was secretly funneling billions of dollars' worth of its high-performance AI servers containing restricted GPU chips to companies in China through a network of sham intermediaries, all in deliberate violation of U.S. export controls. Notably, Super Micro's diversion schemes to generate revenue through illicit sales to end-customers in China began in early 2024—just as Super Micro was accused of engaging in hundreds of millions of dollars in illicit sales diverted to Russia, which had accounted for nearly 5% of the Company's annual foreign sales.

155. The scale of Defendants' scheme was staggering and sprawling. It involved illegal diversions of Super Micro's servers containing restricted NVIDIA technology through at least two different countries and sham entities—one in Thailand called Obon and another in Taiwan called Flying Tiger—run on the ground by at least two distinct groups of Super Micro employees. Moreover, also unknown to investors, these illegal sales generated approximately $2.5 billion in revenue during the Class Period—proceeds that Super Micro reported to investors as driven by legitimate business growth. During the Company's 3Q25, the Company booked approximately $825 million in revenue from illicit sales through Obon, accounting for ***17.9% of the Company's total sales*** for the quarter, and ***60.9% of all Asia sales***. The following quarter the Company booked approximately $510 million in illegal sales through Obon between April and May alone, plus an additional $256 million in June. Collectively, these sales generated approximately $766 million in illicit revenue, representing ***13.3% of total sales*** and ***31.7% of Asia sales*** for the quarter.

### 1. Leading Up To The Diversion Schemes, Liang's Compensation Was Made Fully Contingent On Hitting Increasing Super Micro Revenue And Stock Price Targets

156. Defendant Liang personally benefited financially from these schemes. On March 2, 2021, Super Micro's Compensation Committee approved a significant modification to Defendant Liang's compensation. Under a new plan, Liang's base salary was reduced from $522,236 to $1 per year and his compensation was fully converted to awards of performance-based stock options, with tranches of options vesting if the Company achieved specified revenue and

stock price targets while Liang was CEO. If Super Micro achieved the prescribed targets, Liang was given the option to purchase large amounts of Super Micro common stock at a pre-set exercise price. Because the Company's stock price was affected by reported revenue and growth, revenue increases could simultaneously advance both targets. In practical effect, Liang's entire compensation depended heavily on short term increases in Super Micro's reported revenue and share price.

157. Under Liang's 2021 compensation plan, the revenue targets ranged from a minimum of $4.0 billion to a maximum of $8.0 billion, measured as annualized revenue over four consecutive fiscal quarters. The stock price targets ranged from $4.50 to $12.00, measured by the trailing 60-trading-day average closing price—in other words, the average closing price of Super Micro common stock over the preceding 60 trading days (approximately three months) had to equal or exceed the specified price target. Super Micro achieved these targets by the end of calendar year 2023, at the close of Super Micro's second quarter of fiscal 2024—the last fiscal quarter before Super Micro's diversion scheme to China began with the sales to Obon.

158. In November 2023, the Compensation Committee approved a new plan for Liang, which governed Defendant Liang's compensation throughout the Class Period. This plan kept Liang's base salary at $1 per year but significantly raised the revenue and stock price targets required to unlock any options (effectively his entire compensation). To receive the option awards, Liang needed Super Micro's revenue, then around $7 billion per year, to reach targets of $13 billion, $15 billion, $17 billion, $19 billion, and $21 billion. The awards also required Super Micro's stock price, then hovering around $30 per share, to reach targets of $45, $60, $75, $90, and $110 per share, measured through the same criteria set forth in Liang's earlier plan.

159. If Super Micro achieved these revenue targets over four rolling quarters and stock price targets over 60 trading days, Liang would receive options to purchase up to 5,000,000 common stock shares at $45 per share—significantly below the vast majority of what the market trading price would be upon receiving them. Liang would unlock a tranche of stock options equal to one-fifth of the 5,000,000 total upon hitting each of the five successive targets, up to the maximum. These options would only vest when both the revenue and share price targets were

achieved.

160. Liang's stock options were extremely valuable. By way of example, if he achieved the maximum revenue and stock price targets, Liang would receive the full set of options at a cost of $225 million, with a market value of $550 million, representing a net gain of ***$325 million*** to Liang. On the other hand, the November 2023 compensation plan also specified that Liang was eligible for no other compensation before March 31, 2029. In other words, Liang had to either hit the targets—gaining hundreds of millions of dollars—or he would earn $1 per year for the next six years, with the outcome turning entirely on Super Micro's reported revenue during the Class Period. Every dollar of revenue the Company reported moved Liang closer to vesting additional tranches and unlocking millions of options of Super Micro stock. Conversely, any shortfall in revenue, or any disclosure that would call reported revenue into question or threaten Super Micro's stock price, directly threatened Liang's compensation.

#### 2. Liang Orchestrates The Re-Hirings Of Ousted Sales Leaders And Super Micro's Sham Export Compliance System

161. Shortly after his entire compensation became contingent on Super Micro's revenue growth, Liang took several steps to ensure that Super Micro would generate that revenue.

162. ***First***, Liang reassembled the team he could trust to carry out the illicit schemes generating that revenue. After settling charges with the SEC from the first accounting scandal, Defendant Liang began re-hiring the sales executives, including Defendant Liaw and Chou, who had resigned as a part of the supposed "restructuring" to "remediat[e] material weaknesses in [Super Micro's] internal control over financial reporting" that caused the 2017-2020 accounting scandal.

163. Multiple former Super Micro employees confirmed that Defendant Liang personally orchestrated the return of these executives.

164. FE-1 stated that the 2018 departures of Super Micro sales leaders, including Wally Liaw and Phidias Chou, were due to their role in Super Micro's accounting scandal. When that scandal came to light (2017-2018), Liaw and Chou were given termination agreements that required them to depart the Company, but provided that they could return after several years.

According to FE-1, the decision to bring Liaw and Chou back was Liang's. FE-1 understood that they were brought back because of their close relationship with Liang and specifically to drive increased sales, even though they had a history of sales-related misconduct. Liang also brought back sales executive Gloria Sun, who had departed when Liaw did, had been terminated due to the accounting scandal, and was re-hired by Liang for the same reasons. It was understood internally that Liaw, Chou, and Sun had taken the fall for Liang so that he was not implicated in the accounting scandal in which they were also involved.

165. According to FE-1, the termination agreements provided that, if Liaw returned, he could not return to a sales role at the Company. FE-1 explained that this restriction was discussed regularly and was widely known within the Company. Liaw was first brought back as a consultant in 2021 and then returned to full-time employment in Business Development, a title FE-1 explained was interchangeable with sales. During FE-1's tenure, Liaw was in charge of running sales in China, and primarily dealt with Chinese customers. At the all-Company meetings on Mondays, Liang described Liaw as leading the Company's efforts in China and growing revenue.

166. FE-3 observed that, after the first accounting scandal in 2017, the Company brought back people it had initially let go when it cleaned up house for the earlier accounting improprieties, including Wally Liaw, Phidias Chou, and Gloria Sun. FE-3 stated that, given Charles Liang's operation of the Company, her impression was that Liang was responsible for re-hiring these individuals, especially since executive hiring went to the CEO. FE-3 stated that, as a result, Super Micro set a tone at the top that negatively affected its corporate governance, internal controls, and compliance procedures.

167. These accounts of former Super Micro employees are further corroborated by the facts reported by Bob Luong, former Head of Global Services at Super Micro, who filed a whistleblower retaliation suit against Super Micro and Defendant Liang as discussed above. Consistent with the facts reported by multiple other former Super Micro employees, Luong stated that as part of the Company's public efforts to "remediate" its accounting and sales practices, Super Micro terminated senior sales leaders yet began hiring the executives back in March 2021. For example, Peggy Lin, who had been terminated in connection with the scandal, was re-hired and

appointed to the Company's executive leadership as Chief Administrative Officer. According to Luong, the Company had also forced Liang's wife, Sara Liu, to step down from her active management role in the Company due to external pressure. Yet Liu similarly returned to active management between late 2020 and early 2021. Luong claimed that Peggy Lin and Liu actively negotiated with Super Micro vendor Compuware, headed by CEO Bill Liang (Defendant Liang's brother), to manipulate payment and sale terms to improperly recognize revenue.

168. In May 2021, Luong met with Super Micro's HR department on multiple occasions and reported concerns that the individuals responsible for the Company's prior accounting violations were being re-hired. In March 2022, Luong further formally reported these same concerns about re-hiring the employees who previously engaged in unlawful activity in an internal memo he filed with the Company. After filing a formal complaint in March 2022, Luong began to experience retaliation from Company leadership, even as he continued to escalate concerns about unlawful departures from proper accounting practices. Luong claims that, following consistent instances of harassment and retaliation throughout 2022, he was terminated in April 2023.

169. ***Second***, Liang installed and then retained Defendant Weigand as CFO in furtherance of his efforts to increase Super Micro's revenue through illicit sales. In January 2021, CFO Kevin Bauer, whom Super Micro hired as part of the post-scandal remediation and who was widely regarded for his integrity, resigned. Defendant David Weigand replaced him as CFO.

170. As noted above, in December 2020 and January 2021, whistleblower Bob Luong reported to Bauer that Super Micro had resumed its accounting misconduct, which Bauer in turn escalated to Defendant Liang. Bauer's January 2021 departure occurred right after Bauer internally reported to Liang the accounting misconduct described by Luong.

171. Bauer's departure also was notable for who replaced him: Defendant Weigand. In contrast to Bauer, who steered the Company through the first accounting scandal and internally reported accounting misconduct to Defendant Liang, Weigand facilitated Super Micro's renewed misconduct, including the misconduct alleged herein, as Super Micro's own internal investigation concluded and as numerous former employees confirmed.

172. As discussed, in December 2024 Super Micro disclosed that its own Special

Committee had concluded Defendant Weigand had "primary responsibility for process lapses" that led to the issues that prompted E&Y's resignation earlier that year and recommended that Weigand be removed from his position. While Super Micro publicly committed to doing so, Defendant Weigand has remained the CFO throughout the Class Period and to this day.

173. Further, FE-1 stated that Weigand was Defendant Liang's puppet who was complicit in the face of misconduct. FE-1 also stated that Weigand's public statement that sales to China represented less than 1% of Super Micro sales was an absolute lie. FE-1 explained that sales Team #1 generated the large majority of the Company's revenue, and that Liang told employees the other sales teams contributed very little.

174. FE-3, who ultimately reported to Weigand through her supervisor Kenneth Cheung, reported that Super Micro had difficulty finding a CFO who was suitable to work with Defendant Liang, because Liang wanted a yes man that would not challenge him. FE-3 also noted that after the Hindenburg Report, it was publicly announced Super Micro would replace David Weigand over time. FE-3 noted that, even years after the announcement, it never happened.

175. As noted above, following Bauer's departure, Liang re-hired more executives who had been "restructured" out of the Company from the first scandal. By March 2021, Liang re-hired Lin and other previously terminated employees, installing Lin in a C-level position. In May 2021, Liang re-hired Defendant Liaw, first as a "consultant," then returning him to full-time employment in August 2022, and finally appointing Liaw to Super Micro's Board in December 2023.

176. ***Third***, Defendant Liang, as CEO, ensured that the Company's purported export compliance system—which Liang said publicly he was watching "over [] 24 hours a day"—would not present any meaningful obstacle to the Company's illicit sales, which he also tracked. In contrast to the "robust" compliance system touted to investors, multiple former Super Micro employees confirmed that Super Micro did not have a functioning export compliance program, even after pleading guilty to federal criminal charges of illegally diverting products to Iran.

177. For example, FE-1 stated that during her tenure, Super Micro had a non-functioning compliance team that consisted largely of inexperienced junior employees. Unlike at other companies, where compliance staff handled important documentation and logistics, Super Micro

pushed the compliance function onto the sales teams. Salespeople themselves had to handle the paperwork and submissions, including NVIDIA's requirements to identify end users and confirm in person that a data center outside the United States was a real location. FE-1 further stated that Defendant Liaw had a great deal of power within the Company and could do whatever he wanted. FE-1 explained that the documentation required for GPU shipments made it implausible that Super Micro did not know where its products were going. The movement of GPUs had to be documented in writing, and Super Micro knew exactly where the GPUs were going.

178. Similarly, FE-4 stated that Super Micro's published export compliance policies were all done for show. She stated that, even when the Company hired someone for the compliance team after its first accounting scandal in 2017, senior management controlled the information they wanted her to see. Further, FE-4 stated that Super Micro's leadership deliberately tried to avoid creating documentary evidence of the export violation scheme. She stated that everything was relayed verbally, a measure to minimize email communication that might expose Super Micro's illicit sales practices.

179. FE-1 also recounted that Super Micro's Senior Vice President and Chief Growth Officer, Cenly Chen, played a central role in the Company's sales of GPU-equipped servers. FE-1 stated that Cenly Chen led sales Team #1. Chen had a very close relationship with NVIDIA and managed the Company's acquisition of GPU chips from NVIDIA. Because chip supply was limited, NVIDIA would allocate a certain number to Super Micro, and Chen decided how to distribute them among Super Micro's customers. Chen routinely met with Defendant Liang to discuss the Company's dealings with NVIDIA and to obtain Liang's approval of how the chips would be allocated, including when she needed to pull chips allocated to another sales team. FE-1 further recalled that, during Chen's Friday sales meetings, Chen warned employees that they would be fired if they discussed scandals involving the Company and instructed them to include management on all correspondence if customers raised issues about reports of Super Micro's misconduct. For example, if a major customer raised concerns about news reports, management would become involved in deciding how to position the Company's response.

180. FE-1 recounted an instance, relayed to her team by Senior Vice President Marcus

Sylva, in which Chen took NVIDIA chips she had obtained from the Company to San Francisco and handed them to a CoreWeave executive as he was boarding a plane to China so that CoreWeave could test them at its facilities.

181. FE-1 stated that Chen departed Super Micro in May 2026, following public disclosure of Super Micro's export diversion scheme. According to FE-1, it was widely known within the Company that Chen had to leave because she had sent emails requesting that NVIDIA release chips with serial numbers associated with the GPUs illegally diverted to customers in China. FE-1 stated that Chen resigned so that the Company could claim that no current employees were involved in the scheme for which Liaw was arrested. FE-1 further stated that Liang had Chen leave the Company to avoid the scandal, and that, had Chen stayed, she would have been held responsible along with others.

182. Other Super Micro employees reported similar facts. FE-4 stated that the Company's relationship with NVIDIA was managed by Cenly Chen, who handled all allocations of NVIDIA chips to Super Micro. Further, whenever the Company had business related to NVIDIA, Liaw was also asked to attend those talks on behalf of the executive leadership. FE-4 stated that there was no way Cenly Chen lacked knowledge of the Company's illicit sales. During the Company's 2017 accounting scandal, Super Micro's Senior Vice President of Business Development, Nancy Lee, resigned from her position, but was kept on as a consultant. Lee used to run the Super Micro sales team which covered sales to China, but that responsibility was given to Cenly Chen. FE-4 confirmed that Cenly Chen would do whatever it took to close deals, and reported hearing of the same incident, discussed by FE-1, in which Cenly Chen handed NVIDIA chips to a CoreWeave executive boarding a plane to China in order to win CoreWeave's business. FE-4 also independently stated that Cenly Chen's departure from the Company after the Indictment was directly related to the government's investigation.

183. Super Micro's lack of functioning controls was a result of Defendant Liang's leadership. For example, FE-3 stated that Super Micro was tightly controlled by Charles Liang. FE-3 said that as a start-up company scales, it is supposed to implement governance structures and specialized teams to ensure compliance. But that is not how Super Micro was. It still felt more like

a founder-managed start-up than a major public company. She stated that for an established company, Super Micro had a notable lack of internal systems for governance and compliance. It was not up to the mark for where it needed to be as a public company.

184. Moreover, Defendant Liang regularly tracked and personally led weekly and quarterly meetings with Super Micro's sales leaders and employees to ensure that Super Micro was generating the revenue required to unlock his lucrative compensation.

185. FE-1 stated that Liang personally led mandatory all-Company meetings every Monday morning, which all Super Micro personnel were expected to attend in person in San Jose or by video. At these meetings, Liang discussed his views of the Company, overall projected sales numbers, and where the Company was falling short of its projections. FE-1 recalled that Liang repeatedly talked about the need to increase Super Micro's stock price at these meetings and was insistent that Super Micro increase sales so that the stock price could reach $300 per share. This is further confirmed by FE-4, who stated that—before Super Micro's 10-for-1 stock split in October 2024—Liang sought to increase Super Micro's stock price to $3,000 per share, *i.e.*, $300 per share after the split.

186. FE-1 stated that Liaw attended the weekly meetings led by Liang, and that Liang frequently praised how well Liaw was doing at generating new sales. Liaw and Chou were seated in the corporate building alongside Liang.

187. Similarly, FE-3 stated that Liang knew all his big customers by heart and everything about them. FE-3 stated that based on her experience at the Company, most of the bigger deals and accounts are run through Liang, and Liang looked specifically at the economics of the deals. FE-3 noted that, in regular meetings with Defendant Weigand, they went over accounting status, audit status, any significant transactions, and the revenue team would then review this information. FE-3 stated that she reported this information to Weigand, who then presented it at the business review meetings to Liang. FE-3 believed that Weigand had monthly closed meetings with Liang and presented revenue deals that went up or down.

188. ***Fourth***, Super Micro's auditor history further confirms that the Company's compliance infrastructure was a sham. Deloitte & Touche LLP served as Super Micro's

independent auditor for twenty years, from 2003 through 2023. This tenure spanned the Company's 2006 criminal guilty plea for illegal exports to Iran, its pervasive 2017 revenue recognition scandal, its Nasdaq delisting, and multiple findings of "widespread accounting violations" and "an inappropriate tone at the top." Throughout this period, Deloitte continued to give Super Micro clean audits, when (in reality) systemic compliance deficiencies continued to be exposed. When Super Micro replaced Deloitte in 2023 and hired E&Y, its first new outside auditor in two decades, E&Y could not even complete its first audit before concluding that it would "no longer be able to rely on management's and the Audit Committee's representations." Less than a month after E&Y's resignation, Super Micro appointed its third auditor in less than two years.

### 3. Super Micro Illegally Diverted Restricted Products Into China Through Thailand

189. Throughout the Class Period, while Defendants publicly assured investors that Super Micro "follow[ed] all US export control requirements," the Company's most senior executives operated parallel, covert sales channels to funnel billions of dollars' worth of restricted AI servers to companies in China.

190. A significant part of the scheme involved diversion of sales through Thailand in order to reach ultimate customers in China. This part of the scheme originated within Super Micro's own sales organization and was actively directed by Super Micro's co-founder Defendant Liaw, whom Defendant Liang had personally re-hired and installed in a position to run the scheme. As detailed in the preceding section, Defendant Liang personally controlled virtually every significant business decision at Super Micro, particularly with respect to Super Micro's sales.

191. Defendant Liaw, working with Steven Chang (a general manager in Super Micro's Taiwan office) and Ting-Wei "Willy" Sun (a third-party broker), had recruited a Thailand-based entity called Obon to serve as a pass-through company. Obon would place purchase orders with Super Micro for servers containing restricted NVIDIA GPUs, ostensibly for its own use, receive the servers, and then secretly reroute them to Chinese buyers through a network of brokers. To obscure the reality of the scheme, Obon, at the direction of Defendant Liaw and co-conspirators, repackaged the servers in unmarked boxes to obscure their contents and final destination.

192. The scheme began in or around early 2024. Chang, who already had Chinese customers to whom he could no longer sell the now-restricted servers, brokered the initial connection, introducing an executive in Thailand to Defendant Liaw. Liaw, as Senior Vice President of Business Development, oversaw members of Super Micro's global sales teams, including Chang. With Liaw's blessing and oversight, the arrangement was set in motion. From the outset, Defendant Liaw coordinated directly with purported "executives" for the shell company on order volumes, timing, and GPU allocations.

193. By June 2024, Super Micro's sales to Obon were becoming so large and so important that Defendant Liaw was personally thanking his Obon contact for "the help for June" (*i.e.*, for putting in more orders at the end of Super Micro's fiscal year) and promising in return to "help [Obon] the whole year." Defendant Liaw also directed Obon to wire tens of millions of dollars to Super Micro to fund NVIDIA GPU allocations—inventory that would ultimately be diverted to companies in China.

194. By Super Micro's 4Q24, which ran from April to June 2024, Obon had become Super Micro's eleventh most profitable customer worldwide as reflected in an internal spreadsheet tracking Super Micro's largest customers, generating approximately $99.7 million in reported revenue that quarter alone—placing this criminal operation alongside legitimate hyperscale AI infrastructure customers in sales magnitude.

195. Obon lacked any need for, let alone the capacity to store or utilize, the massive quantities of servers it was purchasing, and the servers were never intended to stay with Obon.



196. Obon was a company with no apparent data center operations, no history of purchasing at this level, and no business justification for acquiring billions of dollars in AI servers, as anyone internally monitoring Super Micro's sales would have understood. As reflected in the images below and above, Obon's website contained only barebones descriptions of its business and stock images. It did not, however, indicate that Obon was in the AI business or otherwise had a business justification for the hundreds of millions of dollars' worth of servers it would acquire during the Class Period.[5]







[5] The images referenced in ¶196 are screenshots captured through the Internet Archive's Wayback Machine and reflect the archived URL of the website of Obon Corporation Co., Ltd., as of August 8, 2024, https://obon.co.th/.

197. In October 2024, the rapid growth in Obon's orders prompted Super Micro's compliance team to place a temporary hold on shipments and initiate an audit. But rather than functioning as a genuine safeguard, the hold was treated by the Company's senior executives as an obstacle to be removed. Defendant Liaw emailed compliance personnel, pressuring them to "speed this process up" so that Super Micro could resume shipments to Obon.

198. Chang, meanwhile, conspired with Obon executives to prevent auditors from physically entering the areas where servers were purportedly stored, as they had, in reality, already been shipped to companies in China. Chang also arranged for an auditor he described in writing as "friendly" to conduct the review.

199. Former employee accounts further confirm Super Micro's manipulation of audits, including those by NVIDIA (*see, e.g.*, ¶129). For example, FE-4 also stated that NVIDIA had an employee assigned to inspect data centers for the Asia-Pacific region, but this individual was being paid off to make sure the inspections passed.

200. The compliance team's hold lasted only briefly. It was lifted not because the team's concerns were resolved, but because senior executives orchestrated the removal. As a result, Super Micro was back to shipping servers to Obon by early December 2024, less than two months later.

201. After Obon cleared this sham audit, Defendant Liaw took no more chances of being discovered and directed Obon to prepare fabricated data center lease agreements to attempt to demonstrate that Obon had sufficient capacity to justify its server volumes "in case [of an] audit later." These agreements were often falsified by Chang.

202. With the compliance hold out of the way, Defendant Liaw moved to accelerate and expand the Obon diversion scheme. In December 2024, when an Obon executive texted Chang asking whether a shipment was heading to "SZX [Shenzhen] or HK [Hong Kong]," Chang replied, "if ship to HK can be faster." These communications demonstrated Super Micro's specific awareness that the end-users of the products were ultimately located in China.

203. Around the same time, Defendant Liaw pressed Obon for volume projections to tap into Super Micro's procurement of NVIDIA's most advanced chips. For example, Defendant Liaw asked Obon: "Roughly how many you can take by January? Feb? March? April? Just roughly

forecast will be fine . . . Then we can propose to [Nvidia] with the way they can accept . . . This is the only way to have [Nvidia] to promise the B200 allocation so far as I know."

204. The scheme continued to expand in early 2025 despite escalating U.S. regulatory restrictions and enforcement actions. In mid-January 2025, further demonstrating that Super Micro was tracking developments related to the export controls that governed its conduct in real time, Defendant Liaw forwarded to an Obon executive a White House press release announcing the new AI Diffusion Rules, regulations that would require export licenses for shipments to Southeast Asian countries including Thailand, set to take effect on or about May 13, 2025. Liaw's response was not to halt the scheme but to urgently accelerate it: "We need to speed these up before May 13!" Days later, Liaw texted: "We can ship all your [servers] by Feb. Let us run fast before May 13!" Chang, for his part, sent his Obon counterpart a photograph of a pallet that could "ship to China, HK [] or any countries without any problems."

205. While Defendant Liaw and his co-conspirators monitored law enforcement activity surrounding their illegal exports to avoid getting caught, even the arrest of other individuals for the same type of conduct did not deter the scheme—it only caused the co-conspirators to change tactics to avoid getting caught. In late February 2025, Singaporean authorities arrested three individuals for illegally moving NVIDIA AI chips into China. An Obon contact texted Liaw a news article about the arrests, writing "I'm very concerned Wally." Liaw noted that Super Micro's Obon sales had already drawn scrutiny from BIS, stating "We have not shipped to [Singapore] for quite a while because BIS has questioned." Days later, Liaw was pressing his contacts about pending orders, texting that he had "pushed all staffs to prepare 4000 this month."

206. Defendant Liaw also continued to coordinate large orders knowing that the individuals to whom he was selling the servers planned to use Obon as a pass-through entity to get servers elsewhere. When a broker reached out to Liaw asking about the status of orders for "investors and customers," Liaw asked, "How can we help [the broker]?"

207. In April 2025, Defendant Liaw again orchestrated a workaround when Super Micro's compliance team again paused Obon shipments. Liaw instructed Chang to help Obon craft responses to compliance inquiries, emphasizing: "You need to have strong and persuasive reasons

to convince the [Super Micro] staffs!" Chang and Sun drafted fabricated explanations for submission to the compliance team. When the ruse succeeded, Chang celebrated in a group message: "Heheheh, Gooood news for everyone!" Defendant Liaw urgently texted Obon: "We will speed up the shipment right away! Please issue the B200 [purchase order] right away!" This was the second time in six months that the compliance team's supposed concerns about Obon had been easily overridden by the very executives running the scheme.

208. With the April 2025 compliance hold lifted and the AI Diffusion Rules about to come into effect, the floodgates opened. In just three weeks between late April and mid-May 2025, Super Micro shipped over approximately $510 million worth of servers with NVIDIA B200 and H200 GPUs to Obon—all destined for China. The transactions were remarkable in both scale and brazenness: approximately 58 servers with NVIDIA B200 GPUs for $17.4 million on May 8; another 60 servers for $18 million on May 12; and 60 more for $18 million on May 15. Each batch was promptly forwarded to Chinese end-customers through the co-conspirators' broker network. In June 2025, Super Micro shipped at least 854 more servers to Obon for diversion to China, generating over $250 million in additional illicit sales revenue.

209. Together, these sales from January through June 2025 generated over ***$1.5 billion*** in illicit revenue, booked and reported to Super Micro's investors as legitimate revenue. And at Super Micro's per unit price of approximately $300,000, they constituted approximately ***5,000 advanced AI servers***, such a vast amount that they could only be used by major AI labs and hyperscalers like those operating in China, and comparable to firms like OpenAI, Meta, Amazon, and Google. Startups, by contrast, typically cannot afford even a single server, renting them instead from others. Even mid-size AI companies only use a few dozen servers.

210. By the summer of 2025, the volume of illegal shipments had grown so large that it required an industrial-scale concealment operation. In July and August 2025, as the compliance team purported to demand another audit of Obon's purchases, Super Micro's general manager Chang worked with Defendant Liaw's fixer, Willy Sun, to devise a plan to stage "dummy" servers at warehouses rented by Obon, to give the appearance that Obon was in possession of the large number of servers it had purchased. When Chang learned the audit would likely focus on NVIDIA

GPUs shipped in June 2025, he alerted Obon: "we need to speed up for b200 preparation." Sun helped stage a dummy warehouse in preparation for the audit. Sun's texts were explicit about the vast scope of the logistics that would be required to carry out this massive deception, given the outsize number of servers that Obon had nominally purchased: Sun requested "854 . . . labels cut out this month"—labels that would be affixed to the dummy servers to give the appearance they were the same servers that had been shipped to Obon (which had been diverted to customers in China). Sun estimated the staging operation would require "100 people in total," forklift operators, catered meals, and a "20-person shuttle bus" to transport workers between a hotel and the warehouse.

211. Just days before the "audit," on August 5, 2025, the DOJ announced the arrest of two Chinese nationals for illegally smuggling AI chips to companies in China. When one of the brokers Defendant Liaw used to divert products to Chinese customers forwarded the press release to Defendant Liaw the next day, Liaw responded with sobbing emojis, yet continued coordinating with Chang and Sun to push real servers through Obon.

212. The August 2025 audit was a farce from start to finish. One of Super Micro's own compliance auditors, who was tasked with conducting the audit, did not even go to the warehouse and was instead off-site enjoying entertainment paid for by Obon. All of the other obvious red flags were missed or ignored—the barebones nature of Obon's online operations including its website, the absurdly large number of total servers sent to such a company that had no plausible need for them.

213. Sun and his team took photographs and videos of the staged dummy servers and sent them to Defendant Liaw. Liaw responded: "That's spectacular!" Two days later, Liaw pressed Sun to begin placing more purchase orders. When Sun advised waiting "until the audit is over," Liaw responded with celebratory emojis and excitedly wrote, "Order now!"

214. On August 20, 2025, BIS contacted Super Micro directly: the agency had reason to believe that Obon was diverting Super Micro's servers to companies in China and requested an immediate compliance hold on all Obon shipments. BIS subsequently advised the Company it would conduct a post-shipment verification of certain servers Obon had purchased. A post-

shipment verification is a significant enforcement action, reflecting a determination by BIS that previously exported items have been diverted in violation of U.S. export control laws.

215. In December 2025, when a BIS export control officer scheduled a visit to Obon's warehouse in Thailand, Sun and one of the brokers arrived the day before the inspection to stage another round of dummy servers. Surveillance cameras captured them unboxing the fakes, using a hair dryer to transfer labels and serial numbers from genuine packaging, and repackaging the dummies in authentic Super Micro boxes. As depicted in the DOJ indictment, with Sun (left) and one of the brokers involved in the scheme (right) circled in white:



216. When the federal officer arrived on December 19, 2025, Sun was waiting. He introduced himself as "Michael," supposedly an assistant from Obon's local law firm, and guided the officer through the inspection, providing false answers about where the servers had been stored. By then thousands of real servers were long gone, already in China.

217. After the BIS inspection, and while the results remained pending, Defendant Liaw contacted Obon and asked for a new purchase order, instructing his contact to proceed "exactly the same as before." When Obon asked about the status of the BIS verification, Obon's executive reported that he had spoken with Sun, who "said he is optimistic." Liaw responded, "Great!"

218. Thai government trade data confirms that Obon was a pass-through conduit for Super Micro's servers into China, and that its role ended when BIS scrutiny shut the scheme down. Records from the Thai Ministry of Commerce's Exporter and Importer System show that in 2024,

Obon ranked first among all Thai importers in server imports from Taiwan (where Super Micro shipped the products from); and Obon ranked second among those importers in 2025—*i.e.*, the same two years Super Micro's Taiwan office was using Obon as a pass-through to move its products to customers in China. The same records show that Obon exported these products as well, ranking first by reported transaction value among Thai exporters of these products to China and Hong Kong in both 2024 and 2025. This data corroborates the route by which Super Micro's servers were shipped to or fully assembled with NVIDIA chips in Super Micro's Taiwan facilities, delivered to Obon, and then forwarded to purchasers in China.

219. Then, in the first half of 2026, Obon disappeared entirely from the ***top 100*** Thai importers and the ***top 100*** Thai exporters of these products. This precisely matches Super Micro's reported Thailand revenue, which surged from 1.5% to 14.2% of total revenue between FY24 and 3Q25, remained above 10% in 4Q25, and then fell below the 10% disclosure threshold and fully vanished from the Company's revenue reporting in FY26. The timing also matches the escalation of U.S. export officials' scrutiny of Super Micro's scheme.

### 4. Parallel Super Micro Scheme To Illegally Divert Restricted Products Into China Through Taiwan

220. The Obon channel was not the only avenue for illegal exports. Super Micro was also diverting servers containing NVIDIA's restricted chips to companies in China through a parallel operation running through Taiwan and a pass-through entity called Flying Tiger Technology Co. ("Flying Tiger").

221. Super Micro's own Taiwan sales personnel worked from inside the Company to carry out the Flying Tiger diversion scheme. Two Super Micro Taiwan employees played central roles: Lin Chang-Chun ("Lin"), a Senior Sales Associate Director, and Wang Hsiang-Yi ("Wang"), a Sales Manager in the Taiwan office. In the indictment criminally charging Lin and Wang based on their role in the diversion scheme, Taiwanese prosecutors described Super Micro Taiwan as the "[u]pstream supplier" in the scheme, with Super Micro's employees procuring 130 GPU-equipped servers for diversion to customers in China. This parallel scheme was exposed in mid-2026, as the Taiwanese government began investigations and raided a facility housing these products.

Taiwanese prosecutors have indicted nine individuals, including Lin and Wang, along with a distribution manager from NVIDIA's Taiwan office, the president of Flying Tiger, and the CEO of Albatron Technology Co. (one of Super Micro's own distributors). According to Taiwanese prosecutors, Super Micro sold and delivered 130 servers in early 2026. At Super Micro's reported 2025 selling price of approximately $500,000 per B300 server, the 130 servers represented approximately $65 million in sales revenue for Super Micro.[6] These sales were booked as Super Micro's revenue in 3Q26, which ran from January 1, 2026 to March 31, 2026.

222. As Taiwanese prosecutors charged, the scheme's groundwork was laid in February 2025, when Flying Tiger's principals took over a Japanese company and established it as a transshipment point for the later diversion of B300-equipped servers to mainland China. Flying Tiger obtained a position on NVIDIA's "whitelist"—a prerequisite for completing the sales—on the false pretense that Flying Tiger was the end-user for the 130 servers, which were, in reality, purchased for diversion to customers in China.

223. Super Micro employee Lin participated the scheme, working with Flying Tiger to complete Super Micro's sales of the 130 servers. Once Lin began participating in the scheme, he brought Wang into the scheme to help procure the servers and divert them to additional customers in China. Throughout 2025, Super Micro employees Lin and Wang helped Flying Tiger engage in extensive efforts to avoid detection of the illicit sales, which closely resembled Super Micro's efforts by Liaw in the Obon scheme. For example, in the Obon scheme, Liaw had Obon wire tens of millions of dollars to Super Micro to fund NVIDIA GPU allocations. In the Flying Tiger scheme, Albatron, one of Super Micro Taiwan's own distributors, advanced the purchase funds so that Flying Tiger, which had only TWD 8 million in paid-in capital, appeared able to afford the servers.

---

[6] *Prices of Nvidia's B300 server at 7 million yuan in China on US curbs: sources*, BUSINESS TIMES (Apr. 30, 2026) https://www.businesstimes.com.sg/companies-markets/telcos-media-tech/prices-nvidias-b300-server-7-million-yuan-china-us-curbs-sources (B300 server priced at $500,000 in late 2025); Che Pan, Liam Mo, and Laurie Chen, *Exclusive-Prices of Nvidia's B300 server at $1 million in China on US curbs, sources say*, REUTERS (Apr. 29, 2026) https://finance.yahoo.com/sectors/technology/articles/exclusive-prices-nvidias-b300-server-064521420.html (same).

224. Additionally, in the Obon scheme, Liaw directed Obon to prepare fabricated data center lease agreements to show it had enough capacity for its server volumes. The Flying Tiger scheme used the same tactic. In Taiwan, Lin worked with an individual named Tsai I-ta ("Tsai"), a Project Manager at Taiwan-based company Chief Telecom, in a ploy to lease server space in a data center designed to give the appearance that Flying Tiger was the actual end-user of the servers. Flying Tiger leased a small section of a Chief Telecom data center that could hold only about 12 servers and staged it as the purported home for more than one hundred GPU-equipped servers (the majority of the 130 servers sold). According to media reports, these GPU-equipped servers delivered to Chief Telecom were stacked on the server room floor and in a warehouse rather than properly installed in the racks and then substituted with low-end servers designed to appear authentic, including cable ports, connected cables, and operational indicator lights.

225. Facts reported by another former Chief Telecom employee, CW-1, corroborate Super Micro's role in the Flying Tiger scheme. CW-1 served as an Operations Team Member at Chief Telecom, a telecommunications company located in Taipei, Taiwan, from January 2024 through September 2025. Chief Telecom operated internet data center ("IDC") facilities, which leased server rack space and hosted servers for customers. Chief Telecom's customers could rent physical space within the IDCs to run servers using the facility's power and cooling infrastructure.

226. Chief Telecom operated three different IDCs, each with different equipment and different customers who leased the spaces. CW-1 was originally assigned to work in the generator/machine room at one of the IDCs. However, around May or June 2024, she was reassigned to work in a new facility Chief Telecom was opening, which was specifically designed to run high-powered GPU servers for AI usage. This IDC was called the LY2 building. Chief Telecom announced the LY2 building in August 2024 and opened the facility to customers in September 2024.

227. In late 2024, Chief Telecom informed CW-1 that Super Micro was starting to rent space in the LY2 facility to operate high-powered GPU servers there. CW-1 stated that another company, Flying Tiger, was the party on the lease for Super Micro's rental. CW-1 was responsible for preparing the space for Super Micro's rental. She stated that the space had to be cleared out of

existing equipment and prepared for server racks and wiring. CW-1 monitored this work being performed by Chief Telecom's vendors and other employees, including a team of four other operators and four engineers.

228. CW-1 recounted several instances where Super Micro representatives came to Chief Telecom in early 2025. CW-1 said that management representatives from both Flying Tiger and Super Micro visited the LY2 facility where the space was leased. These site visits occurred twice in early 2025, both before the Chinese New Year.

229. CW-1 stated that she observed several strange things while preparing the space for Super Micro's rental. For example, CW-1 described an incident in mid-February 2025 that made her suspicious about Super Micro's use of the rental space. At that time, one of CW-1's responsibilities during the night shift was to monitor customer spaces in the LY2 building. During one of her night shifts in mid-February 2025, CW-1 was told that Super Micro had moved a collection of boxes into the facility during the day, which would only remain in the facility temporarily. At that time, CW-1 was required to patrol every floor of the customer areas during the night shift. However, she was explicitly told not to monitor Super Micro's rental areas where it was storing the boxes that night.

230. CW-1 also recalled an earlier incident, when Super Micro moved equipment and boxes into the LY2 building without following the facility's formal documentation process. At that time, customers moving equipment and boxes into the LY2 building were required to go through security on the first floor, where the property manager would document the equipment through verification procedures. However, Super Micro had its delivery truck bypass the first floor and drive around to the B1 level, where they loaded the boxes directly onto the elevator, so there were no records of the delivery made at the LY2 building. CW-1 stated that this delivery did not follow the required process and was not normal. In discussing this with other Chief Telecom employees, CW-1 learned that Super Micro told Chief Telecom the equipment was just temporary and was not being installed in the facility. When Super Micro's representatives returned for the equipment, they moved it out of the building because Super Micro was selling it to another customer.

231. CW-1 also observed that Super Micro did not provide any instructions to build out

the space for the first three to four months of the rental. She found that odd because Chief Telecom's other customers were much more proactive in setting up their spaces to begin operations faster. CW-1 said that while the other customers were very concerned about setting up their servers according to specific schedules, Super Micro was not.

232. CW-1 stated that she raised questions with her direct boss about Super Micro's rental. CW-1 was told they should not speculate on what Chief Telecom's clients intended to do with their space in the facility.

233. In September 2025, NVIDIA conducted a site inspection of the data center that Super Micro and Flying Tiger staged. As a result of their staging efforts, NVIDIA approved the sale of 130 B300-equipped servers to Flying Tiger, to be delivered in three batches.

234. As with the Obon diversion scheme, Super Micro's sham export compliance system presented no meaningful barrier to the Flying Tiger diversion scheme. Super Micro's sales personnel, Lin and Wang, gave Flying Tiger information to exploit the known holes in Super Micro's flimsy export compliance systems. This conduct tracked Super Micro's playbook from the Obon scheme: Obon had wired tens of millions of dollars to Super Micro to fund NVIDIA GPU allocations and prepared fabricated data center leases, and the Flying Tiger scheme relied on Albatron's advanced funds and a staged Chief Telecom lease.

235. Super Micro's sales commission policies directly incentivized Lin and Wang's conduct. Super Micro paid performance bonuses to both employees tied to completing the diverted server orders. Lin received approximately $62,804 and Wang approximately $83,872. Those payments rewarded Lin and Wang for closing 130 sales, which generated illicit proceeds that Super Micro reported to investors as legitimate sales revenue. These policies gave Super Micro's employees a direct financial stake in pursuing the illicit sales.

236. The Flying Tiger scheme was also facilitated by family connections between Wang and senior executives at Super Micro's headquarters, including Phidias Chou—one of the sales executives Defendant Liang personally re-hired after being ousted following the 2017 accounting scandal. Using that access, Wang expanded the Flying Tiger scheme. Wang obtained information that a batch of 64 servers (nearly half of the total 130 sold) was available to purchase from Super

Micro. Wang then told a Taiwan-based trading intermediary about the servers and used the intermediary to arrange the resale of these 64 servers to an end-purchaser in China. As media reports described it, “Wang supplied the servers.”

237. After procuring the servers from Super Micro, Lin and Wang arranged to re-export the servers out of Taiwan through circuitous routes designed to conceal their unlawful destination in China. For example, after Wang procured the batch of 64 servers from Super Micro, he worked with shipping intermediaries to ship these servers out of Taiwan by several routes:

- In January 2026, Flying Tiger exported 16 servers from Taiwan into China.
- On January 30, 2026, Wang arranged the export of 26 servers to Indonesia, where they were transshipped into China and delivered to a buyer there.
- In February 2026, Flying Tiger exported another 24 servers to Indonesia for transshipment to China.
- In April 2026, Wang arranged eight servers to be routed through Japan and Hong Kong to a buyer in China.

238. In total, 74 of the 130 Super Micro servers successfully reached Chinese buyers through the Flying Tiger channel. Taiwanese customs officials intercepted the remaining 56 servers in April 2026 before they could be shipped, after officials identified irregularities that flagged the transactions as requiring (and missing) an export permit.

239. As discussed below, starting in June 2026, the extent and impact of the Flying Tiger scheme was revealed, following Taiwanese authorities raiding warehouses in Keelung and seizing Super Micro servers equipped with restricted NVIDIA B300 chips, and ultimately detaining four Super Micro employees for facilitating exports to China.

#### 5. Former Super Micro Employees Report That The Illicit Sales Diverted To Customers In China Were Internally Known Throughout The Company, Including To Defendants Liang And Weigand

240. Facts reported by multiple former Super Micro employees further confirm Defendant Liang’s knowledge and role in facilitating Defendant Liaw’s actions in the Obon sales scheme.

241. FE-4 stated that Wally Liaw’s illicit sales practices in Asia were known within the

inner circle at the Company, including to senior salespeople. She stated that it was impossible that Liang did not know about what Liaw was doing, and Liaw did not act without getting a blessing from Liang. Everything with sales had to be approved by Liang, starting with the team leaders, then going up to Liaw, and then Liang. FE-4 stated that Liang was personally involved in any customer orders and pricing. For example, when deal pricing with customers was negotiated, members of Super Micro's cost team would go into Liang's office and bring sales documents to review the numbers and pricing with Liang directly. FE-4 stated that Liang would review each one and approve or reject the deal. FE-4 stated that she believed Liang's spouse, Super Micro co-founder Sara Liu, also knew about the illicit sales operations that were occurring because she was the master controller for the procurement team. For example, Liu's direct report Peter Hsu placed GPU orders with NVIDIA, and Liu reported this information up to Liang.

242. FE-4 said that Liang also closely monitored Super Micro employees' whereabouts, kept logs of everyone going in and out daily, weekly and on the weekends, and had IT set up monitoring systems so he could see how employees were using their devices, including their cell phones.

243. FE-1 similarly stated that, during her tenure, Wally Liaw was running sales to China, including sales that were being diverted to China. According to FE-1, Charles Liang knew 100% what Liaw was doing, and Liang was likely 80% involved in it himself. FE-1 explained that, given Liang's requirement that he personally approve transactions, his involvement in every aspect of the business, and the length and closeness of his relationships with Liaw, Chou, and Chen, it was preposterous to think that Liang did not know what Liaw was doing.

244. FE-2 stated that it was impossible that Wally Liaw was acting as a lone wolf without Charles Liang's recognition. FE-2 stated that during the Class Period, Charles Liang was personally involved in all new customer opportunities and required notice of all new deals. To obtain approval for new deals, FE-2 was required to seek approval from her direct manager, Jessie Chou, Chou's supervisor Cenly Chen, and then ultimately to Liang for sign-off. She stated that, considering Liang's close personal involvement in new sales opportunities and deal approvals, it was not feasible that Liaw did everything without Liang knowing. FE-2, for example, stated that

Chief Growth Officer Cenly Chen and other sales leaders did a monthly update on new sales with Liang, which included reporting on large volume business. FE-2 stated that, if the Company's reported sales for Thailand rose from 1% to over 10% of total Company sales, it would indicate new markets, and this would be brought to Charles Liang's attention. This kind of sales increase, FE-2 said, generally raised questions such as whether Super Micro had exposure, and why the customer was buying so much product. She stated that Liang specifically was conscious of any new sales markets where the Company was expanding, and what products the Company was selling into that market.

245. FE-2 further stated that the Company internally tracked all deals through a SAP system that made the deal information readily available. FE-2 also reported that sales deals were put through a review board run by Super Micro's finance department, which reviewed and approved the deals. For deals involving NVIDIA chips, FE-2 stated that the Company required a deal review to validate the Super Micro customer, which was overseen by a board that included five individuals from Super Micro's finance and sales departments.

246. FE-2 further stated that the Company internally circulated monthly notices on countries and companies which the Company was banned from selling restricted products to. However, she stated that Super Micro employees deviated from the compliance system and did things unlawfully. FE-2 said, concerning Defendant Liaw, that Wally didn't give a shit about compliance. He just wanted the sales. He didn't care where they were coming from. FE-2 also stated that, compared to similar companies, Super Micro paid extremely low commissions, which greatly incentivized salespeople to increase the volume of their deals.

247. FE-4 stated that the illicit Chinese sales operations happened once Charles Liang brought back all his lieutenants who were let go during the first accounting scandal between 2017 and 2018. This included Wally Liaw, who remained part of Liang's inner circle, and Phidias Chou, Super Micro's former Senior Vice President of Worldwide Sales who was very close to Liang.

248. FE-4 stated that Liaw and Chou were directly involved in Super Micro's accounting misconduct that led to being delisted from Nasdaq. When that scandal occurred, Liang arranged for the Company to pay Liaw and Chou a lot of money to take the blame for the scandal, with the

understanding that they could return to the Company after four to five years. FE-4 stated that Liang orchestrated this arrangement so that he could bring these executives back to generate more sales. FE-4 stated that Liang set up similar arrangements for Gloria Sun and Nelson Wang, who temporarily departed after the accounting scandal and were re-hired by Liang. FE-4 stated that Liang re-hired Liaw, Chou, Gloria Sun, and Nelson Wang because he wanted their assistance in schemes to generate sales to manipulate the price of Super Micro's stock to $3,000 per share (before the Company's split), meaning $300 a share (accounting for the split).

249. FE-4 stated that, when Liaw and Chou returned, they were very influential at the Company. Liaw, for example, was initially brought back as a consultant with the accounting team, where he was made responsible for managing relationships with Super Micro's suppliers such as NVIDIA. Chou was given a role running sales. FE-4 explained that, even though Liaw and Chou were nominally hired back as consultants, it was evident that they pulled the strings behind the scenes.

250. FE-4 stated that Super Micro's illegal Chinese sales operations had been happening for years. She knew this was occurring from Super Micro sales managers who were directly involved in these illicit sales. FE-4 stated that the illegal Chinese sales happened through middlemen, who offered cash incentives to Super Micro employees, around $50,000 to $100,000, to get GPUs allocated and restricted servers smuggled into China. FE-4 stated that these servers incorporated GPUs like the H100 and H200, which were illegal to sell or ship into China. FE-4 stated that the Chinese sales operations were done all in cash. The Chinese operations paid a premium to secure their allocation, so the commissions for Super Micro salespeople were higher than other deals.

251. FE-4 stated that the illegal Chinese sales operations worked as follows. The Company would secure the GPUs in the U.S., ship them into Asia through Super Micro's Taiwan office, and they would be combined, reassembled, and repackaged for sales ultimately to China. FE-4 stated that outside of the illicit sales, Super Micro had little demand for orders through the Taiwan office. While Taiwan was the corridor for AI business, Taiwan itself lacks the infrastructure and power required to run all the GPUs that were being shipped there. FE-4 stated

that shipments were also funneled through Japan, but Japan did not have legitimate demand for the same reasons. FE-4 stated that Steven Chang, the manager in Super Micro's Taiwan office who was indicted as part of the DOJ case, was following the instructions of Super Micro top leaders, including Wally Liaw. Steven Chang did anything he was told by those above him, because he was reprimanded if he did not follow their instructions.

252. Facts reported by former Super Micro employees further indicate Defendant Weigand's awareness of the Company's Obon sales. FE-3 stated that there was no way Weigand would not have known the sales in the diversion scheme were happening, given the internal information the Company internally monitored and reported to Weigand.

253. During the Class Period, FE-3 was responsible for, among other things, preparing the list sorted by the customers that brought in 10% or more in revenue for the Company for its SEC disclosure every quarter. The Company internally tracked and monitored revenue on a customer-by-customer basis, which was internally tracked in the Company's SAP system of record. This information was easily accessible internally, as anyone approved to be a user on SAP could run a report and download the information into an Excel spreadsheet.

254. For example, FE-3 stated that her team would receive a list of the Company's customers from highest to lowest revenue each quarter, as well as information concerning the location of customers, the concentration of sales revenue in those customers, and the product concentrations among those customers' sales. Weigand and his team reviewed this information as part of preparing for Super Micro's quarterly earnings calls. FE-3 further stated that either Weigand or Cheung would have gone over the list with Charles Liang before earnings calls. It was a basic step to prepare for major customers and major product sales. These lists contained historical information showing the customers' revenue generated over time, allowing anyone to identify customers showing significant upticks in revenue.

255. FE-3 stated that Super Micro had a specific process where the Office of the CFO reviewed Super Micro's deals as part of their finance function. A typical part of the function was to review payment terms and pricing for the deal. The customer names and locations would also be known, as this information was regularly tracked and reported through the Company's internal

systems. FE-3 further stated that, if a customer came out of nowhere to generate significant sales, the CFO's office would review where they are from, and if they don't have an established history, the CFO would usually have to approve payment terms. Additionally, the Company also had a credit review department that went over customer credit ratings or established if they were credit worthy. If they found that someone was not credit worthy, it would need approval by the CFO for payment terms.

256. FE-3 recounted that Obon was repeatedly discussed during the Company's accounting reviews leading up to quarterly reporting and earnings calls. This company stood out to FE-3 and the accounting department because Obon was a relatively new customer; they didn't have a history. There were multiple discussions that took place about Obon in the first half of calendar year 2025, around April to May of 2025. The discussions were about the change in revenue, the customer concentration and impact on the Company's profitability. These meetings involved the accounting function in Asia. FE-3 stated that Weigand was involved in these discussions and had a formal process to provide this information upwards to Liang.

### 6. Defendants Profited From The Fraud Through Lucrative Executive Compensation Awards And Insider Trading

#### a. Defendants Liang's And Weigand's Executive Compensation

257. Defendants Liang and Weigand stood to benefit personally and significantly from their fraud and Super Micro used performance-based incentive payouts to encourage executives to inflate Super Micro's revenues and stock price.

258. Super Micro's illicit revenue, and Defendants' deception of investors concealing these schemes, were critical to Liang unlocking the stock options under his November 2023 compensation plan. As discussed above, *supra* §IV.D.1, Liang's plan contained five revenue milestones: $13 billion, $15 billion, $17 billion, $19 billion, and $21 billion, each measured by the Company's total revenues over the previous four consecutive fiscal quarters as reported in its SEC filings. Each revenue milestone was paired with a corresponding stock price target ($45, $60, $75, $90, and $110, respectively) measured by a trailing 60-trading-day closing price average.[7]

---

[7] During the Class Period, Super Micro effected a 10-for-1 forward split of its common stock, and

259. The options would vest in five equal tranches of 1,000,000 shares each if Super Micro achieved both the revenue and stock price targets for each milestone. Given Liang's ability to purchase these shares at a pre-set exercise price of $45 per share, he could acquire the full set for $225 million—meaning Liang stood to unlock at minimum ***$155 million*** in compensation assuming he sold the shares at the target prices of each tranche, or ***$325 million*** if he held the shares and sold them at the highest price target of $110.

260. The timing of Liang's November 2023 compensation plan was significant. During calendar year 2023, over $125 million in Super Micro products were exported into Russia, accounting for 4.9% of the Company's foreign sales that year. Tightened controls ended those sales by year-end 2023, cutting off a material source of the revenue that determined Liang's compensation. The diversion scheme with Obon—which began in early 2024, just as the Russia sales ended—more than made up for the shortfall.

261. By June 30, 2024, Super Micro's trailing four-quarter revenue was approximately $14.99 billion, which satisfied Liang's first milestone of $13 billion. By September 30, 2024, four-quarter revenue reached approximately $18.81 billion, meeting the second and third milestones of $15 billion and $17 billion, respectively. By December 31, 2024, four-quarter revenue reached approximately $20.82 billion, which satisfied Liang's fourth milestone of $19 billion.

262. Throughout this period, the Obon scheme was generating increasingly significant portions of Super Micro's reported revenue. The four quarters measured for the first milestone, in June 2024, included approximately $99.7 million in illicit Obon sales. From there, Obon's contributions of illicit revenue rose drastically. The four quarters measured for the second and third milestones, in September 2024, included approximately $504.4 million in illicit Obon sales. The four quarters measured for the fourth milestone, in December 2024, included approximately $909.1 million in illicit Obon sales—more than nine times the amount that counted toward the first milestone only six months earlier.

---

its shares began trading on a split-adjusted basis on October 1, 2024. Unless otherwise noted, all share prices and counts in this Complaint are adjusted to reflect the split. For example, Super Micro's closing price on March 13, 2024 of $1,188.07 per share appears in this Complaint as $188 per share.

263. Although Liang cleared the first four revenue milestones by margins that exceeded the contributions from Obon, Liang also needed to achieve the stock price targets for the options associated with these milestones to vest. The first four targets required Super Micro's stock to sustain a trailing 60-trading-day average at or above the target price: $45, $60, $75, and $90 per share, respectively. Liang achieved these stock price targets while Defendants were concealing the Obon scheme from investors and misrepresenting the sources of Super Micro's revenue.

264. Super Micro reached the $45 target on February 26, 2024, when its 60-trading-day average reached $45.70. Super Micro reached the $60 target on March 13, 2024, when its 60-trading-day average reached $61.07. Super Micro reached the $75 target on April 1, 2024, when its 60-trading-day average reached $75.28. Super Micro reached the $90 target on April 25, 2024, when its 60-trading-day average reached $90.31. During this period, Defendants, including Liang, repeatedly assured the market that Super Micro complied with U.S. export controls, driving the stock price to artificially inflated highs.

265. Had the existence of pervasive export control violations schemes been disclosed at the time Liang's stock price goals were being measured, the resulting decline in Super Micro's stock price would have prevented Liang from achieving the stock price targets for the first four milestones. Indeed, when the Obon scheme was revealed to the market on March 19, 2026, Super Micro's stock price fell over 33% by the next trading day, closing at ***$20.53 per share*** on March 20, 2026—less than half of Liang's lowest stock price target.

266. Liang's unlocking of the options from meeting the first four milestones translated into tens of millions of dollars—with significantly greater upside as Super Micro's stock price continued to rise. Because every dollar of increase in Super Micro's stock price added $4 million to the value of Liang's vested options, and because any shares he acquired by exercising them could not be sold until November 14, 2026, Liang had a powerful and continuing personal incentive to keep the stock price inflated by concealing the illicit sources of Super Micro's revenue.

267. After unlocking the first four tranches of options, Liang could not meet the fifth revenue milestone without the revenue generated by the illicit sales from the Obon scheme. The fifth milestone was especially valuable to Liang, because the corresponding tranche would vest

only once Super Micro's stock sustained a 60-trading-day average of at least $110 per share. At that price, the 1,000,000 shares in the fifth tranche would be worth at least $110 million, which Liang could acquire for $45 million, representing gains of at least $65 million.

268. Super Micro's illicit sales generated through Obon delivered Liang the fifth revenue milestone. On August 26, 2025, the Compensation Committee certified Liang's achievement of the $21 billion revenue goal, based on the Company's rolling four-quarter revenue as of March 31, 2025. These four quarters were 4Q24, 1Q25, 2Q25, and 3Q25—quarters in which Super Micro derived significant illicit revenue from the Obon scheme. As reflected in Super Micro's August 28, 2025 filing, the Company's total revenue from those four quarters was just shy of $21.57 billion, meaning Liang cleared the $21 billion sales target by ***less than $600 million***. During the same four-quarter period, the Company booked approximately ***$1.73 billion*** in illicit sales to Obon. In other words, Liang would not have achieved the fifth revenue milestone without contributions from the illicit sales.

269. In addition, during the Class Period, Defendant Weigand was a recipient of such an incentive plan that used performance-based incentive payouts, which encouraged him to inflate Super Micro's revenues and stock price.

270. During FY24, FY25, and FY26, Defendant Weigand was the beneficiary of a Performance Program for Other NEOs (the "Performance Program") which aimed to "link compensation to corporate and individual performance." Under this Performance Program, in addition to his base salary and fixed bonus, Weigand received a performance-based annual incentive award ("Performance Incentive Award") payable 20% in cash ("Performance Cash") and 80% in the form of service-based performance-based restricted stock units ("PRSUs"), which, once granted, vested over a period of approximately four years. Weigand's Performance Cash was paid out promptly following the end of the fiscal year, and PRSUs were granted at approximately that same time.

271. During FY24 and FY25, Weigand was motivated to artificially inflate Super Micro's revenues and stock price due to his receipt of a Performance Incentive Award based on particular key performance indicators ("KPIs") for Super Micro, including (1) percentage

appreciation in Company stock price for the fiscal year; (2) percentage increase in number of long-term investors in the Company, defined as either a new long-term investor with at least 1,000,000 shares added during the fiscal year, or an existing long-term investor who increased their holdings by at least 50% during the fiscal year; and (3) percentage increase in worldwide revenue from the prior fiscal year.

272. For FY26, the KPIs used to calculate Weigand's Performance Incentive Award were modified to include the following: (1) worldwide revenue performance; (2) worldwide gross margin; (3) earnings per share; (4) inventory reserves as a percentage of revenue, based on minimizing inventory write-downs as percentage of revenue; (5) material weakness remediation, "measured on an all or nothing basis."

273. Based on these KPIs, which included artificially inflated stock prices during the Class Period, Weigand received Performance Cash totaling as follows: (1) $110,060 for FY24; (2) $55,638 for FY25; and (3) $194,255 for FY26. Likewise, based on the KPIs set forth above, Weigand received PRSU payout value totaling as follows: (1) $440,239 for FY24; (2) $222,553 for FY25; and (3) $777,020 for FY26.

274. Thus, throughout the Class Period, Defendant Weigand was motivated to closely monitor and enhance the Company's revenue, stock price, and long-term investors, as well as any policies or procedures that would increase those metrics. By concealing the truth regarding Super Micro's reliance on sales of servers to China-based companies in violation of U.S. export control laws, with contemporaneous knowledge that the Company lacked sufficient controls to ensure compliance with those applicable export control regulations, Defendant Weigand reaped substantial cash and PRSU benefits.

**b. Defendants Liang's And Weigand's Class Period Insider Sales**

275. Defendants Liang and Weigand further capitalized on their fraud through insider sales of Super Micro stock during the Class Period. As Super Micro shipped hundreds of millions of dollars of restricted servers to Obon in 2025, Defendant Liang and Defendant Weigand (the "Insider Trading Defendants"), collectively sold more than $39 million of Super Micro stock at

prices inflated by their fraud.

276. As discussed below, $37.44 million of these sales occurred between May and July 2025. The timing of these sales was not coincidental. It is right after the AI Diffusion Rules and increased external scrutiny signaled to Company insiders the scheme would come to an end, leading both to Liaw accelerating the sales to Obon (such that the scheme generated its peak revenue), and the Insider Trading Defendants selling massive amounts of Super Micro stock.

277. ***Class Period Sales.*** Defendant Liang sold the following amounts of Super Micro stock during the Class Period:

| Name | Date | Shares Sold | Avg. Price/Share | Proceeds |
|---|---|---|---|---|
| Charles Liang | 5/14/2025 | 184,694 | $44.9783 | $8,307,222.14 |
| | 5/14/2025 | 15,306 | $44.5638 | $682,093.52 |
| | 6/18/2025 | 300,000 | $45.00 | $13,500,000.00 |
| | 7/28/2025 | 200,000 | $60.00 | $12,000,000.00 |
| | **TOTAL:** | **700,000** | | **$34,489,315.66** |

278. Defendant Weigand sold the following amounts of Super Micro stock during the Class Period:

| Name | Date | Shares Sold | Avg. Price/Share | Proceeds |
|---|---|---|---|---|
| David Weigand | 5/20/2025 | 67,000 | $44.0223 | $2,949,494.10 |
| | 9/03/2025 | 24,700 | $40.2844 | $995,024.68 |
| | 9/03/2025 | 300 | $40.8533 | $12,255.99 |
| | 9/15/2025 | 25,000 | $45.14 | $1,128,500.00 |
| | **TOTAL:** | **117,000** | | **$5,085,274.77** |

279. ***Timing of Sales.*** The Insider Trading Defendants' Class Period sales of Super Micro stock occurred at suspicious times designed to capitalize on Super Micro's artificially

inflated stock price and avoid losses based on material non-public information, just as they realized the Obon sales were in jeopardy.

280. On or around January 15, 2025, BIS announced sweeping new export restrictions in the AI Diffusion Rules, which imposed new licensing requirements on sales of NVIDIA's restricted GPUs even to countries like Thailand, where Obon was located. The AI Diffusion Rules were scheduled to take effect on or about May 13, 2025.

281. By the time the AI Diffusion Rules were announced, the Obon scheme had become a major source of Super Micro's revenue. For example, its revenue for calendar year 2024 included approximately $909.1 million in illicit, undisclosed Obon sales.

282. Defendants, including Liaw and Liang, were aware of the AI Diffusion Rules and their impact on Super Micro. For example, the day after the AI Diffusion Rules were announced, Liaw sent an Obon executive the press release announcing the AI Diffusion Rules, and wrote, "we need to speed [the illegal server sales] up before May 13!"—the day the new restrictions would go into effect. Similarly, two weeks after the rule was announced, on January 28, 2025, Super Micro posted its updated "Export Compliance Policy" on its website, stating that "All Supermicro employees are responsible for complying with this policy," including members of "Supermicro senior management" like Liang.

283. Defendant Liaw reacted to the AI Diffusion Rules by pressuring Obon to buy more servers before the rules ended Super Micro's exports to Obon.

284. Defendant Liang reacted to the AI Diffusion Rules by selling or adopting a new trading plan to sell his Super Micro stock before the rules ended Super Micro's exports to Obon. On February 28, 2025, Defendant Liang adopted a new Rule 10b5-1 trading plan to sell 500,000 shares of Super Micro stock by December 31, 2025. Defendant Liang could not wait for the new trading plan's 90-day cooling off period to expire, so he sold 200,000 shares of stock on May 14, 2025 for proceeds of nearly $9 million. Defendant Liang then used the plan to sell 300,000 shares on June 18, 2025 and 200,000 shares on July 28, 2025, which exhausted the plan. Liang's sales pursuant to this newly-adopted plan generated significant proceeds. Liang's June 18, 2025 sale at $45.00 per share yielded proceeds of $13.5 million. His July 28, 2025 sale at $60.00 per share

yielded proceeds of $12 million.[8]

285. In the Forms 144 filed for Liang's sales, he certified that, as of February 28, 2025, he did "not know any material adverse information in regard to the current and prospective operations of [Super Micro] which has not been publicly disclosed." SEC Rules applicable to Rule 10b5-1 trading plans similarly required Defendant Liang to certify that he was not in possession of material nonpublic information about Super Micro or the Super Micro Securities at the time he adopted the plan. *See generally* 17 C.F.R. § 240.10b5-1(c)(ii)(C)(1).

286. Liang made these representations in the same quarter that Super Micro booked approximately $825 million in illicit sales to Obon—17.9% of Super Micro's total revenue and 60.9% of its Asia sales—a revenue stream the AI Diffusion Rules all but assured would be shut off.

287. Defendant Liang's use of the 10b5-1 plan was designed to give investors the false impression that his insider trades were legitimate, and to obscure suspicion and liability for executing these trades based on MNPI. As noted above, Defendant Liang had previously been forced to disgorge the proceeds of his insider trades in connection with the SEC charges arising from Super Micro's 2017 accounting scandal.

288. Defendant Weigand's Class Period sales were also suspiciously timed. For example, Weigand's single largest Class Period transaction was an open market sale of 67,000 shares on May 20, 2025 for proceeds of approximately $2.95 million. This sale occurred just days after Super Micro shipped over approximately $510 million worth of servers to Obon in a three-week period between late April and mid-May 2025, while the Company was illegally diverting Super Micro servers to companies in China.

289. Then, a few days later, on May 30, 2025, Weigand entered into a new Rule 10b5-1 trading plan to dispose of up to 50,000 shares of common stock by December 1, 2025. Weigand used the plan to sell 25,000 shares in a pair of sales on September 3, 2025 (immediately after the

[8] On February 26, 2025, two days before Liang adopted his 10b5-1 plan, his spouse, Sara Liu, sold all 46,293 shares of Super Micro common stock she directly held, at a weighted-average price of $50.171, for proceeds of $2,322,566.10.

Rule 10b5-1 plan's legally imposed cooling off period), executed at prices between $40 and $41 per share, generating proceeds of over $1 million. On September 15, 2025, Weigand sold another 25,000 shares pursuant to the plan, executed at $45.14 per share, generating additional proceeds of over $1.12 million.

290. Like Liang, in the Forms 144 filed for Weigand's sales, Weigand certified that, as of May 30, 2025, he did "not know any material adverse information in regard to the current and prospective operations of [Super Micro] which has not been publicly disclosed." Defendant Weigand was also required to make a similar representation to adopt the new May 30, 2025 trading plan in the first place under SEC rules governing those plans. Thus, Weigand made these representations while Super Micro sold over $510 million to Obon in the span of only weeks and continued to generate significant illicit sales through June 2025.

291. ***Comparison To Prior Sales.*** Defendant Liang's sales of Super Micro stock during the Class Period were higher than his sales during the period immediately preceding and of equal length as the 879-day Class Period, *i.e.*, the period between September 6, 2021 and February 1, 2024 (the "Control Period").

292. During the Control Period, Liang sold a total of $23.9 million of his holdings in Super Micro stock. By contrast, Liang sold approximately $34.5 million of his Super Micro stock during the Class Period. Additionally, Liang's trading patterns during the Class Period deviated significantly from his Control Period trading. During the Control Period, Liang sold his holdings of Super Micro stock on three occasions: January 17-18, 2023; January 19, 2023; and December 5, 2023. The first two of these trades were executed pursuant to 10b5-1 trading plans, and the third sale, in December 2023, "was [as] a selling shareholder pursuant to a registered offering of shares on Form S-3." In other words, Liang's only Control Period sale that was not pre-planned under a 10b5-1 trading plan was also not an open market sale—it was part of a registered offering by the Company. By contrast, during the Class Period, Liang made a significant unplanned sale on the open market, selling 200,000 of his Super Micro shares on May 14, 2025—while the Obon scheme was in full effect—which was out of line with his prior trading pattern, and also adopted a new trading plan.

### 7. Summary Of The Illicit Scheme Revenue

293. The following table summarizes the amounts that illegal sales through Obon contributed to Super Micro's reported results:

| Q/FY | Period Dates | All Sales | Asia Sales | Illicit Sales ($) | Illicit Sales (% All Sales) | Illicit Sales (% Asia Sales) |
|---|---|---|---|---|---|---|
| 4Q24 | Apr–Jun 2024 | $5.3B | $1.3B | $99.7M[9] | 1.9% | 7.9% |
| 1Q25 | Jul–Sep 2024 | $5.9B | $954.6M | $404.7M[10] | 6.8% | 42.4% |
| 2Q25 | Oct–Dec 2024 | $5.7B | $768.2M | $404.7M | 7.1% | 52.7% |
| 3Q25 | Jan–Mar 2025 | $4.6B | $1.4B | $825M[11] | 17.9% | 60.9% |
| 4Q25 | Apr–Jun 2025 | $5.8B | $2.4B | $766M[12] | 13.3% | 31.7% |
| **Total** | | **$27.3B** | **$6.76B** | **$2.5B** | **9.1%** | **37.0%** |

294. Additionally, Super Micro generated approximately $65 million in illicit revenue from the Flying Tiger scheme. As Taiwanese prosecutors revealed, Super Micro sold 130 servers equipped with restricted NVIDIA B300 GPUs to Flying Tiger. At Super Micro's reported selling price of approximately $500,000 per B300 server, those 130 servers generated approximately $65 million in sales revenue, which Super Micro booked in 3Q26 (January 1, 2026 through March 31, 2026). The proportion of Super Micro's Asia sales the Flying Tiger scheme comprised cannot be calculated based on Super Micro's public reporting to the SEC, because starting in 2Q26—the

---

[9] As DOJ's Indictment (*see infra* §IV.E) later revealed, internal Super Micro documents showed that Super Micro had approximately $99.7 million in sales to Obon during 4Q24.

[10] As the Indictment revealed, Super Micro's sales to Obon generated at least approximately $2.5 billion in illicit revenue. After subtracting the illicit sales identified in the Indictment for 4Q24 (approximately $99.7 million), 3Q25 (approximately $825 million), and 4Q25 (approximately $766 million), the remaining $809.3 million of illicit Obon sales in 1Q25 and 2Q25 represented an average of $404.7 million for each of those quarters.

[11] According to email communications detailed in the Indictment, Super Micro sold 2,749 of the servers to Obon between January and April 2025, each with a selling price of approximately $300,000 based on Super Micro's deals with Obon at that time. In total, this generated approximately $825 million in illicit sales in 3Q25.

[12] As the Indictment revealed, Super Micro sold over approximately $510 million of restricted servers to Obon in April and May 2025 alone. In June 2025, Super Micro sold 854 additional servers to Obon. At the $300,000 per server selling price, these June 2025 sales amounted to approximately $256 million. Collectively, these sales generated approximately $766 million in 4Q25 sales revenue.

quarter immediately after illicit sales to Obon ended—Super Micro stopped reporting its Asia sales and instead split its revenue into only two categories: the "United States" and "Other."

295. The illegal proceeds were material and represented a significant portion of Super Micro's reported financial performance. Every quarter, Super Micro included these illicit revenues in its earnings reports and SEC filings, falsely presenting them to investors as part of legitimate revenue and sales growth.

### E. Super Micro's Stock Price Declines As Investors Learn About The Illegal Diversion Scheme And Its Implications And Scope

296. The relevant truth about Super Micro's diversion schemes, the Company's regulatory non-compliance, and its reliance on the proceeds of those illegal sales was revealed through a series of disclosures of previously misrepresented or concealed facts. These disclosures were followed by significant declines in the price of Super Micro Securities.

297. On March 19, 2026, after market close, DOJ unsealed an indictment charging Defendant Liaw, his fixer Willy Sun, and Super Micro's Taiwan sales manager Steven Chang, for their roles in Super Micro's export diversion scheme related to Obon (the "Indictment"). The DOJ charged each with one count of conspiracy to violate the Export Control Reform Act, punishable by up to twenty years in prison, one count of conspiracy to smuggle goods from the United States, punishable by up to five years in prison, and one count of conspiracy to defraud the United States, punishable by up to five years in prison. The Indictment alleged that, beginning in or about 2024, the indicted individuals participated in a scheme that "caused the sale of at least approximately $2.5 billion worth" of Super Micro servers to Obon, which were ultimately diverted to companies in China. The same day, DOJ issued a press release stating that Liaw and Sun were arrested by federal agents and were in U.S. custody, and that Chang remained a fugitive. In describing their criminal conduct, DOJ stated that Liaw, Sun, and Chang utilized a "web of lies, obfuscation, and concealment—all to drive sales and generate revenues in violation of U.S. law," which "generate[d] billions of dollars in ill-gotten gains and pose[d] a direct threat to U.S. national security." The DOJ stated that these actions "defrauded the United States."

298. Analysts were shocked by the disclosures contained in the Indictment, and quickly

recognized that these newly-revealed facts concerning Super Micro's export diversion scheme starkly contradicted Defendants' previous representations to investors. For example, analysts from CFRA assessed these new disclosures against the company's "messy history of auditor departures, accounting violations, and de-listings"—which Defendants assured investors were "all fixed," as Liang told investors in March 2025. CFRA reported that the facts in the Indictment made "these new violations look ***more like a structural problem than a one-off mistake***, further ***damaging the company's already weak credibility***, especially given the direct involvement of co-founder Wally Liaw." CFRA thus downgraded Super Micro from Buy to Sell, slashing its price target from $40 to $16, while projecting up to $5 billion in regulatory penalties.

299. Along these same lines, Raymond James analysts characterized the DOJ Indictment as "a bad look" for "a company with a tarnished history," reporting that the incident "introduces a new legal/compliance overhang on top of pre-existing concerns (accounting delays, internal control weaknesses, related-party risk)." Raymond James further cautioned that Super Micro's "reputational discount" now extended "from financial reporting credibility to export-control governance and board oversight, particularly given involvement of a board member." Northland Capital Markets downgraded Super Micro's investment rating in response to the March 19, 2026 disclosures, observing that "***[t]his is the 2nd time Wally Liaw's sales practices have led to investigations***." Analysts from Bernstein similarly questioned how Super Micro could maintain credibility with investors, especially given Defendant Liang—Super Micro's CEO and Chairman—had ***re-hired*** Liaw after he was ousted in the 2017 accounting scandal. Bernstein wrote: "it's one thing being duped once by rogue employees (allegedly) committing crime right under your nose, but ***it's quite another hiring the same person back (as a board director too)*** and later ***for that same person to (allegedly) do something worse like this***." Bernstein asked sardonically: "Do we need to add a smuggling line to our SMCI revenue build?"

300. Following these disclosures, Super Micro's stock price declined by $10.26 per share, or 33.32%, from a closing price of $30.79 on March 19, 2026, before the Indictment was unsealed, to a closing price of $20.53 on March 20, 2026, the immediately following trading day.

301. On March 19, 2026, Super Micro issued a press release in response to the

Indictment, downplaying it by highlighting the charges were against individuals only and not the Company, and announcing that it had placed Liaw and Chang on administrative leave and "terminated its relationship" with Sun "effective immediately." Reacting to this press release, Northland Capital Markets noted that, despite cutting ties with Willy Sun, Super Micro exhibited a "lack of definitive action to immediately sever ties with Wally Liaw." The next day, on March 20, 2026, Super Micro announced that Defendant Liaw had "resigned" from the Board "effective immediately," without any mention of the $2.5 billion diversion scheme that Defendant Liaw had directly orchestrated while serving as a board member and senior executive.

302. The relevant truth regarding the scope of Super Micro's diversion schemes and deception of investors did not fully emerge at that time. Moreover, Defendants also attempted to downplay the seriousness of the facts in the Indictment, portraying the Obon diversion scheme as a one-off isolated incident, rather than a systemic compliance problem. For example, on March 26, 2026, Defendant Liang published a letter to Super Micro's "stakeholders," in which he claimed that "***Supermicro has been a victim*** of the elaborate schemes orchestrated by these individuals, which deceived both federal authorities and our internal compliance team." In this letter, Defendant Liang stated, "***This has no impact on our business operations.***"

303. Defendants also continued to reinforce the false picture previously presented to investors, of a company with robust controls that earnestly investigated and definitively acted once aware of misconduct. For example, on April 7, 2026, Super Micro announced that it had launched an "independent investigation" into the Indictment, led by two independent board members, Scott Angel and Tally Liu, with the assistance of outside counsel and a forensic accounting firm. Defendant Liang stated that the Company was "committed to protecting America's advanced technologies and intellectual property" and that the investigation was "being conducted in line with our commitment to ensuring our technology is handled with the highest level of ethical and legal scrutiny."

304. Nevertheless, on April 23, 2026, independent consulting firm BlueFin Research published a report revealing that Oracle had canceled a significant AI infrastructure contract with Super Micro. According to BlueFin, Oracle canceled an order for 300 to 400 server racks built

with NVIDIA chips from Super Micro, with each rack valued at approximately $3.5 million, representing a total contract loss of between $1.1 billion and $1.4 billion. BlueFin estimated that Super Micro had shipped only 100 to 200 racks before the Oracle cancellation occurred.

305. Directly contradicting Defendant Liang's claim to investors that the diversion scheme "***has no impact on our business operations***," industry sources indicated that Oracle's decision to cancel the contract was directly related to the Indictment. Moreover, Taiwanese manufacturer Wiwynn had picked up the rack business following the cancellation, such that the lost revenue was not due to any reduction in Oracle's demand for AI infrastructure, but rather Oracle's decision to distance itself from Super Micro in the wake of the diversion scheme.

306. *Bloomberg Intelligence* analyst Woo Jin Ho described the Oracle loss as "a leading indicator of companies seeking to de-risk their exposure to the server maker following the indictment of its co-founder for smuggling GPUs to China," concluding that Dell would be "a leading beneficiary in picking up the order slack."

307. In the middle of 2026, it became clear that the illegal diversion of Super Micro's products to Chinese companies was not limited to the Obon scheme. On May 20, 2026, Taiwanese law enforcement authorities raided warehouses in the port city of Keelung, Taiwan. During those searches, authorities seized 50 GPU-equipped Super Micro servers, which had been procured from Super Micro and were *en route* for illegal reexport to customers in China.

308. It was reported that Taiwanese prosecutors had detained three individuals in connection with the alleged illegal export of restricted AI servers to companies in China. The reports indicated that the Taiwan court conducted detention hearings and ordered all three held, finding substantial evidence that they had committed offenses including using altered private documents and causing false information to be recorded in official documents. The reports also indicated that the suspects had purchased Super Micro servers equipped with NVIDIA B300 chips in Taiwan and used shell companies and false export declarations to conceal the actual destinations of the servers, and that some of the servers had already been exported to buyers in mainland China, Hong Kong, and Macau.

309. These media reports stated that the Taiwan case did not have an evident connection

to Super Micro's Obon scheme through Thailand. In the public reporting from May about actions by the Taiwanese prosecutors there was no direct connection made to Super Micro personnel or Defendants.

310. On May 28, 2026, Super Micro issued a press release acknowledging the Taiwan investigation for the first time, stating that its "collaboration with authorities in Taiwan resulted in the arrest of three suspects and the seizure of 50 servers that had been deceptively acquired after being sold by Supermicro to an authorized reseller." Super Micro again sought to minimize the significance of the news about the Taiwanese investigation to the Company, characterizing the investigation as a cooperative effort rather than evidence of a systemic compliance failure. The Company stated that the "initial transaction — Supermicro's sale of products to an authorized reseller — followed a rigorous vetting and review process that exceeded applicable government requirements," and attributed the diversion to "the challenges that can arise when products are resold through multiple downstream parties beyond direct manufacturer control." Defendants did not disclose that the investigation implicated personnel from Super Micro's own Taiwan office, nor did the Company acknowledge the existence of a second diversion scheme independent of the Obon scheme that had been revealed by the DOJ Indictment just two months earlier.

311. Despite Defendants' efforts to downplay and contain information related to Taiwan, the emergence of the Taiwan investigation raised new questions about whether Super Micro's compliance failures were systemic—and not the one-off, isolated incident the Company portrayed in response to the Obon scandal.

312. On June 9, 2026, Super Micro filed a Form 8-K (the "June 2026 Form 8-K") with the SEC notifying investors that it had updated the risk factors disclosed in its other SEC filings. In the June 2026 Form 8-K, Super Micro revealed that "the Company received a subpoena from the SEC requesting the production of documents relating to certain customers, including one customer that is the subject of the allegations in the Indictment, and the Company's controls and procedures." Super Micro further revealed that, it "also received a grand jury subpoena from the U.S. Attorney's Office for the Southern District of New York seeking documents and information relating to the individuals and facts referenced in the Indictment, as well as the Company's

compliance program and internal controls, and related issues. The Company has also received other subpoenas, including one from the U.S. Attorney's Offices for the Eastern District of New York and one from Central District of California that predate the Indictment requesting documents and information relating to certain other customers." The Company also revealed for the first time that it had received multiple subpoenas from BIS, including "at least two subpoenas and one informal request relating to a certain customer implicated by the facts and circumstances that are also the subject of the Indictment."

313. The Company's disclosure of the multiple additional subpoenas from federal prosecutors and regulators also revealed new information that was concerning to investors. For example, the June 9, 2026 disclosure revealed for the first time that the Eastern District of New York subpoena, "predate[s] the Indictment" related to Super Micro's Obon scheme, and "request[ed] documents and information relating to certain other customers" of Super Micro—*i.e.*, other than Obon—indicating that U.S. authorities had been investigating Super Micro for export violations beyond the Obon scheme, since before the Indictment was unsealed in March 2026.

314. The June 2026 Form 8-K also revealed to investors that Super Micro was subjected to increasing legal and financial exposure as a result of the export compliance violations that it had repeatedly told investors its "robust" controls would prevent. For example, in disclosing that the Company had received multiple subpoenas from BIS, Super Micro stated to investors that BIS "could seek to suspend, revoke or deny [the Company's] export privileges." In other words, Super Micro revealed that, far from the diversion scheme in the Indictment being an isolated, contained incident with "***no impact on our business operations***," the Company was forced to admit that the widening investigations into its illicit sales practices threatened its ability to export products outside the U.S. at all—putting the Company's entire international sales revenue at risk.

315. The market reacted severely to this negative news. Analysts now understood that, contrary to the Company's efforts to distance itself from the illicit sales schemes revealed by the Indictment, Super Micro's corporate systems, leadership, and sales practices were directly implicated in these schemes. Analysts at CFRA called the disclosures "a big red flag given the ongoing BIS investigation." Wolfe Research noted that the Company had "received a subpoena

from the SEC relating to the situation and the company's internal controls" and warned that it was "possible that other senior managers at Super Micro could become involved in the case," flagging the risk that NVIDIA could "pull back from their relationship with the server supplier" and "steer a bigger allocation of GPUs destined for [Super Micro's] customers through Dell (and away from Super Micro)." These disclosures reflected investor sentiment that, despite the Company's repeated assurances to the contrary, the Company's illicit sales practices were revealed to be more widespread than represented, exposing Super Micro to ever-worsening legal and business repercussions.

316. As a result of these disclosures, Super Micro's stock price declined by $11.37 per share, or approximately 27.98%, from a closing price of $40.64 on June 9, 2026, to a closing price of $29.27 on June 10, 2026.

317. Analysts connected the June 10, 2026 decline in the Company's stock price directly to the facts concerning the additional subpoenas the Company revealed in its June 2026 Form 8-K. For example, a June 11, 2026 report from Wolfe Research noted that "Super Micro's Issues Present Supply, Demand, and Regulatory Risks," including because Super Micro had "***received a subpoena from the SEC*** relating to the situation," which meant it was "possible that other senior managers at Super Micro could become involved in the case." Similarly, a June 10, 2026 research note from CFRA called the disclosures "a big red flag given the ongoing BIS investigation," which the June 2026 Form 8-K now revealed to include an additional subpoena.

318. On June 29, 2026, multiple media outlets, including *Financial Times* and *Bloomberg*, reported Taiwanese government authorities raided Super Micro's offices in Taiwan and the residences of six individuals as part of the probe into Super Micro's second illegal export scheme. The June 29, 2026 reporting revealed that the Keelung District Prosecutors Office were investigating ***nine individuals*** for illegally trans-shipping dozens of Super Micro GPU-equipped servers to companies in China. The June 29, 2026 reporting also revealed that four of these individuals were Super Micro employees, two of whom were detained by Taiwanese authorities pending a hearing, and the other two were released on bail. The June 29, 2026 reporting revealed that these individuals had successfully moved numerous servers illegally into China, while

approximately 50 additional servers were intercepted by Taiwanese authorities *en route* to China.

319. The market reacted negatively to news of the raids. For example, *Bloomberg Intelligence* analyst Woo Jin Ho stated that the Taiwan raid reflected "persistent headline risk after its co-founder [Defendant Liaw] was indicted for allegedly smuggling NVIDIA GPUs to China." *The Motley Fool* characterized the raid as reopening "a legal cloud the recent rally had ignored," warning that "the fear" raised by the enforcement action may be "rational." Analysts at Quiver Quantitative observed that "legal, compliance, and customer-risk overhangs are colliding," leaving "shares more vulnerable to risk-off trading."

320. Following these disclosures, Super Micro's stock price declined significantly even though the broader market rallied sharply that day. Specifically, following these disclosures, Super Micro's stock price declined by $2.48 per share, or approximately 8.1%, from a closing price of $30.63 on June 26, 2026, to a closing price of $28.15 on June 29, 2026.

321. In all, disclosures of the relevant truth concerning Super Micro's undisclosed illicit sales of AI servers diverted to companies in China, which Defendants' materially false and misleading misstatements, omissions and fraudulent courses of conduct concealed, caused massive losses to investors.

### F. Post-Class Period Developments

322. On August 31, 2026, Super Micro filed its Form 10-K for the 2026 fiscal year ("FY26 Form 10-K"). The FY26 Form 10-K contained an audit opinion from BDO, Super Micro's independent auditor that replaced E&Y after its resignation in October 2024. Based on BDO's audit of Super Micro's internal controls, it concluded that "the Company did not maintain, in all material respects, effective internal control over financial reporting as of June 30, 2026, based on the COSO criteria." Specifically, "The Company's information technology controls for certain systems that support some of the financial reporting processes did not operate for a sufficient period of time, and the Company did not perform controls in a consistent and timely manner to monitor user access to certain financial applications, system infrastructure and programs."

323. On September 8, 2026, Willy Sun, Defendant Liaw's co-conspirator, entered a plea of guilty to charges in a Superseding Information, which included one count of conspiracy to

violate the Export Control Reform Act, one count of conspiracy to smuggle goods from the United States, and one count of conspiracy to defraud the United States, all in relation to the Obon diversion scheme. In addition, Sun entered a plea of guilty to an obstruction of justice charge based on the fact that, on March 19, 2026, the day the original Indictment was unsealed, Sun "deleted an encrypted messaging application and its contents from his cellphone, with the intent to impede, obstruct, and influence an investigation by the United States Attorney's Office for the Southern District of New York."

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

324. Throughout the Class Period, Defendants made numerous materially false and misleading statements in public appearances with investors, press articles and interviews, the Company's SEC filings, and other public media. Defendants' false and misleading statements are set forth below, with the particular language identified as false and misleading through the use of bold, italicized text. The bases for the falsity of each statement are below, and the narrative discussion in Section IV above is incorporated into those allegations as relevant.

325. Defendants' materially false and misleading statements left investors with the misimpression that Super Micro was in compliance with all applicable U.S. export restrictions, including those prohibiting the re-exportation of products to companies in China, and that it was achieving legitimate, sustainable growth in its sales of its products to customers in Asia. In fact, and unbeknownst to investors, Super Micro was engaged in a scheme to divert its products to companies in China in violation of U.S. export restrictions, and its increase in sales to the region were in part an illusion created by this illegal activity.

### A. False And Misleading Statements From February 2, 2024 Through March 31, 2024

326. On February 2, 2024, Super Micro filed with the SEC its Form 10-Q for the second quarter of its FY24, which was reviewed and approved by Defendants Liang and Weigand, who signed the 10-Q (the "2Q24 Form 10-Q"). The 2Q24 Form 10-Q incorporated by reference the "Risk Factors" in Part I, Item 1A of Super Micro's Annual Report on Form 10-K for its FY23,

filed with the SEC on August 25, 2023, and signed by Defendants Liang and Weigand (the "FY23 Form 10-K"). In the "Risk Factors" section of the FY23 Form 10-K, Defendants stated:

> [W]e are subject to U.S. and other applicable trade control regulations that restrict with whom we may transact business . . . ***If we fail to comply*** with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists, ***we may be subject*** to civil or criminal penalties.

327. On February 16, 2024, Defendant Liang gave a video interview to *Bloomberg Technology*, published on Bloomberg's website with the title, "Super Micro CEO Sees Market Gains Amid Huge Stock Rally." During that interview, Liang was asked, "You had to pull out your manufacturing from China previously . . . How do you see that restriction on supply and the ongoing relationship between the U.S. and China now and it affecting your business?" In response, Defendant Liang stated, "We are [a] USA company, located in Silicon Valley . . . ***for sure we follow the national law. The company complies very well***."

328. On February 22, 2024, Super Micro issued a press release, also attached to a Form 8-K filed with the SEC and reviewed and approved by Defendant Liang, who signed it, announcing an offering of $1.73 billion in convertible senior notes pursuant to Rule 144A. The press release filed with the Form 8-K explicitly incorporated the risk factors from the FY23 Form 10-K, stating that "[v]arious factors could also adversely affect the Company's operations, business or financial results in the future . . . including those factors discussed in detail in the 'Risk Factors' sections contained in the Company's Annual Report on Form 10-K for the year ended June 30, 2023." The "Risk Factors" section of the FY23 Form 10-K included the language quoted above in ¶326.

329. On March 19, 2024, Super Micro filed with the SEC its Registration Statement on Form S-3, signed by Defendants Liang, Weigand, and Liaw. That filing stated that the "Risk Factors" from the FY23 Form 10-K are "incorporated by reference . . . in their entirety." The statements Defendants made in the "Risk Factors" from the FY23 Form 10-K, are quoted above in ¶326.

330. Defendants' statements in ¶¶326-29 were materially false and misleading when made. Defendant Liang's statement that Super Micro "***complies very well***" created a misleading impression that Super Micro was in compliance with U.S. export laws when, in truth, the Company

was by then engaged in a scheme to divert its products to China in violation of U.S. export laws. Indeed, by early 2024, Super Micro was working to conceal illegal sales, including by finding a pass-through company that would forward orders to China. Similarly, Defendants' statements identifying a merely contingent risk that, "***if***" the Company and its employees "***fail to comply***" with export control laws, they "***may***" be penalized, also were misleading when made. At the time Defendants made these statements, Super Micro and its employees were engaged in a scheme to divert its products to companies in China in violation of U.S. export laws, and thus Super Micro was ***already*** subject to civil and criminal penalties for that conduct. Defendants' statements omitted material facts, including as to the existence and impact of the diversion scheme, and contained embedded facts that were false, including that Super Micro complied with U.S. export laws.

### B. False And Misleading Statements From April 1, 2024 Through June 30, 2024

331. On April 23, 2024, *Reuters* published a news article entitled, "China acquired recently banned NVIDIA chips in Super Micro, Dell servers, tenders show." According to the article, "***Super Micro said it complied with U.S. requirements on the sale and export of GPU systems to regions and parties that require licenses***." The article also quoted Super Micro: "***If we become aware that a third party has exported or reexported without the required licenses, we investigate the matter and take appropriate action***." In addition, that article said, "[i]n a letter to *Reuters* on behalf of Super Micro, U.S. law firm Clare Locke said its client '***goes above and beyond what U.S. export restrictions require' by proactively taking steps to ensure its customers do not violate the curbs***." These statements to *Reuters*, including those provided through Super Micro's counsel Clare Locke, were made by Super Micro at the direction of and based on information provided by Defendants Liang, Weigand, Liaw, and other senior Super Micro executives.

332. On May 20, 2024, Defendant Weigand spoke at the J.P. Morgan Global Technology Conference as a representative of Super Micro. During the conference, analysts questioned Defendant Weigand about Super Micro's financial performance, including its share of the market

for servers used for AI. When asked, "[h]ow should we think about the likelihood of share loss," Defendant Weigand stated that Super Micro was "***gaining a lot of new customers right now*** … we're ***seeing a lot of development*** over in Europe, in the Middle East, ***as well as Asia … our Asia sales grew most recently*** . . . we're not concerned about losses at any particular customers. We have very good relationships with our customers."

333. Defendants' statements in ¶331 were materially false and misleading when made. Defendants' statements that Super Micro "***complied with U.S. requirements on the sale and export of GPU systems***," took "***appropriate action***" whenever it became aware of any such violations, and went "***above and beyond what U.S. export restrictions require***" created a misleading impression regarding Super Micro's compliance with U.S. export laws. In reality, at the time of these statements, Super Micro was ***not*** in compliance with U.S. export laws and was engaged in a scheme to divert its products to China in violation of U.S. export laws. These statements also omitted material facts, including as to the existence and impact of the diversion scheme, and contained embedded facts that were false, including that Super Micro complied with export control laws. Moreover, rather than going "***above and beyond***" what U.S. export laws required, at the time of these statements, Super Micro was working to ***conceal*** illegal sales, which were quickly becoming a key source of revenue for the Company, including by shipping servers containing restricted GPUs to a pass-through company that forwarded orders to China.

334. Additionally, Defendant Weigand's statements in ¶332 were materially false and misleading when made. For instance, Defendant Weigand's statement that Super Micro's "Asia sales grew," "***gaining a lot of new customers***" and "***a lot of development***" in the demand for its products created a misleading impression that this revenue growth was driven by legitimate factors. In reality, as explained above, Super Micro's revenue was driven in material part by illegal sales, which meant the revenue stream was both subject to, and exposed the Company to, heightened (but undisclosed) risk.

### C. False And Misleading Statements From July 1, 2024 Through September 30, 2024

335. On July 2, 2024, the *Wall Street Journal* published an article entitled, "The Underground Network Sneaking Nvidia Chips Into China." Super Micro stated in response to the *Wall Street Journal*'s inquiry that the Company "***compl[ies] with U.S. export controls and act[s] if illicit behavior is discovered***." These statements to the *Wall Street Journal* were made by Super Micro at the direction of and based on information provided by Defendants Liang, Weigand, Liaw, and other senior Super Micro executives.

336. On August 6, 2024, Super Micro held its earnings call for the fourth quarter of and full fiscal year 2024. During the call, Defendant Liang announced that Super Micro achieved a "record quarterly result of $5.31 billion" with "143% year-over-year growth." He stated that, for FY24, Super Micro "achieved $14.94 billion in revenue, a 110% year-over-year growth rate. To put this in perspective, our Q4 revenue has exceeded the full-year revenue of fiscal 2022." Liang stated that this "***robust growth [was] driven by our technology and product leadership in the AI infrastructure market***, especially with generative AI training and inferencing."

337. During the August 6, 2024 call, Defendant Weigand stated that "***[g]rowth was driven by strong demand*** for next generation air-cooled and direct liquid cooled rack scale AI GPU platforms." Defendant Weigand represented that, driven by these supposed legitimate business factors, Super Micro achieved the following breakdown of periodic increases in sales: "On a year-over-year basis, US revenues increased 94%, ***Asia increased 437%,*** Europe increased 128%, and the rest of [the] world increased 386%. On a quarter-over-quarter basis, US revenues increased 20%, ***Asia increased 66%,*** Europe increased 74%, and rest of the world increased 187%."

338. During the call, Defendants Liang and Weigand presented a slide deck, which included the following slide representing that Super Micro's revenue from China constituted "***Less than 1% of Total Revenue***."




339. On August 12, 2024, *The Information* published an article entitled, "Nvidia AI Chip Smuggling to China Becomes an Industry." The article published a quote from a spokesperson for Super Micro, stating, "***[w]e follow all US export control requirements on the sale, service, support, and export of GPU systems to regions and parties that require licenses under the Export Administration Regulations***," and "***[i]f Supermicro becomes aware that a third party has exported or reexported without the required licenses, it investigates the matter and takes appropriate action***." These statements to *The Information* were made by Super Micro at the direction of and based on information provided by Defendants Liang, Weigand, and Liaw, and other senior Super Micro executives.

340. On September 6, 2024, J.P. Morgan published a report titled, "Super Micro Downgrade to Neutral as Uncertainty of 10K Delay and Follow-up Response Will Drive Overhang." The report stated, "Our discussion with the company following the announcement of the delay in the 10-K filing [has] indicated" that, with respect to Super Micro's compliance with export restrictions, "***there is a detailed process in place both from Super Micro (and Nvidia) to check customer background before approving orders***." The report further stated that, in response

to concerns about the impact of restrictions on exports to China on the Company, Super Micro indicated that "***sales to China have declined in recent years in terms of revenue mix and is only a low-single digit percentage of total company revenue***." These statements to J.P. Morgan were made by Super Micro at the direction of and based on information provided by Defendants Liang, Weigand, Liaw, and other senior Super Micro executives.

341. Defendants' statements in ¶¶336-40 were materially false and misleading when made. For instance, Defendants' statements that Super Micro's revenue performance was driven by "***technology and product leadership in the AI infrastructure market***" and "***strong demand***" for Super Micro's cooling products, and touting the growth in Asia sales, created a misleading impression that Super Micro's revenues, and in particular its revenues from Asia sales, were legitimate and sustainable. In reality, as explained above, Super Micro's revenue was driven in material part by illegal sales that resulted in illegal product diversions to China, which meant the revenue stream was not sustainable or legitimate. Likewise, Defendants' statement that "***less than 1%***" of Super Micro's sales that quarter were to China and that sales to China comprised "***only a low-single digit percentage of total company revenue***" created the misleading impression that China sales were *de minimis*. In truth, Super Micro generated approximately $100 million in illegal sales to China during 4Q24, which was roughly double the figure that Defendant Weigand provided.

342. Additionally, Defendants' statements that Super Micro "***follow[s] all US export control requirements on the sale, service, support, and export of GPU systems***," and took "***appropriate action***" whenever it became aware of any such violations, and that "***there is a detailed process in place both from Super Micro (and Nvidia) to check customer background before approving orders***," in ¶¶335, 339-40 were false and created a misleading impression regarding the Company's compliance with U.S. export laws. In reality, at the time of these statements, Super Micro was ***not*** in compliance with U.S. export laws and was engaged in a scheme to divert its products to China in violation of U.S. export laws, and by that time, Super Micro's illegal sales were a key source of revenue, and Super Micro's "***process[es]***" for purportedly checking customer background before approving orders were overridden or skirted by

Defendants, as confirmed by former Super Micro employees FE-1, FE-4 and FE-2. ¶¶177-78, 246. These statements also omitted material facts, including as to the existence and impact of the diversion scheme and contained embedded facts that were false, including that Super Micro complied with U.S. export laws. Moreover, rather than "***investigat*[*ing*]**" potential export violations or "***taking appropriate action***," Super Micro was working to ***conceal*** illegal sales, which were quickly becoming a key source of revenue for the Company, including by shipping servers containing restricted GPUs to a pass-through company that forwarded orders to China.

### D. False And Misleading Statements From October 1, 2024 Through December 31, 2024

343. On November 5, 2024, Super Micro held its earnings call for the first quarter of fiscal year 2025. During the call, an analyst asked Defendant Weigand if Super Micro had "any 10% customer exposures in the quarter and the upcoming quarter,"—*i.e.*, customers who comprised 10% or more of Super Micro's revenue—and "what percent of overall revenue did the 10% customers represent in the September quarter?" In response, Defendant Liang stated, "we will have 10% customers," but assured investors, "at the same time, ***we continue to gain more new customers, especially in [] Asia*** . . . ***we will be able to keep a healthy ratio***" in Super Micro's customer base.

344. On December 2, 2024, Super Micro issued a press release attached to a Form 8-K, which was filed with the SEC and reviewed and approved by Defendant Liang, who signed it (the "December 2024 Form 8-K"). The December 2024 Form 8-K stated that Super Micro's Special Committee "reviewed 11 specific export transactions noted by EY" and "also reviewed certain allegations of export control violations contained in a short-seller report released on August 27, 2024" (*i.e.*, the Hindenburg Report) but "***did not see any evidence suggesting that anyone at the Company tried to circumvent export control regulations or restrictions, or that anyone at the Company was aware that any of its products might be diverted to a prohibited end user or location***." The December 2024 Form 8-K also stated that "the Special Committee concluded it appears ***the Company has implemented a reasonable program for compliance with applicable export control regulations***."

345. On December 19, 2024, *The Information* published an article entitled, "U.S. Prompts Nvidia, Supermicro Probe Into How Chips Ended Up in China." The article published a quote from a spokesperson for Super Micro, stating the Company "***follows all U.S. export control requirements on the sale and export" of Nvidia chips***," and "***[i]f we become aware that a third party has exported or reexported without the required licenses, we investigate and take appropriate action***." These statements to *The Information* were made by Super Micro at the direction of and based on information provided by Defendants Liang, Weigand, and Liaw, and other senior Super Micro executives.

346. The same day, December 19, 2024, *Reuters* published an article, "US prompts Nvidia probe into how chips ended up in China, *The Information* reports." Super Micro reportedly stated to *Reuters* that, "***Supermicro follows all U.S. export control requirements on the sale and export of GPU systems*** to regions and parties that require licenses under the Export Administration Regulations." These statements to *Reuters* were made by Super Micro at the direction of and based on information provided by Defendants Liang, Weigand, and Liaw, and other senior Super Micro executives.

347. Defendants' statements in ¶343 were materially false and misleading when made. For instance, Defendant Liang's statement that Super Micro's sales in Asia would reflect diversification from "***more new customers***" and that the Company would keep a "***healthy ratio***" of customers created a misleading impression that Super Micro's revenue, and in particular its revenue from its Asia sales, was driven by legitimate and sustainable business factors. In reality, as explained above, Super Micro's Asia sales growth was driven in part by illicit sales to a single customer. In truth, Super Micro had sold hundreds of millions of dollars of servers to Obon as part of its scheme to divert sales to China in violation of U.S. export laws, which meant that the revenue stream was not sustainable or legitimate.

348. Similarly, Defendants' statements' that Super Micro "***follows all U.S. export control requirements on the sale and export***" of GPU systems and NVIDIA chips and took "***appropriate action***" whenever it became aware of any such violations, in ¶¶344-46, created a misleading impression regarding the Company's compliance with U.S. export laws. In reality, at

the time of these statements, Super Micro was not in compliance with U.S. export laws and was engaged in a scheme to divert its products, including GPU systems and NVIDIA chips, to China in violation of U.S. export laws. These statements also omitted material facts, including as to the existence and impact of the diversion scheme, and contained embedded facts that were false, including that Super Micro complied with export control laws. Moreover, rather than "***investigat[ing]***" potential export violations or "***tak[ing] appropriate action***," Super Micro ***concealed*** its illegal sales and attempted to ***obstruct*** compliance audits, including through using fake lease agreements to make it seem as though Obon had the infrastructure to use the servers Super Micro had shipped to it, and trying to find ways to physically prevent auditors from entering Obon's facilities. In fact, Super Micro was working to grow its business in China by pushing orders onto customers. Defendants' statements in the December 2024 8-K that the Special Committee found no evidence "***that anyone at the Company tried to circumvent export control regulations***" or "***was aware that any of its products might be diverted to a prohibited end user or location***," and that Super Micro had "***implemented a reasonable program for compliance with applicable export control regulations***" were misleading when made for the same reasons. At the time of these statements, Super Micro was engaged in a scheme to divert its products to companies in China in violation of U.S. export laws and did not have a reasonable compliance program in place. Further, Super Micro's purported "***program***" for export compliance was overridden or skirted by Defendants, as confirmed by former Super Micro employees FE-1, FE-4 and FE-2. ¶¶177-78, 246.

### E. False And Misleading Statements From January 1, 2025 Through March 31, 2025

349. On or about January 28, 2025, Super Micro published an "Export Compliance Policy (External)" on the Company's website. In this policy, Defendants stated, "It is the policy of Super Micro . . . ***to fully comply with all export and re-export control laws of the United States***."

350. The policy additionally stated: (i) "[i]t is the policy of Supermicro senior management that ***the company will fully comply with all U.S. government regulations concerning the export and reexport of commodities, software and technology***"; (ii) "[t]he

company ***is committed to obtaining and adhering to all necessary export licenses and conditions for controlled items, technology, or software***"; and (iii) each year, senior management was responsible for communicating to all employees that "***[u]nder no circumstances will a Supermicro transaction be undertaken in a manner contrary to U.S. export regulations***."

351. On February 25, 2025, Super Micro filed with the SEC its Form 10-K for fiscal year 2024 (the "FY24 Form 10-K"), its Form 10-Q for the first quarter of fiscal year 2025 (the "1Q25 Form 10-Q"), and its Form 10-Q for the second quarter of fiscal year 2025 (the "2Q25 Form 10-Q"). The FY24 Form 10-K was reviewed, approved, and signed by Defendants Liang, Weigand, and Liaw. Both the 1Q25 and the 2Q25 Forms 10-Q were reviewed, approved, and signed by Defendants Liang and Weigand. The 1Q25 and the 2Q25 Forms 10-Q Defendants incorporated by reference the "Risk Factors" in Part I, Item 1A of the FY24 Form 10-K and also stated in each of them that, "[t]here have been no material changes in our risk factors as described in [the FY24 Form 10-K]."

352. In the "Risk Factors" section of the FY24 Form 10-K, Defendants stated:

> We are subject to U.S. and other applicable trade control regulations that restrict with whom we may transact business . . . ***If we fail to comply*** with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists, ***we may be subject*** to civil or criminal penalties.

353. In the "Risk Factors" section of the FY24 Form 10-K, Defendants further stated:

> We are subject to U.S. and other applicable trade control regulations that restrict with whom we may transact business . . . ***If we fail to comply*** with laws and regulations restricting dealings with sanctioned countries, companies and/or persons subject to restricted party lists or parties engaged in restricted end uses, ***we may be subject*** to enforcement actions, including civil or criminal penalties.

354. In the same form, Defendants also stated, "our products ***could*** be re-exported to sanctioned persons or countries or provided by our retailers to third persons in contravention of our requirements or instructions or the laws."

355. In the Management's Discussion and Analysis ("MD&A") section of the FY24 Form 10-K Defendants presented the following table setting forth "percentages of net sales by geographic region for fiscal years 2024, 2023 and 2022 (dollars in millions)" as well as a comparison in sales by geographic regions from FY23 to FY24:

| | Years Ended June 30, | | | 2024 over 2023 Change | | 2023 over 2022 Change | |
|---|---|---|---|---|---|---|---|
| | 2024 | 2023 | 2022 | $ | % | $ | % |
| United States | $ 10,187.2 | $ 4,834.1 | $ 3,035.5 | $ 5,353.1 | 110.7 % | $ 1,798.6 | 59.3 % |
| *Percentage of total net sales* | 68.0 % | 67.9 % | 58.4 % | | | | |
| Asia | 2,912.6 | 1,050.8 | 1,139.9 | 1,861.8 | 177.2 % | (89.1) | (7.8)% |
| *Percentage of total net sales* | 19.4 % | 14.7 % | 21.9 % | | | | |
| Europe | 1,294.0 | 1,003.1 | 825.2 | 290.9 | 29.0 % | 177.9 | 21.6 % |
| *Percentage of total net sales* | 8.6 % | 14.1 % | 15.9 % | | | | |
| Others | 595.4 | 235.5 | 195.5 | 359.9 | 152.8 % | 40.0 | 20.5 % |
| *Percentage of total net sales* | 4.0 % | 3.3 % | 3.7 % | | | | |
| Total net sales | $ 14,989.2 | $ 7,123.5 | $ 5,196.1 | $ 7,865.7 | 110.4 % | $ 1,927.4 | 37.1 % |

356. In presenting this purported comparison of FY24 to FY23 sales, Defendants stated, "The period-over-period increase in overall net sales ***is driven by an increase in demand from customers for GPU servers, HPC [high-performance computing], and rack-scale solutions which have higher ASPs [average selling price], especially for large enterprise and data center customers from the United States, Asia and Europe sales where they have experienced significant growth***. The period-over-period increase of net sales in Asia and Europe is ***mainly due to an increase in net sales in Singapore, Japan and United Kingdom***."

357. In MD&A section of the 1Q25 Form 10-Q, Defendants presented a similar table as setting forth "net sales by geographic region for the three months ended September 30, 2024 and 2023 (dollars in millions)" as well as a purported comparison of the Company's first quarter results from FY23 to FY24:

| | Three Months Ended September 30, | | Change | Change |
|---|---|---|---|---|
| | 2024 | 2023 | $ | % |
| United States | $ 4,241.3 | $ 1,619.5 | $ 2,621.8 | 161.9 % |
| *Percentage of total net sales* | 71.4 % | 76.4 % | | |
| Asia | $ 954.6 | $ 225.5 | $ 729.1 | 323.3 % |
| *Percentage of total net sales* | 16.1 % | 10.6 % | | |
| Europe | $ 645.9 | $ 190.9 | $ 455.0 | 238.3 % |
| *Percentage of total net sales* | 10.9 % | 9.0 % | | |
| Others | $ 95.5 | $ 83.8 | $ 11.7 | 14.0 % |
| *Percentage of total net sales* | 1.6 % | 4.0 % | | |
| Total net sales | $ 5,937.3 | $ 2,119.7 | | |

358. In presenting this purported comparison of the Company's first-quarter results from FY23 and FY24, Defendants stated, "The period-over-period increase in overall net sales is ***driven by an increase in demand from customers for GPU servers, HPC, and rack-scale solutions which have higher ASPs, especially for large enterprise and data center customers from the***

***United States, Asia and Europe sales where they have experienced significant growth***. The period-over-period increase of net sales in Asia and Europe is ***mainly due to an increase in net sales in Singapore, Japan and United Kingdom***."

359. In the MD&A section of the 2Q25 Form 10-Q, Defendants presented the following table as setting forth "net sales by geographic region for the three and six months ended December 31, 2024 and 2023 (dollars in millions)" as well as a purported comparison of the Company's second quarter and half a year results from FY23 to FY24:

| | Three Months Ended December 31, | | Change | Change | Six Months Ended December 31, | | Change | Change |
|---|---|---|---|---|---|---|---|---|
| | 2024 | 2023 | $ | % | 2024 | 2023 | $ | % |
| United States | $ 3,847.0 | $ 2,605.6 | $ 1,241.4 | 47.6 % | $ 8,088.3 | $ 4,225.1 | $ 3,863.2 | 91.4 % |
| *Percentage of total net sales* | 67.8 % | 71.1 % | | | 69.6 % | 73.0 % | | |
| Asia | $ 768.2 | $ 656.2 | $ 112.0 | 17.1 % | $ 1,722.8 | $ 881.7 | $ 841.1 | 95.4 % |
| *Percentage of total net sales* | 13.5 % | 17.9 % | | | 14.8 % | 15.2 % | | |
| Europe | $ 933.8 | $ 288.4 | $ 645.4 | 223.8 % | $ 1,579.6 | $ 479.3 | $ 1,100.3 | 229.6 % |
| *Percentage of total net sales* | 16.4 % | 7.9 % | | | 13.6 % | 8.3 % | | |
| Others | $ 129.0 | $ 114.7 | $ 14.3 | 12.5 % | $ 224.5 | $ 198.5 | $ 26.0 | 13.1 % |
| *Percentage of total net sales* | 2.3 % | 3.1 % | | | 2.0 % | 3.5 % | | |
| Total net sales | $ 5,678.0 | $ 3,664.9 | | | $ 11,615.2 | $ 5,784.6 | | |

360. In presenting this purported comparison of the Company's second quarter and half a year results from FY24 to FY25, Defendants stated that, "[t]he period-over-period increase in overall net sales is ***driven by an increase in demand from customers for GPU servers, HPC, and rack-scale solutions which have higher ASPs, especially for large enterprise and data center customers from the United States, Asia and Europe sales where they have experienced significant growth***. The period-over-period increase of net sales in Europe and Asia is ***mainly due to an increase in net sales in the United Kingdom, Spain, Sweden and Singapore***."

361. On March 10, 2025, Defendant Liang was interviewed by *Fox Business*. During the interview, Defendant Liang was asked if "the troubles [were] behind Super Micro." Defendant Liang responded that Super Micro's new auditor had "found everything is good" and that Super Micro "***[had] the matter all fixed and indeed nothing [was] really wrong***."

362. Defendants' statements in ¶¶349-54, 361 were materially false and misleading when made. Defendants' statements that Super Micro "***fully compl[ied] with all export and re-export control laws of the United States***," was "***committed to obtaining and adhering to all necessary***" export laws, and that Super Micro's troubles were behind them and "***nothing [was] really wrong***" created a misleading impression regarding the Company's compliance with U.S.

export laws. In reality, at the time of these statements, Super Micro was engaged in a scheme to divert its products to China in violation of U.S. export laws. Moreover, rather than "***fully complying***" with U.S. export laws and being "***committed***" to compliance, at the time of these statements, Super Micro was working to ***conceal*** illegal sales, including by actively monitoring BIS enforcement actions and speeding up shipments as the risk of BIS action grew, and conspiring to create new schemes to work around additional forthcoming BIS restrictions. In addition, by no later than February 2025, as mounting regulatory pressure made the Obon sales increasingly difficult to complete, Super Micro participated in a parallel scheme using Flying Tiger as a pass-through to divert additional servers to China. Defendants' statement that Company management would convey to employees that "***[u]nder no circumstances will a Supermicro transaction be undertaken in a manner contrary to U.S. export regulations***," was materially false and misleading for the same reasons, including that Company management, rather than instructing employees to comply with U.S. export regulations, were orchestrating a scheme to and instructing employees on how to violate these regulations, as multiple former employees confirmed. ¶¶177-78, 246. Defendants' statements also omitted material facts, including as to the existence and impact of the diversion scheme, and contained embedded facts that were false, including that Super Micro complied with export control laws.

363. Defendants' statements identifying a merely contingent risk that, "***if***" the Company and its employees "***fail to comply***" with export control laws, they "***may***" be penalized, also were misleading when made. At the time Defendants made these statements, Super Micro and its employees were engaged in parallel schemes using Obon and Flying Tiger to unlawfully divert its products to companies in China in violation of U.S. export laws, and thus Super Micro was ***already*** subject to civil and criminal penalties for that conduct. Defendants' statements omitted material facts, including as to the existence and impact of the diversion scheme, and contained embedded facts that were false, including that Super Micro complied with U.S. export laws.

364. Additionally, Defendants' statements in ¶¶355-60 were materially false and misleading when made. Defendants' statements touting Super Micro's growth in Asia and attributing that growth to "***an increase in demand from customers***," and "***an increase in net sales***"

in countries such as Singapore and Japan, created the misleading impression that this growth was driven by legitimate and sustainable factors. In reality, as explained above, this growth was driven in part by illicit sales to a single customer. Indeed, during each of 4Q24, 1Q25, and 2Q25, Super Micro had sold approximately $99.7 million, $404.7 million, and another $404.7 million, respectively, worth of servers to Obon as part of its scheme to divert sales to China in violation of U.S. export laws, which meant that the revenue stream was not sustainable or legitimate.

### F. False And Misleading Statements From April 1, 2025 Through June 30, 2025

365. On May 6, 2025, Super Micro held its earnings call for the third quarter of fiscal year 2025. During the call, Defendant Liang stated, "***we successfully fulfilled our commitment to regain financial regulatory compliance***."

366. During the call, one analyst asked, "AI diffusion rules, there's a lot of investor angst about that. How are you guys thinking about your visibility and how the order should flow through given AI diffusion [rules] could impact or possibly could impact your revenues?" In response, Defendant Liang stated, "***[a]t this moment, we see our demand continue to grow. And that's why we continue to expand our facilit[ies] in U.S.A., in Taiwan, in Malaysia. So overall, our technology [is] leading edge, especially, I mean we do continue to see the demand will continue to grow strongly***."

367. During the call, Defendant Weigand stated that Super Micro's "Q3 2025 revenues were $4.6 billion," which were "up 19% year-over-year," and benefited from "***strengthened enterprise adoption of new AI and CPU platforms***." Defendant Weigand also represented that, driven by these supposedly legitimate business factors, Super Micro achieved the following geographical breakdown of quarterly sales: "[b]y geography, the US represented 60% of Q3 revenues, Asia 30%, Europe 6% and the Rest of the World 4%"; and the following geographical breakdown of periodic increases in sales: "On a year-over-year basis, US revenues increased 3%, ***Asia increased 77%,*** Europe decreased 3% and the Rest of the World increased 83%." Defendant Weigand further stated that, "On a quarter-over-quarter basis, US revenues decreased 28%, ***Asia increased 76%,*** Europe decreased 69% and the Rest of the World increased 45%." Defendant

Weigand also stated, “***China continued to represent less than 1% of sales in Q3***.”

368. On May 12, 2025, Super Micro filed with the SEC its Form 10-Q for the third quarter of fiscal year 2025 (the “3Q25 Form 10-Q”). The 3Q25 Form 10-Q was reviewed, approved, and signed by Defendants Liang and Weigand. The 3Q25 Form 10-Q incorporated by reference the “Risk Factors” in Part II, Item 1A of the FY24 Form 10-K, stating “you should specifically consider various factors, including the risks discussed under the heading ‘Risk Factors’ in . . . Part I, Item IA of our Annual Report on Form 10-K for the fiscal year ended June 30, 2024.” The risk warnings made in Super Micro’s FY24 Form 10-K are set forth in ¶¶352-53 above.

369. The 3Q25 Form 10-Q further stated that, “***[t]here have been no material changes in our risk factors as described in [the FY24 Form 10-K]***.”

370. In the MD&A section of the 3Q25 Form 10-Q, Defendants presented the following table as setting forth “net sales by geographic region for the three and nine months ended March 31, 2025 and 2024 (dollars in millions),” the percentage of Super Micro’s sales that each geographic region corresponded to for the period ending in 3Q25, and a purported comparison of the Company’s third quarter and first nine months from FY24 to FY25.

| | Three Months Ended March 31, | | Change | Change | Nine Months Ended March 31, | | Change | Change |
|---|---|---|---|---|---|---|---|---|
| | 2025 | 2024 | $ | % | 2025 | 2024 | $ | % |
| United States | $ 2,768.2 | $ 2,685.2 | $ 83.0 | 3.1 % | $ 10,856.5 | $ 6,910.3 | $ 3,946.2 | 57.1 % |
| *Percentage of total net sales* | 60.2 % | 69.7 % | | | 67.0 % | 71.7 % | | |
| Asia | $ 1,354.3 | $ 764.6 | $ 589.7 | 77.1 % | $ 3,077.2 | $ 1,646.3 | $ 1,430.9 | 86.9 % |
| *Percentage of total net sales* | 29.4 % | 19.9 % | | | 19.0 % | 17.1 % | | |
| Europe | $ 290.1 | $ 297.7 | $ (7.6) | (2.6)% | $ 1,869.7 | $ 777.0 | $ 1,092.7 | 140.6 % |
| *Percentage of total net sales* | 6.3 % | 7.7 % | | | 11.5 % | 8.1 % | | |
| Others | $ 187.3 | $ 102.6 | $ 84.7 | 82.6 % | $ 411.7 | $ 301.1 | $ 110.6 | 36.7 % |
| *Percentage of total net sales* | 4.1 % | 2.7 % | | | 2.5 % | 3.1 % | | |
| Total net sales | $ 4,599.9 | $ 3,850.1 | | | $ 16,215.1 | $ 9,634.7 | | |

371. In presenting this purported comparison of the Company’s third quarter and first nine months results from FY24 and FY25, Defendants stated that “[t]he $749.8 million increase in overall net sales is ***driven by an increase in demand from customers for GPU servers, HPC, and rack-scale solutions which have higher ASPs, especially for large enterprise and data center customers from Asia where these customers have experienced significant growth***. The $589.7 million increase of net sales in Asia is ***mainly due to an increase in net sales in Japan, and Thailand***.”

372. In the 3Q25 Form 10-Q, Defendants also stated, “For the three months ended March 31, 2025 and 2024, 60.2% and 69.7% of the Company’s revenues were from the United States,

and ***14.2% and 1.5% of the Company's revenues were from Thailand, respectively***."

373. Defendant Liang's statement that Super Micro "***successfully fulfilled [its] commitment to regain financial regulatory compliance***," ¶365, created a misleading impression regarding the Company's compliance with U.S. export laws. In reality, Super Micro was then engaged in a scheme to divert its products to China in violation of U.S. export regulations, so it ***had not regained*** "***financial regulatory compliance***," but remained regulatorily non-compliant. Defendant Liang's statement also omitted material facts, including as to the existence and impact of the diversion scheme, and contained embedded facts that were false, including that Super Micro complied with export control laws.

374. Similarly, Defendant Liang's statements in ¶366, in response to a question about the impact of the AI Diffusion Rules, that Super Micro continued to see its "***demand . . . grow***," and that while tariffs "***may impact the demand a little bit***" Super Micro would "***continue to gain market share***," was materially false and misleading for the same reasons. These statements created the misleading impression that the AI Diffusion Rules would impact Super Micro's sales only "a little bit" and would even benefit Super Micro's market share. In reality, the AI Diffusion Rules ***would have a large negative impact*** on Super Micro's Asia sales and export compliance, decreasing its market share, because Super Micro's revenue was and had been dependent on sales to Obon, and the new rules restricted Super Micro's illicit China sales, including as Defendants internally recognized in discussing and planning to increase shipments ahead of the AI Diffusion Rules.

375. Defendants' statements in ¶371 were also materially false and misleading when made. Defendants' statements touting Super Micro's growth in Asia and attributing that growth to "***an increase in demand from customers***" and "***an increase in net sales in Japan, and Thailand***" created a misleading impression that this growth was driven by legitimate and sustainable business factors. In reality, this growth was driven in part by illicit sales to a single customer (Obon), Super Micro was engaged in a scheme to divert its products to China in violation of U.S. export laws, and those illegal sales were a material driver of Super Micro's Asia revenue. Indeed, during 3Q25, Super Micro had sold approximately $825 million worth of servers to Obon, comprising 17.9% of

the Company's total sales and 60.9% of Asia sales in that quarter, as part of its scheme to divert sales to China in violation of U.S. export laws, which meant that the revenue stream was not sustainable or legitimate. Moreover, in disclosing an increase in sales ***in*** Thailand, Defendants misleadingly failed to disclose that most of the sales were not ***in*** Thailand at all but to customers in China, ***through*** Thailand.

376. Defendants' statements in ¶¶368-69 were also false and misleading when made. Defendants' statements identifying lack of compliance with export control laws as a contingent and future risk that, "***if***" the Company and its employees "***fail to comply***" with export control laws, they "***may***" be penalized created a misleading impression about Super Micro's compliance with U.S. export laws. In reality, at the time Defendants made these statements, Super Micro was engaged in parallel schemes using Obon and Flying Tiger to divert its products to companies in China in violation of U.S. export laws, and thus ***already*** was subject to civil and criminal penalties for that conduct.

### G. False And Misleading Statements From July 1, 2025 Through September 30, 2025

377. On July 24, 2025, *Financial Times* published an article entitled, "Nvidia AI chips worth $1bn smuggled to China after Trump export controls," reporting that "[a]t least $1bn worth of Nvidia's advanced artificial intelligence processors were shipped to China in the three months after Donald Trump tightened chip export controls." *Financial Times* included a response to its allegations from Super Micro in the article, in which Super Micro "said it '***complies with all US export control requirements on the sale and export of GPU systems***.'" These statements to *Financial Times* were made by Super Micro at the direction of and based on information provided by Defendants Liang, Weigand, Liaw, and other senior Super Micro executives.

378. On August 5, 2025, Super Micro held its earnings call for the fourth quarter and full fiscal year 2025. During the call, Defendant Weigand stated: "On a year-over-year basis, US revenues decreased 33%, ***Asia increased 91%,*** Europe increased 66%, and rest of world decreased 3%. On a quarter-over-quarter basis, US revenues decreased 21%. ***Asia increased 78%.*** Europe increased 196% and rest of world increased 53%."

379. During the call, analysts asked Defendants questions about Super Micro's projected growth in the first quarter of fiscal year 2026. When asked, "what is going to be the driver of the projected Q-over-Q uptick to the September quarter revenue," Defendant Weigand responded, "***we have a lot of customers that are building out a really good deployments . . . that's what gives us a guide to the first quarter***." Defendant Liang added that Super Micro was "***gaining many more customers*** in Europe, Middle East ***and Asia now . . . the near future should be pretty strong***."

380. On August 5, 2025, after the Company's earnings call, *Reuters* published an article titled, "Two Chinese nationals in California accused of illegally shipping Nvidia AI chips to China." The article reported that two individuals from the company ALX Solutions had been indicted by the DOJ because they "exported [] advanced Nvidia chips and other technology to China from October 2022 through July 2025 without the required licenses from the U.S. Commerce Department." The article reported that ALX purchased these restricted materials "from . . . Super Micro Computer, declaring that the customers were in Singapore and Japan." The article cited invoices for multiple orders ALX purchased from Super Micro, with one order valued at $28.5 million. As quoted in the article, Super Micro provided a statement to *Reuters* that the Company was "***firmly committed to compliance with all U.S. export control regulations***." These statements to *Reuters* were made by Super Micro at the direction of and based on information provided by Defendants Liang, Weigand, Liaw, and other senior Super Micro executives.

381. On August 28, 2025, Super Micro filed with the SEC its FY25 Form 10-K. The FY25 Form 10-K was reviewed, approved, and signed by Defendants Liang, Weigand, and Liaw. In the "Risk Factors" section of the FY25 Form 10-K, Defendants stated:

> We are subject to U.S. and other applicable trade control regulations that restrict with whom we may transact business . . . ***If we fail to comply*** with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists, ***we may be subject*** to civil or criminal penalties.

382. In the "Risk Factors" section of the FY25 Form 10-K, Defendants further stated:

> We are subject to U.S. and other applicable trade control regulations that restrict with whom we may transact business . . . ***If we fail to comply*** with laws and regulations restricting dealings with sanctioned countries, companies and/or persons subject to restricted party lists or parties engaged in restricted end uses, ***we may be subject*** to enforcement actions, including civil or criminal penalties.

383. In the MD&A section of the FY25 Form 10-K, Defendants presented the following table as setting forth "percentages of net sales by geographic region for fiscal years 2025, 2024, and 2023 (dollars in millions)" and the percentage increase in net sales for these regions as between

| | Years Ended June 30, | | | 2025 over 2024 Change | | 2024 over 2023 Change | |
|---|---|---|---|---|---|---|---|
| | 2025 | 2024 | 2023 | $ | % | $ | % |
| United States | $ 13,052.6 | $ 10,187.2 | $ 4,834.1 | $ 2,865.4 | 28.1 % | $ 5,353.1 | 110.7 % |
| *Percentage of total net sales* | 59.4 % | 68.0 % | 67.9 % | | | | |
| Asia | 5,494.1 | 2,912.6 | 1,050.8 | 2,581.5 | 88.6 % | 1,861.8 | 177.2 % |
| *Percentage of total net sales* | 25.0 % | 19.4 % | 14.7 % | | | | |
| Europe | 2,727.0 | 1,294.0 | 1,003.1 | 1,433.0 | 110.7 % | 290.9 | 29.0 % |
| *Percentage of total net sales* | 12.4 % | 8.6 % | 14.1 % | | | | |
| Others | 698.3 | 595.4 | 235.5 | 102.9 | 17.3 % | 359.9 | 152.8 % |
| *Percentage of total net sales* | 3.2 % | 4.0 % | 3.3 % | | | | |
| Total net sales | $ 21,972.0 | $ 14,989.2 | $ 7,123.5 | $ 6,982.8 | 46.6 % | $ 7,865.7 | 110.4 % |

FY23 and FY24, and as between FY24 and FY25:

384. In presenting this purported comparison of the Company's results from FY24 and FY25, Defendants stated that "[t]he year-over-year increase in total net sales is ***driven by an increase in demand from customers for GPU servers, HPC and rack-scale solutions which have higher average selling prices, especially from large enterprise and data center customers resulting in increased sales of*** 28.1% in the United States, ***85.9% in Thailand and Japan,*** and 111.9% in the United Kingdom, Sweden, and Spain, ***where we have experienced significant growth***." In the FY25 Form 10-K, Defendants also stated that "[f]or the year ended June 30, 2025, ***59.4% and 10.9% of revenues were from the United States and Thailand, respectively***."

385. Defendants' statements in ¶¶377, 380-82 were materially false and misleading when made. Defendants' statement that Super Micro "***complies with all US export control requirements on the sale and export of GPU systems***" and that it was "***firmly committed to compliance with all U.S. export control regulations***," created a misleading impression regarding the Company's compliance with U.S. export laws. In reality, Super Micro was ***not*** in compliance with U.S. export laws and was engaged in parallel schemes to divert its products to China in violation of U.S. export laws. Defendants' statements also omitted material facts, including as to the existence and impact of the diversion scheme, and contained embedded facts that were false, including that Super Micro complied with export control laws. Moreover, rather than being "***firmly committed***" to compliance, at the time of these statements, Super Micro was working to ***conceal***

illegal sales, including by staging fake servers in warehouses and hiring fake employees to work at the warehouses to evade detection of illegal sales during audits. In addition, by no later than February 2025, as mounting regulatory pressure made the Obon sales increasingly difficult to complete, Super Micro participated in a parallel scheme using Flying Tiger as a pass-through to divert additional servers to China. Defendants' statements identifying lack of compliance with export control laws as a contingent and future risk that, "***if***" the Company and its employees "***fail to comply***" with export control laws, they "***may***" be penalized, were misleading when made for the same reasons. At the time Defendants made these statements, Super Micro was engaged in parallel schemes using Obon and Flying Tiger to unlawfully divert its products to companies in China in violation of U.S. export laws and was ***already*** subject to civil and criminal penalties for that conduct.

386. Defendants' statements in ¶¶378-79, 383-84 were also materially false and misleading when made. Defendants' statements touting Super Micro's revenue growth and attributing that growth to "***gaining many more customers in [] Asia***," and "***a lot of new customers***" created a misleading impression that this growth was driven by legitimate business factors. In reality, this growth was driven in material part by illicit sales to a single customer (Obon), and Super Micro was engaged in a scheme to divert its products to China in violation of U.S. export laws. Indeed, during 4Q25, Super Micro had sold approximately $766 million worth of servers to Obon, which represented approximately 13.3% of the Company's sales and over 31.7% of Asia sales for the quarter. Super Micro's reported sales for full FY25 included approximately over $2.4 billion in illicit Obon sales, comprising 10.9% of the Company's total sales and 43.7% of Asia sales for FY25. Moreover, Defendants' statements that the Company experienced increased sales of "85.9% ***in*** Thailand and Japan" and generated "***10.9% of revenues***" from Thailand were misleading because, unbeknownst to investors, the Thailand sales were made to Obon as part of the diversion scheme so they were not sales "***in***" Thailand but sales ***through*** Thailand.

### H. False And Misleading Statements From October 1, 2025 Through December 31, 2025

387. On November 7, 2025, Super Micro filed with the SEC its Form 10-Q for the first quarter of fiscal year 2026 (the "1Q26 Form 10-Q"). The 1Q26 Form 10-Q was reviewed, approved, and signed by Defendants Liang and Weigand. The 1Q26 Form 10-Q stated that the factors discussed in Part I, Item 1A 'Risk Factors'" of the FY25 Form 10-K "are incorporated herein by reference." The risk warnings made in Super Micro's FY25 Form 10-K are set forth in ¶¶381-82 above.

388. Defendants' statements identifying lack of compliance with export control laws as a contingent and future risk that, "***if***" the Company and its employees "fail to comply" with export control laws, they "***may***" be penalized, also were misleading when made for the same reasons. At the time Defendants made these statements, Super Micro was engaged in schemes to unlawfully divert its products to companies in China in violation of U.S. export laws and was ***already*** subject to civil and criminal penalties for that conduct, including through its diversion schemes involving both Obon and Flying Tiger.

### I. False And Misleading Statements From January 1, 2026 Through March 31, 2026

389. On February 6, 2026 Super Micro filed with the SEC its Form 10-Q for the second quarter of fiscal year 2026 (the "2Q26 Form 10-Q"). The 2Q26 Form 10-Q was reviewed, approved, and signed by Defendants Liang and Weigand. The 2Q26 Form 10-Q stated that "the factors discussed in Part I, Item 1A 'Risk Factors'" of the FY25 Form 10-K "are incorporated herein by reference." The risk warnings made in Super Micro's FY25 Form 10-K are set forth in ¶¶381-82 above.

390. Defendants' statements identifying lack of compliance with export control laws as a contingent and future risk that, "***if***" the Company and its employees "***fail to comply***" with export control laws, they "***may***" be penalized, also were misleading when made for the same reasons. At the time Defendants made these statements, Super Micro was engaged in parallel schemes using Obon and Flying Tiger to unlawfully divert its products to companies in China in violation of U.S.

export laws and was ***already*** subject to civil and criminal penalties for that conduct.

## VI. DEFENDANTS' OTHER FRAUDULENT ACTS

391. As set forth above and herein, throughout the Class Period, Defendants employed devices, schemes, or artifices to defraud and/or engaged in acts, practices, or a course of business which operated as a fraud or deceit upon investors in connection with the purchase or sale of Super Micro Securities concerning the Company's purported compliance with U.S. export controls and the source of increasing demand for the Company's products.

392. Importantly, as detailed above, Defendant Liaw, with the knowledge and acquiescence of Defendants Liang and Weigand, orchestrated a fraudulent scheme to divert servers to China in violation of U.S. export laws and engaged in fraudulent and deceptive conduct to avoid the truth about the scheme from becoming known. Liaw engaged in knowingly illegal sales to Chinese customers, orchestrated through Obon and Flying Tiger. Defendant Liaw took fraudulent steps to avoid the truth about these sales from becoming known, including: (i) instructing Obon on how to falsely respond to compliance inquiries; (ii) staging dummy servers at warehouses rented by Obon ahead of auditor visits to give the appearance that Obon was in possession of the large number of servers it had purchased; (iii) affixing fake labels and serial numbers to packages; and (iv) using a fake employee of a law firm to respond to BIS inquiries with false answers about the servers that Obon had ordered. And as Super Micro's Obon sales drew more scrutiny, rather than halting the diversion scheme, Defendant Liaw helped coordinate a new diversion scheme through Flying Tiger.

393. As these schemes were ongoing, Defendants took additional steps to avoid the truth from becoming known. For example, Defendants fervently denied accusations that Super Micro was involved in the chip smuggling efforts uncovered by numerous investigations. Defendants also deceived NVIDIA by purportedly conducting "spot checks" of Super Micro's customers that failed to uncover the diversion schemes and by providing NVIDIA false certifications of Super Micro's compliance with U.S. export laws. Defendants further deceived regulators by submitting false forms concerning the identity of the end user of Super Micro's servers and the ultimate destination of those exports.

394. In both examples, Defendants' actions concealed illegal conduct that was contrary to investor expectations that they and Super Micro complied with U.S. law. The scheme also allowed revenue growth, particularly revenue growth in Asia, to appear significant and legitimate, when that growth was actually driven in significant part, as Defendants concealed, by illegal acts.

395. Defendants' fraudulent conduct also included at least the following: (i) drafting, editing, approving, making, and disseminating false and misleading statements to investors concerning Super Micro's purported compliance with U.S. export laws and the magnitude of the Company's Asia revenues alleged above in Section V; (ii) drafting, editing, approving, making, and disseminating statements concerning the results of the investigation into the issues raised by the Hindenburg Report, the delay in filing the FY24 Form 10-K and Forms 10-Q for 1Q25 and 2Q25, and the resignation of E&Y; (iii) Defendants' violation of Regulation S-K Items 105 and 303 in each of Super Micro's periodic SEC filings during the Class Period; (iv) the process underlying and including Defendants Liang's and Weigand's certifications pursuant to the Sarbanes-Oxley Act of 2002 set forth within each of Super Micro's periodic SEC filings during the Class Period; and (v) engaging in at least the diversion schemes described in the DOJ and Taiwan indictments and in the efforts to fraudulently conceal these schemes (*see supra* §IV.D, the allegations from which are incorporated herein as fraudulent conduct).

396. For instance, in response to investigations by *Reuters*, *Wall Street Journal*, *The New York Times*, *The Information*, and *Financial Times*, among others, in April 2024, July 2024, August 2024, December 2024, and July 2025, Super Micro employees drafted, edited, approved, made, and facilitated the dissemination of statements unequivocally denying the Company's participation in any diversion schemes and reiterating its compliance with U.S. export control regulations.

397. Similarly, in response to the Hindenburg Report, the delayed FY24 Form 10-K filing, and the resignation of E&Y, Super Micro's Board of Directors conducted a purported investigation concerning the allegations raised in or by these reports or events, including the Company's purported efforts to comply with U.S. export controls. At the conclusion of this investigation, Super Micro agents, including employees, members of the Company's Board, and

retained third parties, drafted, edited, approved, made, and disseminated statements falsely purporting to clear Super Micro executives and employees of violations of U.S. export controls and of any claims of regulatory noncompliance.

398. Defendants also drafted, edited, approved, made, and disseminated SOX certifications and statements concerning Super Micro's internal controls in the Company's Forms 10-K and 10-Q for the following periods:

(a) the FY24 Form 10-K;
(b) the 1Q25 Form 10-Q;
(c) the 2Q25 Form 10-Q;
(d) the 3Q25 Form 10-Q;
(e) the FY25 Form 10-K;
(f) the 1Q26 Form 10-Q; and
(g) the 2Q26 Form 10-Q.

399. In each SOX certification, Defendants certified that they had "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under [their] supervision," and that the SEC annual filings disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting." These SOX certifications thus reassured investors and concealed the lack of proper disclosure controls and other compliance infrastructure tied to the U.S. export control regime. These statements, which included the discussion of material weaknesses other than with respect to controls governing financial reporting tied to revenue derived from illegal sales of servers powered by controlled NVIDIA chips, likewise fraudulently reassured investors that any control issues had been identified and were in the process of being remediated during the Class Period when, in reality, Super Micro was recognizing billions in revenue tied to illegal sales and was not disclosing these material facts.

400. Following the issuance of U.S. export restrictions on the sale of advanced NVIDIA AI chips to China in 2022, 2023, and 2025, Defendants drafted, edited, approved, made, and

disseminated statements that highlighted sales and revenue from Southeast Asia generally and concealed the true extent of sales to and revenue from customers in China specifically, to conceal the existence and impact of Super Micro's diversion schemes. Defendants also presented the risks associated with the expansion of U.S. export controls in 2022, 2023, and 2025 as risks that ***may*** occur when, in reality, the risks already had occurred.

401. Defendants also violated Regulation S-K, Items 105 and 303. Item 105 of Regulation S-K (17 C.F.R. § 229.105) requires the disclosure in a registrant's SEC filings of "the principal factors that make an investment in the registrant or offering speculative or risky." Throughout the Class Period, Defendants included in each of Super Micro's Forms 10-K and Forms 10-Q purported risk disclosures that framed export control violations as hypothetical and contingent: "[W]e are subject to U.S. and other applicable trade control regulations that restrict with whom we may transact business . . . If we fail to comply with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists, we may be subject to enforcement actions, including civil or criminal penalties." These statements violated Item 105 by presenting as a speculative, forward-looking risk a circumstance that had already occurred. Super Micro was already engaged in a scheme to unlawfully divert its products to companies in China in violation of U.S. export regulations and was already subject to civil and criminal penalties for that conduct. Item 105 required Defendants to disclose the actual, existing risks posed by the Company's ongoing violations—including the risk of criminal prosecution, loss of access to NVIDIA's controlled GPU chips, regulatory sanctions, reputational risks, and the termination of significant customer relationships—as existing material risks to the business. By characterizing an ongoing violation as a future contingency, Defendants' fraudulent risk disclosures conveyed to investors that Super Micro was in compliance with applicable export restrictions when it was engaged in a massive, ongoing scheme to circumvent them, and investors were deprived of information about one of the most significant risks facing the Company.

402. Additionally, Defendants violated Item 303 of Regulation S-K (17 C.F.R. § 229.303). Item 303 requires that registrants disclose in the MD&A section of their SEC filings "any known trends or uncertainties that have had or that are reasonably likely to have a material

favorable or unfavorable impact on net sales or revenues or income from continuing operations." Item 303 further provides that, "[i]f the registrant knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed." Throughout the Class Period, Defendants were required by Item 303 to disclose that Super Micro's reported sales, revenues, and growth were materially attributable to proceeds generated through the illegal diversion scheme, and those revenues were not sustainable or, at minimum, that their sustainability was imperiled by the Company's ongoing violations of U.S. export control laws coming to light.

403. Specifically, Item 303 required Defendants to disclose the following known trends, demands, events, and uncertainties: (i) that a significant and growing portion of Super Micro's reported Asia sales—reaching nearly 18% of total sales and over 60% of Asia sales in Q3 FY25—was generated through the illegal diversion of restricted products to companies in China through Obon; (ii) that the discovery of this scheme, which Defendants knew was the subject of regulatory scrutiny by BIS and other authorities, was reasonably likely to result in criminal prosecution, loss of NVIDIA GPU access, reputational harm, and the termination of major customer contracts, each of which would materially and adversely affect the Company's revenues and financial condition; and (iii) that Super Micro's reported geographic revenue breakdown—including the claim that "China continued to represent less than 1% of sales"—materially understated the Company's exposure to China and export control enforcement actions.

404. Instead of making these required disclosures, Defendants attributed Super Micro's sales growth in the MD&A sections of its Forms 10-K and Forms 10-Q to seemingly legitimate business factors. These failures to disclose the known trends and uncertainties related to the diversion scheme in violation of Item 303 rendered materially false and misleading the affirmative disclosures Defendants made concerning Super Micro's revenue performance and geographic sales distribution in the MD&A, as alleged above. By electing to discuss the Company's sales growth, geographic revenue mix, and customer diversification in their MD&A, Defendants put these subjects into play and had a duty to fully, completely, and truthfully disclose all material

facts regarding these subjects so as to avoid misleading investors.

405. The Item 303 violations also rendered misleading Defendants Liang's and Weigand's certifications as to the accuracy and completeness of the SEC filings, including their certifications pursuant to the Sarbanes-Oxley Act that each filing "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," which require that periodic filings with the SEC "fairly present[ed], in all material respects, the financial condition and results of operations of the Company" and did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

## VII. ADDITIONAL INDICIA OF SCIENTER

406. Numerous allegations set forth above and summarized below collectively give rise to the strong inference that each Defendant knowingly or with deliberate recklessness misled investors about Super Micro's compliance with U.S. export control requirements and its reliance on, and exposure to, illegal sales diverted to companies in China, while also engaging in a scheme to defraud investors.

407. ***Direct Warnings and Access to Information.*** During the Class Period, Defendants received direct warnings and had access to and reviewed or recklessly disregarded information showing that Super Micro was violating export regulations through its diversion scheme.

408. First, BIS repeatedly warned Defendants that Super Micro was likely violating export restrictions. As discussed in Section IV.D.3 above, by no later than January 15, 2025, Defendant Liaw knew that illicit sales diverted to customers in China were under scrutiny from U.S. authorities from BIS. In or around August 2025, BIS also directly informed Super Micro that it had reason to believe that Obon was diverting Super Micro's servers to China and requested a compliance hold on all shipments to Obon. And in December 2025, a BIS export control officer scheduled a visit to Obon's warehouse in Thailand.

409. Second, numerous public reports of the chip smuggling schemes put Defendants on notice of Super Micro's export control violations. Super Micro specifically responded to these reports, denying them. For example, in August 2024, *The Information* provided a broker's detailed

account of the methods used to smuggle chips into China and reporters stated that they personally saw 600 servers containing restricted chips (including some of Super Micro's servers) in the broker's Hong Kong warehouse that was used to smuggle chips into China. And in December 2024, *The Information* detailed how chip smugglers were able to avoid detection of their scheme during audits using a simple technique of printing out labels containing the serial numbers of the machines Super Micro was auditing and attaching them to other servers—the same methods Super Micro used in its diversion scheme. Super Micro reviewed both articles before they were published and denied the allegations therein.

410. Third, in response to these reports and other allegations of chip smuggling, Super Micro responded to and commented on the reporting and also purported to conduct numerous internal investigations into export control violations. As alleged in Section IV.C.3 above, Super Micro's internal Special Committee conducted an investigation into the Company's compliance with export regulations following E&Y's resignation in October 2024. The results of that investigation were published in December 2024, when the Company disclosed that E&Y's resignation was due in part to its expressed concern over at least eleven specific export transactions. In addition, when NVIDIA asked Super Micro to conduct spot checks of customers in Southeast Asia, the Company purportedly visited warehouses and data centers in the region and began more carefully reviewing its clients. The Company even conducted multiple purported compliance audits of Obon following concerns raised by Super Micro's compliance team.

411. The fact that Defendants were directly warned that Super Micro was likely violating export regulations through its diversion scheme and supposedly conducted investigations in response to these allegations gives rise to a strong inference of scienter. Given that reporters easily found evidence of the scheme and put Defendants on notice of the exact methods used to divert shipments to China, Defendants' purported investigations either uncovered the schemes but Defendants continued to mislead investors about them, or Defendants recklessly assured investors about their compliance with the law while conducting sham investigations not aimed at uncovering the truth that others were able to discover—particularly given the schemes' scope, pervasiveness, duration, and importance to the Company, all of which made the true facts behind the sales hiding

in plain sight to Company insiders but not investors.

412. ***Super Micro's Obligations Under Export Laws***. As discussed in Section IV.A.3 above, the export laws themselves created an obligation for Defendants to investigate the circumstances of Super Micro's illegal sales. BIS provided a list of numerous Red Flags and warned subject companies not to "self-blind" or "cut off the flow of information" to avoid knowing violations of the EAR. Super Micro's sales to Obon raised numerous Red Flags, including: (i) Obon's business operations and infrastructure could not support the volume of servers it was ordering; (ii) Obon's barebones website indicated it had no background in AI technology; and (iii) Obon had not purchased this technology prior to the 2022 IFR, yet dramatically increased its orders after. Defendants were in the business of selling these high-powered servers. They sold ***over 8,300*** servers—volumes only the largest AI labs could support—to a first-time customer that quickly became Super Micro's eleventh largest customer. And BIS guidance required Super Micro to conduct a meaningful investigation into the circumstances of such sales. These facts support an inference that Defendants were at least deliberately reckless in not knowing that Obon was not the end user of the servers.

413. ***Defendants' Representations of Personal Knowledge.*** As discussed in Section IV.A.3 above, after BIS announced its 2022 and 2023 IFRs, Defendants indicated that they were aware that these restrictions applied to Super Micro's servers. For example, on a November 1, 2022 earnings call, an analyst asked Defendant Liang whether Super Micro was "seeing any kind of impacts from the sanctions on China by the US." Defendant Liang responded, "Yes. We see some impact for sure" and assured the analyst that Super Micro would be "keeping watch" over export restrictions and their impact on the Company. And at the Barclays Global Technology Conference on December 7, 2023, Defendant Weigand fielded an analyst question about the potential impact of BIS's export restrictions and stated, "as everyone knows, GPU sales in China were unfortunately stopped."

414. In addition, Super Micro's Export Compliance statement, which was on the Company's website starting around January 2025, claimed that "senior management," which included each of the Defendants, was required to remind employees that "[u]nder no circumstances

will a [Super Micro] transaction be undertaken in a manner contrary to U.S. export regulations." The statement further detailed the processes that Super Micro's management and employees supposedly followed to comply with applicable export laws, including placing all orders for restricted GPUs on hold until the Global Trade Compliance Team and "Restricted GPU Qualification Committee" confirmed that the sale complied with U.S. export restrictions.

415. Defendants Liang, Weigand, and Liaw also signed Super Micro's FY24 Form 10-K, in which they added as a risk factor—for the first time in any of Super Micro's SEC filings—that Super Micro's products "***could be*** re-exported to sanctioned persons or countries or provided by our retailers to third persons in contravention of our requirements or instructions or the laws."

416. Given the frequency and conviction with which Defendants highlighted Super Micro's compliance with export controls, specifically assured investors about Super Micro's supposedly rigorous procedures for complying with export controls, and stated their understanding that compliance with export controls was important to investors, Defendants either knew of or were deliberately reckless in disregarding the facts uncovered by the Company's supposedly rigorous compliance efforts. In addition, Defendants specifically stated that Super Micro's products could be re-exported to restricted countries, which implied that illegal re-exporting had not yet occurred, and supports an inference that they were, at minimum, deliberately reckless in making such a specific statement without first confirming that their statement was not false or misleading.

417. ***E&Y's Resignation.*** The timing and circumstances surrounding E&Y's resignation support a strong inference of scienter. As discussed in Section IV.C.3 above, E&Y's October 2024 resignation occurred at or around the same time that Defendant Liaw and Chang were actively obstructing auditors carrying out the Company's own compliance audit of Obon. The Company would later admit, on December 2, 2024, that E&Y's resignation was due in part to its expressed concern over at least eleven specific export transactions and that the internal Special Committee inquiry concerned, among other things, Super Micro's compliance with relevant U.S. export laws and regulations. E&Y's contemporaneous determination that it could no longer rely on representations from management or the Audit Committee is consistent with Super Micro's

management's active concealment of the diversion scheme and deception of the Company's own auditor.

418. ***The Special Committee's Recommendations.*** The Special Committee's findings and recommendations support scienter. As discussed in Section IV.C.3 above, the Special Committee recommended that Super Micro replace Defendant Weigand in his role as CCO and CFO because of "lapses" like "ensuring guardrails were always in place and observed" and "instances where the documentation, tracking, training, and instructions around appropriate guardrails were inconsistent or vague." The Special Committee also recommended that Super Micro "appoint a General Counsel and expand the number of in-house attorneys." Despite the Special Committee having made these recommendations in December 2024, at the time of filing this Complaint, Super Micro has still not replaced Defendant Weigand. In addition, Super Micro did not appoint a new CCO until March 20, 2026—the day after the Indictment was disclosed—and only appointed a General Counsel in March 2025. The fact that the Special Committee found that Weigand was responsible for "lapses" severe enough to recommend his replacement, and that Super Micro lacked sufficient compliance personnel, but the Company failed to promptly act on those recommendations, supports an inference that Defendants were at least deliberately reckless in assuring investors that Super Micro had sufficient compliance procedures in place.

419. ***The Magnitude and Significance of the Fraud.*** The significance of Super Micro's illegal sales and the consequences of violating export regulations support scienter.

420. First, Obon's diversion scheme generated ***at least $2.5 billion*** in revenue for Super Micro, with nearly $100 million during the final quarter of Super Micro's FY24 and $2.4 billion in FY25. This illicit sales revenue during FY25 represented 10.9% of Super Micro's total sales and 43.7% of Asia sales for that fiscal year. As set forth in the Company's internal spreadsheet, by the fourth quarter of fiscal year 2024, Obon had become Super Micro's eleventh most profitable customer worldwide and accounted for approximately $99.7 million in revenue for the quarter alone—alongside major U.S. technology and social media companies developing artificial intelligence infrastructure. Defendants specifically touted Super Micro's growing sales in Thailand as a key revenue driver. Given the magnitude of these illegal sales and the fact that Defendants

explicitly and specifically mentioned that sales to Thailand were a key driver of Super Micro's revenue growth during the Class Period, there is a strong inference that Defendants either knew the circumstances of the sales to Obon or were at least deliberately reckless in ignoring those circumstances. *See supra* §IV.D.7.

421. Second, the severity of the potential consequences arising from the diversion scheme, including the loss of major customer contracts, the criminal indictment, the ongoing SEC investigation, and reputational harm, further supports scienter. Defendants Liang, Weigand, and Liaw acknowledged the importance of complying with export regulations to Super Micro's bottom line in the Company's SEC filings. For example, in Super Micro's FY24 Form 10-K, Defendants stated violations of export controls "could have negative consequences, including government inquiries, investigations, enforcement actions, monetary fines, or civil and/or criminal penalties, and our reputation, brand, and revenue may be harmed" and that failure to comply "with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists" could subject Super Micro to "civil or criminal penalties" and "[a]ny future violations could have an adverse impact on our ability to sell our products to United States federal, state and local government and related entities." Super Micro suffered the consequences of export control violations when, following the unsealing of the Indictment, Oracle canceled a significant AI infrastructure contract with Super Micro valued at between $1.1 billion and $1.4 billion. Industry sources indicated that Oracle's decision to cancel the contract was directly related to the Indictment and the export-control violation scheme. Defendants' awareness of the potential catastrophic consequences of violating export control laws on Super Micro's business supports an inference that they were at least deliberately reckless in not knowing the Obon and Flying Tiger schemes were ongoing and provided a strong motive to conceal the illegal activity for as long as possible. *See supra* §IV.E.

422. ***Super Micro's Prior History of Export Control Violations, Accounting and Internal Control Failures.*** In 2006, Super Micro pleaded guilty to a felony charge of exporting computer components to Iran in violation of U.S. export restrictions. Defendant Liang then assured the market that the Company had learned from those failures, stating: "We were a new company

and didn't know every regulation. ***Now, we are well trained and watch over this 24 hours a day***." In 2020, the SEC charged Super Micro with "widespread accounting violations" and ordered Defendant Liang to reimburse the Company for more than $2.1 million in profits from stock sales. Super Micro promptly re-hired many of the same employees terminated in connection with internal-controls failures, including Defendant Liaw in May 2021. And even after the Special Committee recommended in December 2024 that Super Micro replace Weigand for his role in various "lapses," and even after Super Micro publicly committed to replacing Weigand, Super Micro has still not replaced him. Defendants' history of knowingly violating export controls, sustained instances of material weaknesses in its internal controls, violating accounting rules and re-hiring employees connected with those violations supports an inference that they were at least deliberately reckless in assuring investors that Super Micro remained in compliance with export regulations. *See supra* §§IV.B, IV.C.3.

423. ***Inappropriate Tone at the Top.*** The culture perpetuated by senior executives at Super Micro supports scienter. As Super Micro was forced to admit in its restated SEC filings following the 2017 revenue recognition scandal, the Company had "a culture of aggressively focusing on quarterly revenue without sufficient focus on compliance" and "an inappropriate tone at the top" that was "inconsistent with a commitment to integrity and ethical values." In addition, FE-3, for example, reported that Defendant Liang set an improper tone at the top by re-hiring sales leaders who had been ousted after the 2017 accounting scandal, and installing them in executive and senior leadership positions. FE-3 stated that these actions had a negative impact on the company-wide systems for internal controls and compliance. FE-2 similarly stated that Defendant Liaw, one of the ousted leaders re-hired by Liang, didn't give a shit about compliance and just wanted the sales. And even though the Special Committee recommended replacing Weigand due to his "lapses" like "ensuring guardrails were always in place and observed" and "instances where the documentation, tracking, training, and instructions around appropriate guardrails were inconsistent or vague," and even though Super Micro publicly committed to immediately following this recommendation in 2024, Super Micro still has failed to replace him nearly two years later. The fact that focusing on revenue without regard for compliance was a prominent

feature of Super Micro's culture supports an inference that Defendants were at minimum deliberately reckless. *See supra* §§IV.C.3, IV.D.5.

424. ***Compliance Certifications.*** During the Class Period, NVIDIA required Super Micro to certify its compliance with export controls as a condition of receiving GPU allocations, and Super Micro was required to conduct audits to verify that its customers in Southeast Asia still had possession of their servers. The fact that Super Micro provided these certifications to NVIDIA demonstrates that it either properly audited the customers to whom it sold NVIDIA's GPU chips—in the course of which Super Micro employees would have discovered the truth behind the diversion schemes to the extent not already known—or that they did not do so and recklessly provided the certifications anyway. *See supra* §§IV.A.2, IV.A.3.

425. ***SOX Certifications.*** Defendants Liang and Weigand had personal responsibility for designing and maintaining effective internal controls and for reviewing and certifying the truth and accuracy of the Company's financial statements. During the Class Period, Defendants Liang and Weigand signed SOX certifications stating that they had "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under [their] supervision," and that the SEC annual filings disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting." Defendants Liang and Weigand also attested that those filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." If Defendants reviewed and evaluated the financial statements as represented in each of the SOX Certifications, they would have been alerted to the dramatic increase in sales to Obon and Flying Tiger and to the fact that Super Micro was not in compliance with U.S. export laws—particularly in light of the fact that Defendants identified sales to Thailand as a key revenue driver. Defendants, therefore, either knew of the material misstatements and omissions contained in Super Micro's financial statements or failed to perform the required reviews and falsely represented that they had.

426. Defendants' SOX Certifications further give rise to a strong inference of scienter because, while they disclosed certain material weaknesses in Super Micro's internal controls during the Class Period—relating to IT general controls, segregation of duties, manual journal entries, and documentation of control procedures—they failed to disclose any material weakness related to the Company's export compliance controls or the diversion scheme. Defendants' selective disclosure of these purported weaknesses while concealing consequential deficiencies in the Company's export compliance controls bolsters the strong inference that they acted with scienter.

427. ***Incentive Compensation.*** Defendants Liang and Weigand were paid under compensation structures that tied their pay directly to Super Micro's reported revenue and stock price. The illicit sales inflated both, and Defendants' misrepresentation and concealment of those sales kept both artificially inflated. These structures gave Liang and Weigand strong personal financial motives to conduct and conceal the diversion schemes from investors. *See supra* §IV.D.1.

428. <u>Defendant Liang</u>. During the Class Period, Liang received a salary of $1 per year. All of his other compensation consisted of stock options that vested only when Super Micro met specific revenue and stock price targets set under his November 2023 award plan. Liang reached his first four revenue targets while Super Micro engaged in generating illicit sales through the Obon scheme—which represented increasingly significant portions of the revenue Liang used to achieve the milestones. Liang reached his first four stock price targets only as a result of Defendants concealing Super Micro's rampant export control violations and resulting Obon sales revenue, as evidenced by the fact that Super Micro's stock price fell well below those targets once the scheme was revealed.

429. After four tranches vested in 2025, each $1 increase in the stock price added $4 million to the value of Liang's options. Without the illicit Obon revenue, Super Micro would not have reached the fifth revenue milestone, giving Liang a continuing interest in keeping the stock price inflated so the final tranche, worth at least $65 million in gains, could vest.

430. Liang only achieved the fifth revenue milestone as a result of the illicit Obon sales. In the four quarters ending March 31, 2025, the measurement period for the $21 billion milestone,

Super Micro booked approximately $1.73 billion in illicit sales to Obon. Those sales grew from approximately $99.7 million in 4Q24 to approximately $825 million in 3Q25 alone. Excluding the illicit revenue, Super Micro's four-quarter revenue would have fallen approximately $1.16 billion short of the $21 billion threshold.

431. These compensation policies gave Liang especially strong, personal incentives to inflate Super Micro's revenue and deceive investors as to the illicit sources of Super Micro's revenue contributions, because doing so directly rewarded him with extremely lucrative compensation awards in direct proportion to the revenue reported.

432. Defendant Weigand. In addition, during the Class Period, Defendant Weigand's executive compensation plan incentivized him to inflate Super Micro's revenues and stock price. These policies gave Weigand personal incentives to deceive investors, and rewarded Weigand with Performance Cash totaling as follows: (1) $110,060 for FY24; (2) $55,638 for FY25; and (3) $194,255 for FY26. Likewise, Weigand received PRSU payout value as follows: (1) $440,239 for FY24; (2) $222,553 for FY25; and (3) $777,020 for FY26.

433. ***Suspicious Insider Sales.*** Defendants Liang and Weigand capitalized on their fraud by selling more than $39 million of Super Micro stock at prices inflated by the concealed diversion scheme, including approximately $37.44 million between May and July 2025, as illicit Obon revenue neared its peak and before BIS requested a hold on all shipments to Obon in August 2025.

434. Defendant Liang. During the Class Period, Liang sold 700,000 shares for approximately $34.45 million, proceeds that dwarfed his $1 annual salary and departed from the pattern of Liang's trades during the Control Period. Liang's sales were timed to capitalize on the Obon scheme before the AI Diffusion Rules threatened to shut it down. Weeks after the rules were announced, and as Liaw urged Obon to "run fast before May 13," Defendant Liang adopted a 10b5-1 trading plan to sell 500,000 shares, certifying that he knew no undisclosed material adverse information, in the same quarter Super Micro booked approximately $825 million in illicit Obon sales, or 17.9% of total revenue.[13] Defendant Liang could not wait for the new trading plan's 90-

[13] Trades pursuant to such plans are immunized only if the plan is entered into by an insider "[b]efore becoming aware" of material non-public information and is established "in good faith

day cooling off period to expire, so he sold 200,000 shares of stock on May 14, 2025 for proceeds of nearly $9 million. Under Liang's plan, he sold 300,000 shares on June 18, 2025 for approximately $13.5 million; and 200,000 shares on July 28, 2025 for approximately $12 million.

435. Liang designed these trades to be completed, and thus his shares sold, before Super Micro's reported revenue was set to reflect the impact of the illicit sales ending due to the AI Diffusion Rules. Defendant Liang falsely stated in the certification that he was not aware of any material non-public information about Super Micro's dependence on illicit sales, when in fact, he was. Regardless of the false certification itself, the timing of adoption of the trading plan itself and the trades executed thereunder further supports the strong inference of Defendant Liang's scienter. *See supra* §IV.D.6.

436. Defendant Weigand. Weigand's sales followed a similarly suspicious pattern. On May 20, 2025, days after Super Micro shipped approximately $510 million in servers to Obon in three weeks, and eight days after he signed the Company's 3Q25 Form 10-Q, Weigand sold 67,000 shares of stock he already held, outside any trading plan, for approximately $2.95 million, his largest Class Period sale and a departure from his prior practice of option-exercise-and-sell transactions. On May 30, 2025, Weigand entered into a 10b5-1 trading plan to dispose of up to 50,000 shares of common stock by December 1, 2025. Weigand used the plan to sell 25,000 shares in a pair of sales on September 3, 2025, executed at prices between $40 to $41 per share, generating significant proceeds of over $1 million. On September 15, 2025, Weigand sold another 25,000 shares pursuant to the plan, executed at $45.14 per share, generating additional proceeds of over $1.12 million. In entering the 10b5-1 plan, Weigand certified that he knew no undisclosed material adverse information, when in fact he did. Regardless of the false certification itself, the timing of

---

and not as part of a plan or scheme to evade the prohibitions" of the rules. 17 C.F.R. § 240.10b5-1(c)(1)(ii)(A). Rule 10b5-1 requires an insider to, among other things, include a representation in the plan certifying that, on the date of adoption of the plan, he is not in possession of material non-public information about the issuer at the time the plan is adopted. *Id.* § 240.10b5-1(c)(1)(ii)(C)(1). Otherwise, insider trades that do not comply with these provisions and are made on the basis of material nonpublic information about the issuer or its securities, in breach of a duty of confidence owed to the issuer of the security and its shareholders, are a "manipulative or deceptive device" prohibited by Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. *Id.* § 240.10b5-1(a).

adoption of the trading plan itself and the trades executed thereunder further support the strong inference of Defendant Weigand's scienter.

437. Weigand's approximately $5.09 million in proceeds far exceeded his incentive compensation, including approximately $360,000 in performance-based cash compensation over the three fiscal years spanning the Class Period. *See supra* §§IV.D.1, IV.D.6.

438. ***Defendant Liang's Close Control and Personal Involvement.*** Since its founding in 1993, Super Micro has been led by one person—Defendant Liang. Liang is considered so integral to Super Micro's operations that the Company warns in its SEC filings during the Class Period that it may not be able to implement its business strategy without him. Former employees have noted that Liang "approves and looks at everything the company is doing—every new product, marketing effort, sales effort, anything you want to do or promote," and calling Liang a "one-man show." Senior Vice President Don Clegg additionally stated that "If [Liang] says a product will be on schedule, it will be on schedule," and "It's almost as if [Liang] wills things to happen." Liang also had a close personal relationship with Defendant Liaw and was personally responsible for re-hiring him after his involvement in the accounting scandal just a few years earlier. Liang also has failed to find a replacement for Defendant Weigand, even after the Special Committee recommended doing so nearly two years ago and even after the Company publicly committed to following this recommendation immediately. Given Defendant Liang's close involvement in all aspects of Super Micro's operations, his close personal relationship with Defendant Liaw, and his apparent refusal to replace Weigand, it is implausible that he was unaware of Liaw leading a diversion scheme that generated at least $2.5 billion in revenue for the Company. *See supra* §§IV.A.1, IV.C.3.

439. ***Defendant Liaw's Orchestration of the Diversion Scheme.*** Defendant Liaw's direct orchestration of the diversion scheme demonstrates his actual knowledge of the Company's export control violations. Defendant Liaw was intimately involved in orchestrating the scheme to subvert export controls and illegally divert billions of dollars' worth of Super Micro servers containing NVIDIA AI chips to China. The facts revealed by the Indictment demonstrate that Defendant Liaw coordinated directly with executives of Obon on order volumes, timing, and GPU

allocations. Moreover, by June 2024, Liaw recognized Obon's importance to Super Micro's financial performance in meeting quarter-end sales goals, thanking its executives for the "help for June" and promising "[i]n return" to "help [Obon] the whole year." Liaw also directed Obon to transfer tens of millions of dollars to Super Micro so that the Company could place NVIDIA GPU allocation orders and reserve inventory for subsequent diversion to companies in China.

440. In April 2025, Defendant Liaw corresponded with brokers, who had questions about the status of orders for their customers, demonstrating he knew that the brokers were not the ultimate end users of the servers they had ordered. On or about August 6, 2025, a broker sent Liaw a link to a U.S. DOJ press release regarding Chinese nationals who had been arrested for illegally smuggling AI chips to China. Liaw responded by sending sobbing emojis to the broker—clearly demonstrating his recognition that such conduct was both illegal and carried severe punishments—yet continued leading Super Micro's participation in the diversion schemes. *See supra* §IV.D.3.

441. ***Active Efforts to Conceal Misconduct and Export Violations.*** The fact that Defendants personally orchestrated and authorized Super Micro's misconduct and violations of export controls furthers a strong inference of scienter.

442. First, FE-4 explained that Super Micro's leadership deliberately avoided creating documentary evidence of the export scheme. According to FE-4, everything was relayed verbally, a measure to minimize email communication that might expose Super Micro's illicit sales practices. *See supra* §IV.D.5.

443. Second, Defendant Liaw actively obstructed audits. In October 2024, after the rapid growth in orders from Obon prompted Super Micro's compliance team to place a temporary hold on shipments and initiate an audit, Defendant Liaw and Super Micro's general manager, Steven Chang: (i) prevented auditors from physically entering Obon's purported data center facilities; (ii) arranged for an auditor Chang described in writing as "friendly" to conduct the review; (iii) fabricated lease agreements to create the false appearance that Obon had sufficient data center capacity to justify its server purchases; and (iv) staged "dummy" non-working servers to deceive inspectors. And in December 2025, when a BIS export control officer conducted a post-shipment verification of Obon's warehouse, Liaw's fixer, Sun, impersonated a law firm assistant and

presented the officer with dummy servers that had been staged the previous day. *See supra* §IV.D.3.

444. Third, Defendant Weigand was hired to facilitate Super Micro's ongoing schemes, including accounting misconduct and the export diversion schemes described herein. Defendant Weigand was installed as CFO after the Company's prior CFO, Kevin Bauer, internally reported accounting misconduct to Defendant Liang. According to FE-1, Weigand was Defendant Liang's puppet who was complicit in the face of misconduct. FE-3, who ultimately reported to Weigand through her supervisor Kenneth Cheung, corroborated that Super Micro had difficulty finding a CFO who was suitable to work with Defendant Liang because Liang wanted a yes man that would not challenge him. That Weigand was hired for this purpose is further evidenced by the fact that even after the Special Committee recommended he should be replaced in December 2024, Super Micro has still not done so.

445. Liang's deliberate selection of Weigand to serve as CFO in this period where Super Micro resumed its illegal activity, and his failure to follow through on the Company's publicly stated commitment to implement internal recommendations to remove Weigand as CFO, supports scienter. Indeed, Weigand's compensation was subject to the Compensation Adjustment Factor—a subjective determination by Liang—that gave Liang direct, personal influence over Weigand's compensation. *See supra* §§ IV.D.3, IV.D.5.

446. The elaborate nature of the concealment efforts furthers the strong inference of scienter.

447. ***Defendant Liaw's Departure.*** Defendant Liaw's knowledge of the falsity of the Class Period statements to investors and his scienter with respect to the diversion scheme is demonstrated by Defendant Liaw's "resignation" from the Board the day after he was arrested.

448. ***Defendants' Evasive Answers and Specific and Repeated Denials of Export Control Violations.*** When pressed about their compliance with U.S. export laws, Defendants either evaded the questions or specifically and vehemently denied that Super Micro was violating export control regulations.

449. First, on February 16, 2024, in his interview with *Bloomberg Technology*,

Defendant Liang was asked a pointed question about the effects of the IFRs on Super Micro's business. Defendant Liang avoided answering the question directly and instead responded, misleadingly, "We are [a] USA company, located in Silicon Valley … ***for sure we follow the national law. The company complies very well***." *See supra* §IV.C.

450. Second, when *Reuters* published its April 2024 article claiming that Super Micro's servers with restricted GPUs had made their way to China, suggesting they were illegally re-exported, *Reuters* asked Super Micro if these claims were true. In response to *Reuters'* inquiry, Super Micro emphatically stated that it "complied with U.S. requirements on the sale and export of GPU systems," and went "above and beyond what U.S. export restrictions require." *See supra* §IV.C.

451. Third, Defendants also swiftly denied the allegations in the Hindenburg Report concerning illegal sales of servers to Russia, dismissing those allegations as mere "rumors and speculation" in response to multiple press inquiries and telling analysts that "there is a detailed process in place both from Super Micro (and Nvidia) to check customer background before approving orders" which would ensure against potential export control violations. *See supra* §IV.C.

452. Fourth, when a December 2024 article from *The Information* again claimed that Super Micro's chips were making their way to China through an illegal smuggling ring, Super Micro denied any knowledge or involvement in the smuggling, stating, "the company 'follows all U.S. export control requirements on the sale and export' of Nvidia chips. 'If we become aware that a third party has exported or reexported without the required licenses, we investigate and take appropriate action.'" *See supra* §IV.C. The fact that Defendants specifically denied any violations of U.S. export laws—and doubled down on their denials—in the face of reports that Super Micro's servers had made their way to Russia and China supports an inference that they were at least deliberately reckless in not knowing that these denials were false.

## VIII. LOSS CAUSATION

453. Defendants' materially false and misleading statements, material omissions, and fraudulent conduct, as alleged herein, directly and proximately caused the economic loss suffered

by Lead Plaintiffs and the Class.

454. As a result of Defendants' materially false or misleading statements, material omissions, and fraudulent conduct, Super Micro Securities traded at artificially inflated prices during the Class Period (or in the case of Super Micro put options, artificially deflated their prices). Defendants' misrepresentations and omissions of material fact and fraudulent courses of conduct directly and proximately caused the price of Super Micro Securities to trade at artificially inflated prices (or, in the case of put options, artificially deflated prices) during the Class Period.

455. Relying on the integrity of the market price for Super Micro Securities and public information relating to Super Micro, Lead Plaintiffs and other Class members transacted in Super Micro Securities at artificially inflated prices (or, in the cases of put options, artificially deflated prices) that incorporated and reflected Defendants' misrepresentations, material omissions, and fraudulent courses of conduct alleged herein. As a result of their transactions in Super Micro Securities during the Class Period at artificially affected prices, and the removal of the inflation (or, in the case of put options, deflation) upon the disclosures set forth below, Lead Plaintiffs and the Class suffered economic loss, *i.e.* damages, under the federal securities laws.

456. Absent Defendants' misrepresentations and omissions of material fact and fraudulent courses of conduct, Lead Plaintiffs and other Class members would not have purchased or otherwise acquired their Super Micro Securities at the artificially affected prices at which they traded. It was entirely foreseeable to Defendants that misrepresenting and concealing material facts from the public and engaging in fraudulent courses of conduct would artificially affect the prices of Super Micro Securities and/or maintain artificial inflation (or in the case of Super Micro put options, artificial deflation in the price of these securities). The economic losses (*i.e.*, damages) suffered by Lead Plaintiffs and other Class members were a direct, proximate, and foreseeable result of Defendants' materially false and misleading statements and omissions of material fact and fraudulent courses of conduct, which artificially affected the price of Super Micro Securities and/or maintained the artificial impact in Super Micro Securities, and of the subsequent significant changes in the price of Super Micro Securities when the relevant truth was revealed and/or the risks previously concealed by Defendants' material misrepresentations and omissions and

fraudulent courses of conduct materialized, as set forth below and in Section IV.F.

457. Under Lead Plaintiffs' theory of liability, Defendants' statements created the misleading impression that Super Micro complied with U.S. export laws. Defendants' statements also created the misleading impression that Super Micro's growth during the Class Period was driven by legitimate or sustainable business factors, and that any restrictions on its sales to China had little impact on its growth, as those sales were responsible for less than 1% of the Company's revenue. In reality, as explained herein, Super Micro did not comply with U.S. export laws and was engaged in a scheme to illegally divert shipments of its servers containing restricted chips to China. These illegal sales, which totaled at least $2.5 billion, contributed significantly to Super Micro's revenue growth, but also exposed the Company to heightened (but undisclosed) risks, and part of Super Micro's reported growth and revenue was neither legitimate nor sustainable.

458. The concealed, misleading, and misrepresented facts concerning Super Micro's illegal diversion scheme and the extent that sales resulting from that scheme contributed to Super Micro's revenue were revealed through the disclosure of new information concerning Super Micro and the Super Micro Securities on: (1) March 19, 2026; (2) June 9, 2026; and (3) June 29, 2026. These disclosures caused the artificial inflation (or in the case of Super Micro put options, artificial deflation) in the price of Super Micro Securities to be removed, proximately causing Plaintiffs and other Class members to suffer actual economic loss. The timing and magnitude of the price changes of Super Micro Securities, as detailed herein, negate any inference that the loss suffered by Lead Plaintiffs and the Class was caused by changed market conditions or other macroeconomic factors unrelated to Defendants' misrepresentations and omissions and fraudulent conduct.

## A. Price Declines In Super Micro Common Stock

### 1. March 19, 2026

459. On March 19, 2026, investors began to learn the relevant truth concealed by Defendants' misstatements and fraudulent courses of conduct regarding Super Micro's diversion scheme.

460. On March 19, 2026, after market close, federal agents arrested Super Micro co-founder, board member, and Senior Vice President of Business Development, Defendant Liaw,

and DOJ unsealed the Indictment charging Liaw, a manager at Super Micro's Taiwan office, Chang, and a Super Micro contractor for allegedly conspiring to divert Super Micro computer servers integrating sophisticated AI technology to companies in China, in violation of U.S. export control rules. The Indictment alleged that, beginning in or about 2024, the indicted individuals participated in a scheme that "caused the sale of at least approximately $2.5 billion worth" of Super Micro servers to Obon, which were ultimately diverted to companies in China.

461. On this news, the price of Super Micro common stock declined by $10.26 per share, or 33.32%, from a closing price of $30.79 on March 19, 2026, to a closing price of $20.53 on March 20, 2026.

462. On March 20, 2026, Bloomberg published an article titled, "Super Micro Makes Changes After Smuggling Scandal Crushes Stock." In the article, Bloomberg reported "Super Micro shares fell 33% to $20.53 in the wake of the indictment, reducing the company's market value by more than $6 billion. It was the worst single-day rout for the San Jose, California-based company since October 2018."

463. Analysts were shocked by the disclosures contained in the DOJ Indictment. For example, CFRA noted that "these new violations look more like a structural problem than a one-off mistake, further damaging the company's already weak credibility, especially given the direct involvement of co-founder Wally Liaw." CFRA thus downgraded Super Micro from Buy to Sell, slashing its price target from $40 to $16, while projecting up to $5 billion in regulatory penalties. Similarly, Northland Capital Markets downgraded Super Micro's investment rating, observing that "this is the 2nd time Wally Liaw's sales practices have led to investigations."

464. In another report, Raymond James analysts characterized the DOJ Indictment as "a bad look" for "a company with a tarnished history," explaining that the incident "introduces a new legal/compliance overhang on top of pre-existing concerns (accounting delays, internal control weaknesses, related-party risk)." Raymond James further cautioned that Super Micro's "reputational discount" now extended "from financial reporting credibility to export-control governance and board oversight, particularly given involvement of a board member." Analysts from Bernstein questioned whether Super Micro could maintain credibility, observing that "[i]t's

one thing being duped once by rogue employees (allegedly) committing crime right under your nose, but it's quite another hiring the same person back (as a board director too) and later for that same person to (allegedly) do something worse like this." Bernstein asked sardonically: "Do we need to add a smuggling line to our SMCI revenue build?"

465. Analysts with Washington Analysis issued a March 20, 2026 report titled "SMCI: Quantifying Export Control Risk" which stated their belief that "the stock should discount further on the following events: 1. A minimum $1 billion fine, with high end potentially reaching $5 billion" given that BIS "has discretion to look at other sales beyond the criminal complaint . . . 2. Compliance and regulatory requirements impairing ongoing Asia-Pacific business by preventing the company from taking orders for chips it previously would have accepted" and "3. Potential replacement of the board and/or management."

466. Additionally, Argus issued a March 20, 2026 report titled, "Lowering to HOLD on AI smuggling allegations" that attributed the decline in Super Micro's common stock to the indictment of "company employees, including a co-founder/board member, and an outside contractor with a scheme to smuggle prohibited AI technology into China." Argus further stated: "The new charges, though leveled against employees not the company itself, reawaken echoes of past missteps by the company on revenue delivery, margin shortfalls, and near-de-listing on the Nasdaq exchange." Per Argus, "[t]he charges overshadow strong fiscal 2Q26 results and FY26 guidance, reported in February 2026" and "the latest alleged missteps suggest the stock will not trade on fundamentals in the intermediate term." Argus also identified "at least some risk that Super Micro could have less-preferred access to next-generation Vera Rubin technology from Nvidia or might face further restrictions and/or monitoring of its operations." The Argus report concluded by reiterating Super Micro's assertion that "it maintains a robust compliance program and is committed to full adherence to all applicable U.S. export and re-export control laws and regulations."

467. In a March 23, 2026 report titled, "Indictment of SMCI employees adds risks to revenues; lowering PO to $24," Bank of America wrote that the Indictment was "another negative on Supermicro's brand" which could "lead to: 1) some suppliers restricting Supermicro's access

to components (including GPUs) or asking for more compliance checks, 2) some customers pausing orders or awarding contracts to competitors" and "3) more regulatory scrutiny." Loop Capital also lowered its price target to $50 per share from $60 per share "to account for an impact to SMCI's P/E as it navigates through the indictments of two employees, including a co-founding Board member (not great)." Also on March 23, 2026, Seaport Research Partners issued a report regarding NVIDIA titled, "World Shocked to Find Super Micro Executives Allegedly Smuggling to [China]."

468. The March 19, 2026 disclosure of the Indictment revealed that, for example, contrary to Defendants' representations that Super Micro "complied with U.S. requirements on the sale and export of GPU systems," Super Micro violated U.S. export laws through its scheme to divert chips containing restricted GPUs to China. Moreover, contrary to Defendants' statements that Super Micro took "appropriate action" whenever it became aware of any such violations and went "above and beyond what U.S. export restrictions require," the Company took steps to conceal its violations of U.S. export laws, including by actively obstructing BIS and other compliance audits. In addition, the disclosure revealed that, contrary to Defendants' statements downplaying the role of Super Micro's China sales and attributing Super Micro's revenue growth to legitimate factors, Super Micro's illicit sales were a significant driver of revenue for the Company during the Class Period. Despite this disclosure, however, the price of Super Micro Securities remained artificially affected because the market still did not know the full scope of consequences of Super Micro's illicit sales scheme.

**2. June 9, 2026**

469. In June 2026, investors continued to learn the relevant truth concealed by Defendants' misrepresentations, omissions, and fraudulent courses of conduct regarding Super Micro's diversion scheme.

470. On June 9, 2026, after market close, Super Micro filed the June 2026 Form 8-K, which notified investors that it had updated the risk factors disclosed in other SEC filings. In the June 2026 Form 8-K, Super Micro revealed that it had "received a subpoena from the SEC requesting the production of documents relating to certain customers, including one customer that

is the subject of the allegations in the Indictment, and the Company's controls and procedures." The filing further disclosed that Super Micro had received a grand jury subpoena from the U.S. Attorney's Office for the Southern District of New York, as well as subpoenas from U.S. Attorney's Offices for the Eastern District of New York and the Central District of California. Super Micro also disclosed that BIS had issued multiple subpoenas and warned that BIS "could seek to suspend, revoke or deny [the Company's] export privileges."

471. In response to this news, the price of Super Micro common stock declined by $11.37 per share, or approximately 28%, from a closing price of $40.64 on June 9, 2026, to a closing price of $29.27 on June 10, 2026.

472. Analysts connected this decline to the disclosure of information concerning the scope and timing of additional criminal and regulatory investigations, including the SEC subpoena. For example, a June 11, 2026 report from Wolfe Research noted that "Super Micro's Issues Present Supply, Demand, and Regulatory Risks," including because Super Micro had "received a subpoena from the SEC relating to the situation," which meant it was "possible that other senior managers at Super Micro could become involved in the case." In a June 10, 2026 research note, analysts at CFRA, maintaining a "Strong Sell" rating, called the disclosures "a big red flag given the ongoing BIS investigation."

473. The June 9, 2026 disclosure revealed additional detail about the potential scope of Defendants' violations of U.S. export laws, which were not revealed by the March 19, 2026 disclosure. Specifically, the disclosure further revealed the scope and severity of wrongdoing by Super Micro and its executives (other than Liaw), with criminal and regulatory investigations focused not just on the indicted individuals but the Company's conduct in violation of U.S. export control laws.

**3. June 29, 2026**

474. On June 29, 2026, Taiwanese government authorities raided Super Micro's offices in Taiwan and the offices of several affiliated companies. Taiwan's Keelung District Prosecutors Office announced that local investigators had raided the residences of six individuals and the sites of three affiliated companies as part of an ongoing probe into the allegedly illegal export of Super

Micro's servers containing NVIDIA AI chips to companies in China. Authorities confirmed that some servers had been successfully sent to companies in China, while approximately 50 additional servers had been seized before they could leave Taiwan. Four Super Micro Taiwan employees were detained for questioning.

475. In response to these disclosures, the price of Super Micro common stock declined by $2.48 per share, or approximately 8.1%, from a closing price of $30.63 on June 26, 2026 (Friday), to a closing price of $28.15 on June 29, 2026 (Monday).

476. Media outlets reporting on this development noted the connection between news of the raid and Super Micro's price declines. For example, in a June 29, 2026 article titled, "Taiwan Raids Super Micro in Widening China Chip Smuggling Probe," Bloomberg reported that following the reports of the raid, "shares of Super Micro . . . fell [8%] in US trading."

477. The June 29, 2026 disclosure of Taiwan's raids revealed that, contrary to Defendants' statements assuring that Super Micro complied with U.S. export laws and denying that Super Micro was involved in any chip smuggling scheme, Super Micro's illicit sales scheme extended far beyond what had previously been disclosed: in addition to diversions through Thailand, the scheme extended to operations through Taiwan, and nine individuals were now under investigation, up from three previously.

### B. Price Declines In Super Micro Convertible Notes and Options

Like its common stock price, the prices of Super Micro's convertible notes and options similarly reacted to the above disclosures:[14]

[14] Note prices herein are based on data from FINRA's Trade Reporting and Compliance Engine, which records all secondary-market trades in such notes.

| | Security Price Decline ($, %) | | | |
|---|---|---|---|---|
| **Corrective disclosure impact date** | **Common Stock** | **0.00% Convertible Note** | **2.25% Convertible Note** | **3.50% Convertible Note** |
| March 20, 2026 | $10.26<br>33.32% | $201.92<br>23.32% | $131.22<br>13.44% | $137.92<br>15.02% |
| June 10, 2026 | $11.37<br>27.98% | $113.85<br>11.04% | $99.37<br>9.04%[15] | $104.47<br>10.14%[16] |
| June 29, 2026 | $2.48<br>8.1% | $59.48<br>6.38%[17] | $38.02<br>3.76%[18] | $20.53<br>2.18%[19] |

478. The prices of the Company's options rose and fell in correspondence with the movements of the common stock price and for the same reasons set forth herein, the disclosures on each date listed above proximately caused loss and damage to investors in those options.

## IX. DEFENDANTS' INSIDER TRADES IN VIOLATION OF SECTION 20A OF THE EXCHANGE ACT

479. The Insider Trading Defendants sold shares of Super Micro common stock while aware, in possession, and on the basis of material, nonpublic adverse information concerning, among other things, Super Micro's participation in the illegal diversion scheme described herein, the Company's reliance on billions of dollars in revenue derived from illicit sales to companies in China, and the material risks to the Company's business, financial condition, and compliance deficiencies related to those violations. The Insider Trading Defendants were required to abstain from trading or disclose this material nonpublic adverse information, but failed to do so, as more fully alleged herein.

480. Contemporaneously with the Insider Trading Defendants' sales of Super Micro common stock, certain Lead Plaintiffs and other Class members purchased shares of Super Micro common stock.

[15] Calculated based on change in closing prices from June 8, 2026 to June 10, 2026.

[16] Calculated based on change in closing prices from June 4, 2026 to June 10, 2026.

[17] Calculated based on change in closing prices from June 25, 2026 to July 1, 2026.

[18] Calculated based on change in closing prices from June 25, 2026 to June 29, 2026.

[19] Calculated based on change in closing prices from June 25, 2026 to June 29, 2026.

481. In particular, Lead Plaintiffs purchased Super Micro common stock contemporaneously with several of Insider Trading Defendants' sales, as follows:

| **Defendant Weigand Sale** | | | **Handelsbanken Contemporaneous Purchase** | | |
|---|---|---|---|---|---|
| **Sale Dates** | **Shares Sold** | **Price Per Share** | **Purchase Dates** | **Shares Purchased** | **Price Per Share** |
| 5/20/2025 | 67,000 | $44.02 | 5/21/2025 | 49,498 | $41.65 |

| **Defendant Weigand Sale** | | | **Storebrand Contemporaneous Purchase** | | |
|---|---|---|---|---|---|
| **Sale Dates** | **Shares Sold** | **Price Per Share** | **Purchase Dates** | **Shares Purchased** | **Price Per Share** |
| 5/20/2025 | 67,000 | $44.02 | 5/22/2025 | 952 | $41.32 |

| **Defendant Liang Sale** | | | **MissPERS Contemporaneous Purchase** | | |
|---|---|---|---|---|---|
| **Sale Dates** | **Shares Sold** | **Price Per Share** | **Purchase Dates** | **Shares Purchased** | **Price Per Share** |
| 6/18/2025 | 300,000 | $45.00 | 6/20/2025 | 1,284 | $45.32 |

| **Defendant Liang Sale** | | | **Handelsbanken Contemporaneous Purchase** | | |
|---|---|---|---|---|---|
| **Sale Dates** | **Shares Sold** | **Price Per Share** | **Purchase Dates** | **Shares Purchased** | **Price Per Share** |
| 7/28/2025 | 200,000 | $60.00 | 7/29/2025 | 2,101 | $60.75 |

| **Defendant Liang Sale** | | | **Storebrand Contemporaneous Purchase** | | |
|---|---|---|---|---|---|
| **Sale Dates** | **Shares Sold** | **Price Per Share** | **Purchase Dates** | **Shares Purchased** | **Price Per Share** |
| 7/28/2025 | 200,000 | $60.00 | 7/30/2025 | 333 | $60.71 |

## X. CLASS ACTION ALLEGATIONS

482. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of January 31, 2026, Super Micro had nearly 599 million shares of

common stock outstanding, owned by thousands of investors. Super Micro convertible senior notes and options were traded regularly by thousands of investors who accrued losses during the Class Period. Record owners and other members of the Class may be identified from records maintained by Super Micro or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

483. Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class—all persons and entities that purchased or otherwise acquired Super Micro Securities during the Class Period, including common stock, convertible senior notes, call options, and put options, and were damaged thereby. Excluded from the Class are Defendants, their affiliates, the officers and directors of Super Micro at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

484. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to members of the Class which predominate over questions which may affect individual Class members include:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Super Micro;

(c) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether Defendants knew or deliberately recklessly disregarded that their statements and/or omissions were false and misleading;

(e) whether Defendants' conduct impacted the price of Super Micro common stock;

(f) whether Defendants' conduct caused the members of the Class to sustain damages; and

(g) the extent of damage sustained by Class members and the proper measure of damages.

485. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of

federal law that is complained of herein. Lead Plaintiffs, like all other members of the Class, purchased or otherwise acquired Super Micro Securities during the Class Period at prices artificially inflated, maintained, or depressed by Defendants' materially false and misleading statements and/or omissions and were damaged as a result.

486. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests which conflict with those of the Class.

487. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. A PRESUMPTION OF RELIANCE APPLIES

488. The Class is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Super Micro Securities was efficient for the following reasons, among others:

(a) Super Micro common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market. Super Micro senior convertible notes traded actively, including on both the over-the-counter market and on electronic trading platforms operated domestically. Super Micro options traded at high volume on national securities exchanges, including Nasdaq and the CBOE;

(b) Super Micro Securities traded at high weekly volumes;

(c) As a regulated issuer, Super Micro filed periodic reports with the SEC;

(d) Super Micro was eligible to and did file registration statements with the SEC on Form S-3;

(e) Super Micro regularly and publicly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(f) Super Micro and its Securities were followed by numerous securities analysts employed by major brokerage firms who wrote public reports which were distributed to those brokerage firms' sales force and certain customers, and the public;

(g) There was a cause and effect relationship between unexpected corporate events or financial releases and movements in Super Micro's Securities prices;

(h) The material representations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Super Micro Securities; and

(i) Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other Class members purchased or acquired Super Micro Securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

489. As a result of the foregoing, the market for Super Micro Securities reasonably promptly digested current information regarding Super Micro from all publicly available sources and reflected such information in the price of Super Micro Securities during the Class Period. Under these circumstances, all purchasers of Super Micro Securities during the Class Period suffered similar injury through their purchase of Super Micro Securities at artificially inflated prices, and a Class-wide presumption of reliance applies.

490. A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose, so positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Super Micro's export compliance and related subjects, and the impact Super Micro's export non-compliance and diversion schemes could have on the Company's future revenue, that requirement is satisfied here.

## XII. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

491. The PSLRA's statutory safe harbor and the bespeaks caution doctrine applicable to forward looking statements under certain circumstances do not apply to any of the materially false

and misleading statements alleged herein.

492. None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time such statement was made.

493. To the extent that any of the materially false and misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.

494. To the extent that the statutory safe harbor does apply to any forward-looking statement alleged herein, Defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading, and/or the statement was authorized and/or approved by an executive officer of Super Micro who actually knew that such statement was false when made.

495. Moreover, to the extent that any Defendant issued any disclosures purportedly designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false and/or misleading when made because they did not disclose that the possible circumstances described as risks that were the subject of such warnings had already occurred and because such Defendant had the requisite state of mind.

## XIII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

### For Violations Of Section 10(b) Of The Exchange Act And SEC Rule 10b-5(b) (Against All Defendants)

496. Lead Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein. During the Class Period, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b).

497. This count is asserted on behalf of all members of the Class against Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5(b), 17 C.F.R. § 240.10b-5.

498. During the Class Period, Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, intentionally or with reckless disregard for the truth, made the material false and misleading statements specified above in Section V, which were false and/or misleading in that they contained misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in connection with the purchase or sale of the Super Micro Securities.

499. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or were deliberately reckless in not knowing the true facts that were available to them.

500. Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Super Micro common stock, convertible notes, or call options and/or wrote Super Micro put options at artificially deflated prices. Lead Plaintiffs and the Class would not have transacted in Super Micro Securities at the prices they did, or transacted at all, had they been aware that the market prices for Super Micro Securities had been artificially affected by Defendants' fraudulent courses of conduct.

501. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective transactions in Super Micro Securities during the Class Period.

502. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

**COUNT II**

**For Violations of Section 10(b) Of The Exchange Act And SEC Rule 10b-5(a) & (c)**
**(Against All Defendants)**

503. Lead Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein.

504. This count is asserted on behalf of all members of the Class against Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rules 10b-5(a) and

(c), 17 C.F.R. § 240.10b-5.

505. During the Class Period, Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, intentionally or with reckless disregard for the truth, employed devices, schemes, and artifices to defraud, and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Lead Plaintiffs and the Class, including the materially false and misleading statements described above in Section V and the conduct specified above in Sections IV and VI, which deceived the investing public, including Lead Plaintiffs and the Class, regarding, among other things, the Super Micro Securities, artificially inflated and maintained the market price of the Super Micro Securities, and caused Lead Plaintiffs and the other members of the Class to purchase or otherwise transact in the Super Micro Securities and suffer losses when the true facts became known.

506. Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Super Micro common stock, convertible notes, or call options and/or wrote Super Micro put options at artificially deflated prices. Lead Plaintiffs and the Class would not have transacted in Super Micro Securities at the prices they did, or transacted at all, had they been aware that the market prices for Super Micro Securities had been artificially affected by Defendants' fraudulent courses of conduct.

507. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective transactions in Super Micro Securities during the Class Period.

508. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

## COUNT III

### For Violations Of Section 20(a) Of The Exchange Act
### (Against The Individual Defendants)

509. Lead Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein.

510. This count is asserted on behalf of all members of the Class against Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

511. Defendants Liang, Liaw, and Weigand acted as controlling persons of Super Micro within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

512. By reason of their high-level positions of control and authority as the Company's most senior officers, Defendants Liang, Liaw, and Weigand had the authority to influence and control, and did influence and control, the decision-making and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. Defendants Liang, Liaw, and Weigand were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Super Micro during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein. Defendants Liang, Liaw, and Weigand were the principal Super Micro officers who communicated with investors on earnings calls and at investor conferences on the Company's behalf. Defendants Liang, Liaw, and Weigand were provided with, or had unlimited access to, copies of the Company's press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were made and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

513. Defendants Liang, Liaw, and Weigand spoke to investors on behalf of the Company during the Class Period. Therefore, Defendants Liang, Liaw, and Weigand were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Super Micro during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

514. As set forth above, Super Micro violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

515. By virtue of their positions as controlling persons of Super Micro and as a result of their own aforementioned conduct, Defendants Liang, Liaw, and Weigand are liable pursuant to

Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Super Micro Securities. As detailed above, during all relevant times, Defendants Liang, Liaw, and Weigand were executive and senior officers of Super Micro, and/or members of the Board of Directors.

516. As a direct and proximate result of Defendants Liang's, Liaw's, and Weigand's conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their transactions in Super Micro Securities.

**COUNT IV**

**For Violations Of Section 20A Of The Exchange Act**
**(Against Defendants Liang and Weigand)**

517. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

518. This count is asserted for violations of Section 20A of the Exchange Act, 15 U.S.C. § 78t-1 on behalf of Plaintiffs and all other members of the Class who purchased shares of Super Micro common stock contemporaneously with the sale of Super Micro common stock by Defendants while they were in possession of material, nonpublic adverse information as alleged herein.

519. Section 20A of the Exchange Act provides that:

> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

520. As set forth herein, Defendants Liang and Weigand violated §10(b) of the Exchange Act, Rule 10b-5 and §20(a) of the Exchange Act for the reasons stated in Counts I and II above. Additionally, Defendants further violated §10(b) of the Exchange Act, Rule 10b-5, and Rule 10b5-1 (17 C.F.R. § 240.10b5-1) by selling shares of Super Micro common stock while in possession

of material, nonpublic adverse information concerning Super Micro's illicit sales and participation in the diversion schemes and which they failed to disclose in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as more fully alleged herein.

521. Contemporaneously with Defendants' Class Period sales of Super Micro stock, each Lead Plaintiff engaged in purchases, as set forth above in Section IX. These transactions occurred on a national securities exchange and in an open and efficient market, while Defendants were in possession of material, nonpublic adverse information they had a duty to disclose, but failed to disclose.

522. Other Class members also purchased shares of Super Micro common stock contemporaneously with Defendants' insider sales of Super Micro common stock.

523. Plaintiffs and other Class members have been damaged as a result of the violations of the Exchange Act alleged herein.

524. By reason of the violations of the Exchange Act alleged herein, Defendants are liable to Plaintiffs and other members of the Class who purchased shares of Super Micro common stock contemporaneously with Defendants' sales of Super Micro common stock during the Class Period.

525. Plaintiffs and other members of the Class who purchased contemporaneously with Defendants' insider sales of Super Micro securities seek disgorgement by Defendants of profits gained or losses avoided from Defendants' transactions in Super Micro common stock contemporaneous with Plaintiffs and the other members of the Class.

526. This action was brought within five years after the date of the last transaction that is the subject of Defendants' violations of Section 20A, and, with respect to the underlying violations of the Exchange Act alleged in this Count and in Count I above, was brought within five years after the date of the last transaction that violated Section 20A of the Exchange Act by Defendants.

## XIV. PRAYER FOR RELIEF

527. WHEREFORE, Lead Plaintiffs pray for judgment as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b) Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d) Awarding such equitable, injunctive or other further relief as the Court may deem just and proper.

## XV. JURY DEMAND

528. Lead Plaintiffs hereby demand a trial by jury.

Dated: October 9, 2026

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ James A. Harrod*
Salvatore J. Graziano*
Hannah G. Ross*
James A. Harrod*
Scott R. Foglietta*
Jorge G. Tenreiro*
Alexander Noble*
Sarah K. Schmidt*
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
hannah@blbglaw.com
jim.harrod@blbglaw.com
scott.foglietta@blbglaw.com
jorge.tenreiro@blbglaw.com
alexander.noble@blbglaw.com
sarah.schmidt@blbglaw.com

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Jennifer L. Joost (Bar No. 296164)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel: (415) 400-3000
Fax: (415) 400-3001
jjoost@ktmc.com

Sharan Nirmul*
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
snirmul@ktmc.com

*Counsel for Lead Plaintiffs and Proposed Lead Counsel for the Class*

**DAVIDSON BOWIE, PLLC**
John L. Davidson (*pro hac vice* forthcoming)
1062 Highland Colony Parkway
200 Concourse, Suite 275
Ridgeland, MS 39157
Telephone: (601) 932-0028
jdavidson@dbslawfirm.net

*Additional Counsel for Co-Lead Plaintiff Public Employees' Retirement System of Mississippi*

**MOTLEY RICE LLP**
Serena P. Hallowell*
800 Third Ave., Suite 2401
New York, NY 10022
Tel: 212.577.0040
Fax: 212.577.0054
shallowell@motleyrice.com

Lance V. Oliver*
Andrew P. Arnold*
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Tel: 843.216.9000
Fax: 843.216.9450
loliver@motleyrice.com
aarnold@motleyrice.com

*Counsel for Additional Named Plaintiff Arkansas Teacher Retirement System*

*admitted *pro hac vice*